IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MINERALS MANAGEMENT SERVICE; | ) | C.A. No. 10-254 |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR; and KEN SALAZAR, | ) | |
| Secretary of the Interior, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Defenders of Wildlife, by and through its undersigned counsel of record, files

this Complaint.  Pursuant to Local Rule 3.4, Plaintiff Defenders of Wildlife's Disclosure

Statement is attached hereto as Exhibit 1.

## **INTRODUCTION**

1.  This action challenges the defendants' violations of the National Environmental Policy

Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq*., and the Administrative Procedure Act

("APA"), U.S.C. §§ 551 *et seq*., in connection with defendant Minerals Management Service's

("MMS") authorization of exploratory drilling operations for oil and gas leases in the Gulf of

Mexico, including the authorization of BP's Deepwater Horizon exploratory drilling operation

("Deepwater Horizon").  As is readily apparent from the April 20, 2010 blowout at the

Deepwater Horizon, which has resulted in the release of over 5 million gallons of oil into the

waters of the Gulf of Mexico, exploratory drilling operations are actions that can individually

and cumulatively have a significant effect on the environment.  Despite this fact, MMS routinely

grants "categorical exclusions" from NEPA review to exploratory drilling operations on the basis that these drilling operations are not likely to have a significant effect on the environment.  In violation of NEPA and its own regulations, MMS has authorized additional categorical exclusions for over twenty exploratory wells and drilling operations in the Gulf since the April 20, 2010 blowout, with over fifteen of these exploratory wells in waters classified as "deepwater" pursuant to MMS regulations. See Map of Categorical Exclusions for Drilling Operations, attached as Exhibit 2.  In violation of NEPA and its implementing regulations, MMS has also failed to prepare a Supplemental Environmental Impact Statement in response to the significant new information presented by the Deepwater Horizon incident.

2.   Plaintiff Defenders of Wildlife ("Defenders") seeks a declaration that Defendants MMS, the Department of the Interior, and Ken Salazar, Secretary of the Interior (collectively hereinafter "MMS") have acted arbitrarily and capriciously and have violated NEPA and its implementing regulations by granting categorical exclusions to exploratory wells and drilling operations authorized since April 20, 2010.  Defenders also seeks a declaration that MMS's Handbook authorizing categorical exclusions for exploratory wells and drilling operations is arbitrary, capricious, and not in accordance with law.  Defenders seeks a vacatur and remand of all categorical exclusions granted to exploratory wells and drilling operations since April 20, 2010, and an injunction barring MMS from issuing any further categorical exclusions for exploratory wells and drilling operations in the Gulf of Mexico given the significant impacts that these operations can have, both individually and cumulatively, on the environment. Finally, Defenders seeks vacatur and remand of the Gulf of Mexico OCS Oil and Gas Lease Sales: 2007-2012 Environmental Impact Statement and an injunction of all future lease sales authorized therein until such time as a Supplemental Environmental Impact Statement has been prepared.

## JURISDICTION AND VENUE

3.   Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (federal officer action), 28 U.S.C. §§ 2201 and 2202 (declaratory judgment), 5 U.S.C. §§ 551 *et seq*. (APA), and 42 U.S.C. §§ 4321 *et seq*. (NEPA).

4.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).  The Deepwater Horizon blowout has resulted in the discharge of at least 5 million gallons of oil in Gulf of Mexico waters, and balls of tar from the spill have already begun washing up on Dauphin Island, Alabama.  The spill threatens the unique coastal resources of the State of Alabama, including the Bon Secour National Wildlife Refuge in Gulf Shores, Alabama which contains 7,000 acres of wildlife habitat for migratory birds, nesting sea turtles and the endangered Alabama beach mouse.  In addition, the categorical exclusions granted since the Deepwater incident also threaten these resources.  Therefore, a substantial part of the events giving rise to the claim are occurring in this district.

## PARTIES

**A**.   **Plaintiffs**

5.   Plaintiff Defenders of Wildlife is a national nonprofit organization dedicated to the protection and restoration of all native wild animals and plants in their natural communities. Based in Washington, D.C., and with offices spanning from Florida to Alaska, Defenders has over 415,000 members across the nation, including over 34,000 members from the states of Louisiana, Mississippi, Alabama, and Florida.  Defenders is a leader in the conservation community's efforts to protect and recover threatened and endangered species, including sea turtles, whales, birds, and manatees impacted by the Deepwater Horizon spill and other Gulf OCS activities.

6.   Defenders' members regularly use, enjoy, and benefit from healthy coastal and marine ecosystems and the presence of diverse coastal and marine life, including the threatened and endangered birds, whales, sea turtles, marine mammals, and other marine species that are likely to be killed, injured, or disturbed by exploratory drilling operations, and the risks inherent in such operations, in the Gulf of Mexico.  Defenders' members derive recreational, aesthetic, economic and scientific benefits from coastal and marine life in the Gulf of Mexico.  MMS's failure to comply with federal law and the resulting harm to the coastal and marine environments, including the disturbance, injury, and death of coastal and marine life that is likely to result from that failure, harms the interests of Defenders' members.

**B.     Defendants**

7.   Defendant Minerals Management Service ("MMS") is an agency within the Department of the Interior that is charged with the management and oversight of the federal oil, natural gas and other mineral resources on the Outer Continental Shelf ("OCS"), including the permitting and issuing of oil and gas leases on the OCS and enforcing environmental regulations related to such leases.

8.   Defendant Department of the Interior ("Interior") is an executive branch agency of the United States Government and is responsible for managing the resources under its jurisdiction in accordance with all applicable laws and regulations.

9.   Defendant Ken Salazar is the Secretary of the Department of the Interior ("the Secretary"), and is sued in his official capacity as the head of the federal agency that took the actions challenged pursuant to the APA and NEPA.

## LEGAL BACKGROUND

### A.  National Environmental Policy Act (NEPA)

10. Congress enacted NEPA to "promote efforts which will prevent or eliminate damages to the environment . . . ."  42 U.S.C. § 4321.  To achieve this goal, NEPA requires federal agencies to fully consider and disclose the environmental consequences of an agency action before proceeding with that action.  See id. § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.  Agencies' evaluation of environmental consequences must be based on scientific information that is both "[a]ccurate" and of "high quality."  40 C.F.R. § 1500.1(b).  In addition, federal agencies must notify the public of proposed projects and allow the public the chance to comment on the environmental impacts of their actions.  See id. § 1506.6.

11.  The cornerstone of NEPA is the environmental impact statement ("EIS").  An EIS is required for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  The EIS must provide a "full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

12. An agency must prepare a supplemental EIS when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  Id. § 1502.9(c)(1)(ii).  Whether new circumstances are significant depends on a number of factors, including "[t]he degree to which the proposed action affects public health or safety,"  "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[t]he degree to which the action . . .  may

cause loss or destruction of significant scientific, cultural, or historical resources."  Id. § 1508.27(b).

### 1.  Categorical Exclusions Under NEPA

13. An agency may comply with NEPA for any action by: (1) preparing an EIS for actions which significantly affect the quality of the human environment; (2) preparing a less extensive environmental assessment ("EA") and making a finding of no significant impact on the environment ("FONSI"); or (3) documenting that the action falls within an established categorical exclusion.  See id. § 1501.4.

14. A "categorical exclusion" is defined as a category of actions which "do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations…."  See id. § 1508.4.  Thus, a categorical exclusion is only permitted where an agency concludes that there will be no "significant effect on the human environment" from a given course of action.  Id.

15.  This definition of "categorical exclusion" mandates that an agency make allowances for "extraordinary circumstances in which a normally excluded action may have a significant environmental effect."  Id.  In such cases, the agency must perform an EA or EIS to ensure that impacts are accounted for.

16. An agency must provide a reasoned explanation for both its reliance on a categorical exclusion and its conclusion that no "extraordinary circumstances" exist to preclude application of the categorical exclusion.  See Jones v. Gordon, 792 F.2d 821, 828 (9th Cir. 1986) ("An agency cannot . . . avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment. … [T]he

6

Service, in issuing the permit, provided no reasoned explanation – indeed, no explanation at all –

of how these conditions would prevent application of an exception to the categorical

exclusions."); Cal. ex rel. Cal. Coastal Comm'n v. Norton, 150 F. Supp. 2d 1046, 1057 (N.D.

Cal. 2001) ("The Court finds that the MMS should have provided some explanation for its

reliance on the categorical exclusion and its view that the extraordinary circumstances exceptions

do not apply before granting the requested suspensions."); see also Wilderness Watch v.

Mainella, 375 F.3d 1085, 1095 (11th Cir. 2004); Fund for Animals v. Babbitt, 89 F.3d 128, 133

(2d Cir. 1996) (reversing a finding of categorical exclusion because the program did not fit

comfortably into any of the Interior Department categories and because the scheduled moose

hunt would trigger the exception for activities that have "highly controversial environmental

effects.").

**2.  Interior Regulations and Guidance on Categorical Exclusions Under NEPA**

17. Interior has promulgated regulations listing the Department's categorical exclusions as

follows:

(a) Personnel actions and investigations and personnel services contracts;
(b) Internal organizational changes and facility and bureau reductions and
closings;
(c) Routine financial transactions…;
(d) Departmental legal activities including, but not limited to, such things as
arrests, investigations, patents, claims, and legal opinions;
(e) Nondestructive data collection, inventory . . . study, research, and monitoring
activities;
(f) Routine and continuing government business, including such things as
supervision, administration, operations, maintenance, renovations, and
replacement activities having limited context and intensity (e.g., limited size and
magnitude or short-term effects);
(g) Management, formulation, allocation, transfer, and reprogramming of the
Department's budget at all levels. . . .;
(h) Legislative proposals of an administrative or technical nature … or having
primarily economic, social, individual, or institutional effects; and comments and
reports on referrals of legislative proposals;

7

(i) Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case;

(j) Activities which are educational, informational, advisory, or consultative to other agencies, public and private entities, visitors, individuals, or the general public.

(k) Hazardous fuels reduction activities using prescribed fire not to exceed 4,500 acres, and mechanical methods for crushing, piling, thinning, pruning, cutting, chipping, mulching, and mowing, not to exceed 1,000 acres;

(l) Post-fire rehabilitation activities not to exceed 4,200 acres (such as tree planting, fence replacement, habitat restoration, heritage site restoration, repair of roads and trails, and repair of damage to minor facilities such as campgrounds) to repair or improve lands unlikely to recover to a management approved condition from wildland fire damage, or to repair or replace minor facilities damaged by fire.

43 C.F.R. § 46.210.

18. Interior regulations further provide that the following "extraordinary circumstances" may preclude application of a categorical exclusion to actions which

(a) Have significant impacts on public health or safety;

(b) Have significant impacts on such natural resources and unique geographic characteristics as . . . park, recreation or refuge lands; wilderness areas; wild or scenic rivers; . . . wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas;

(c) Have highly controversial environmental effects …;

(d) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks;

(e) Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects;

(f) Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects….;

(h) Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species;

(i) Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

43 C.F.R. § 46.215.

19.  On May 27, 2004, MMS issued rules in Interior's Department Manual ("the Manual") to govern its internal NEPA process.

20. In the Manual, MMS designated certain permitting and regulatory actions for categorical exclusion from NEPA review, including the "[a]pproval of an offshore lease or unit exploration[,] development/production plan … in the central or western Gulf of Mexico." Manual at 15.4(C)(10).

21. The Manual explained that MMS would not apply this categorical exclusion:

> [i]n areas of high seismic risk or seismicity, ***relatively untested deepwater***, or remote areas; or (2) within the boundary of a proposed or established marine sanctuary, and/or within or near the boundary of a proposed or established wildlife refuge or areas of high biological sensitivity; or (3) in areas of hazardous natural bottom conditions; or (4) utilizing new or unusual technology.

Id. (emphasis added).

22. In its Notice to Lessees and Operators of Federal Oil, Gas, and Sulphur Leases in the Outer Continental Shelf, Gulf of Mexico OCS Region No. 2008-G04, MMS defined "deepwater" as "those water depths 400 meters (1,312 feet) or greater."  MMS NTL 2008-G04, available at http://www.ocsbbs.com/ntls.asp.

**B. Outer Continental Shelf Lands Act (OCSLA)**

23. Pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), the Secretary sells leases to develop oil and gas deposits in the Outer Continental Shelf ("OCS").

24. Oil and gas exploration in the OCS is governed by a five-step process: (1) the Secretary's promulgation of a five-year leasing program, 43 U.S.C. § 1344; (2) lease sales, 43 U.S.C. § 1337; (3) exploration, 43 U.S.C. § 1340; (4) development and production, 43 U.S.C. § 1351; and (5) sale of recovered oil and gas, 43 U.S.C. § 1353.

25. Before a lease holder may commence exploratory drilling, that lease holder must submit

an exploration plan to MMS for approval.  43 U.S.C. § 1340(c)(1).

26. Pursuant to OCSLA, the Secretary may allow exploration to proceed only if he finds that the lessee's plan "will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or architectural significance."  43 U.S.C. § 1340(g)(3).

27. NEPA review applies to all stages of the OCSLA five-step process.  <u>Vill. of False Pass v. Clark</u>, 733 F.2d 605, 614 (9th Cir. 1984).

**C. Administrative Procedure Act (APA)**

28. The APA confers a right of judicial review on any person that is adversely affected by agency action.  <u>See</u> 5 U.S.C. § 702.  The APA provides that the reviewing court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  <u>Id.</u> § 706(2)(A).

29.  MMS's granting of categorical exclusions from NEPA review for the Deepwater Horizon and the twenty-seven other exploratory drilling operations since the explosion at Deepwater Horizon are "agency actions" subject to judicial review under the APA.

## STATEMENT OF FACTS

**A.  Multisale EIS for Gulf of Mexico Lease Sales**

30. In April of 2007, MMS issued its final EIS ("Multisale EIS") for eleven lease sales in the Gulf of Mexico, including Lease Sale 206 which covers the Deepwater Horizon site.

31. In the Multisale EIS, MMS explained that an oil spill would only be "likely to result in sublethal impacts (e.g., decreased health, reproductive fitness, and longevity; and increased vulnerability to disease) to marine mammals." Multisale EIS at 2-37-38.

32. Likewise, MMS explained that "[i]n most foreseeable cases, exposure to hydrocarbons persisting in the sea following the dispersal of an oil slick will result in sublethal impacts (e.g., decreased health, reproductive fitness, and longevity; and increased vulnerability to disease) to sea turtles." Id. at 2-38.

33. Similarly for birds, the MMS concluded that "[t]he majority of effects resulting from a proposed action … on endangered/threatened and nonendangered/nonthreatened coastal and marine birds are expected to be sublethal: behavioral effects, sublethal exposure to or intake of OCS-related contaminants or discarded debris, temporary disturbances, and displacement of localized groups from impacted habitats." Id. at 2-39.  MMS also noted that "[d]ispersants used in spill cleanup activity can have toxic effects similar to oil on the reproductive success of coastal and marine birds."  Id.

34. With respect to six species of threatened and endangered Alabama beach mice, MMS explained that "[g]iven the low probability of a major (≥1,000 bbl) spill occurring, direct impacts of oil spills on beach mice from a proposed action are highly unlikely." Id. at 2-39.

35. Similarly, when discussing potential impacts to endangered Gulf sturgeon from an oil spill, MMS noted that "[t]he likelihood of spill occurrence and subsequent contact with, or impact to, Gulf sturgeon and/or designated critical habitat is extremely low."  Id. at 2-40.

36.  MMS also concluded that the effects of an oil spill on fish populations and the commercial fishing industry would be "negligible and indistinguishable from variations due to natural causes."  Id.  MMS further explained that

> [a] subsurface blowout would have a negligible effect on GOM fish resources or commercial fishing.  If spills due to a proposed action were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be nonfatal and the extent of damage would be reduced due to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds.  The effect of proposed-

11

action-related oil spills on fish resources and commercial fishing is expected to cause less than a 1 percent decrease in standing stocks of any population, commercial fishing efforts, landings, or value of those landings. Historically, there have been no oil spills of any size that have had a long-term impact on fishery populations. Any affected commercial fishing activity would recover within 6 months. There is no evidence at this time that commercial fisheries in the GOM have been adversely affected on a regional population level by spills or chronic contamination.

Id.

37. MMS estimated that over the 40-year life span of the eleven proposed lease sales, the total amount of oil spilled in the offshore waters of the Central Planning area, which includes the Deepwater Horizon site, would be 5,500 to 26,500 barrels of oil. Id. at 4-241. The maximum amount estimated – 26,500 barrels – is slightly over 1 million gallons, one-fourth of the current estimate of oil spilled at the Deepwater Horizon site.

38. Under the Multisale EIS, the proposed Central and Western Gulf of Mexico lease sales that remain include Sale 215 in 2010, Sale 216 and 218 in 2011, and Sale 222 in 2012.

**B. MMS' Environmental Assessment on Lease Sale 206**

39. In October of 2007, MMS issued an Environmental Assessment ("EA") and a Finding of No New Significant Impact for a specific lease sale – Lease Sale 206 in the Central Planning Area of the Western Gulf of Mexico. Lease Sale 206 encompasses the Deepwater Horizon site.

40. MMS explained that it had fully analyzed the impacts of all Gulf of Mexico lease sales, including Lease Sale 206, in the Multisale EIS and that no further site-specific review was necessary. EA at 1. According to MMS, "[b]ecause the Multisale EIS examined the environmental impacts of a sale similar in size, nature, and potential level of development as proposed lease sale 206, the EA tiers off of the Multisale EIS and incorporates much of the material by reference. Id. at ii, Finding of No New Significant Impact. MMS concluded that "no new significant impacts were identified for proposed Lease Sale 206 that were not already

12

assessed in the Multisale EIS, nor is it necessary to change the conclusions of the kinds, levels, or locations of impacts described in that document." Id.

**C.  BP's Exploration Plan and the Deepwater Horizon Spill**

41. On March 19, 2008, MMS held Lease Sale 206, which included leasing the rights to Mississippi Canyon 252, the site of the Deepwater Horizon oil spill, to BP.

42. On March 10, 2009, BP submitted its Exploration Plan for the Deepwater Horizon site to MMS for review.  In the Exploration Plan, BP disclosed that it planned to drill two exploratory wells at a depth of 4,992 feet approximately fifty miles offshore in the Central Gulf of Mexico.

**1.  Environmental Risks Disclosed in BP's Exploration Plan**

43. In its Exploration Plan, BP explained that "[s]afety features on the M[obile] O[ffshore] D[rilling] U[nit] will include … pollution prevention … and blowout prevention equipment." BP Exploration Plan at 1-1, attached as Exhibit 3.  BP further explained that the likelihood of a blowout was so remote that this possibility could be discounted entirely.  See id. at 2-1 ("A scenario for a potential blowout of the well from which BP would expect to have the highest volume of liquid hydrocarbons is not required for the operations proposed in this EP.").

44. According to the Exploration Plan, all discharges from the Deepwater Horizon site would be made in accordance with a general National Pollutant Discharge Elimination System ("NPDES") permit issued by the U.S. Environmental Protection Agency on May 1, 2007.  BP explained that it was "unlikely that an accidental oil spill release would occur from the proposed activities" and that "in the event of such an accidental release, the water quality would be temporarily affected by the dissolved components and small droplets." Id. at 14-3.  But according to BP, "[c]urrents and microbial degradation would remove the oil from the water column or dilute the constituents to background levels." Id. at 14-3.

45. With respect to the risk posed to fisheries by activities conducted pursuant to its

Exploration Plan, BP explained that

> An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries.  However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds.  No adverse activities to fisheries are anticipated as a result of the proposed activities.

Id. at 14-3.

46. With respect to the risk posed to essential fish habitat by activities conducted pursuant to

its Exploration Plan, BP explained that no adverse impacts were expected:

> [I]t is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sub-lethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds.  No adverse impacts to essential fish habitat are anticipated as a result of the proposed activities in Mississippi Canyon Block 252.
> ….
> In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses . . . [and] techniques for containment and recovery and removal of the oil spill.

Id. at 14-4 - 14-5.

47. With respect to the risk posed to sea turtles by activities conducted pursuant to

its Exploration Plan, BP explained that no adverse impacts were expected:

> Oil spills and oil spill response activities are potential threats that could have lethal effects on turtles.  Contact with oil, consumption of oil particles, and oil-contaminated prey could seriously affect individual sea turtles.  Oil-spill-response planning and the habitat protection requirements of the Oil Pollution Act of 1990 should mitigate the threats.

14

Id. at 14-3 – 14-4.

48. With respect to the risk posed to marine mammals by activities conducted pursuant to

its Exploration Plan, BP explained that no adverse impacts were expected:

> Few lethal effects are expected from oil spills…. Oil spills of any size are
> estimated to be aper[]iodic events that may contact cetaceans…. No adverse
> impacts to endangered or threatened marine mammals are anticipated as a result
> of the proposed activities in Mississippi Canyon Block 252.

Id. at 14-3.

49. With respect to the risk posed to marine and pelagic birds by activities conducted

pursuant to its Exploration Plan, BP explained that no adverse impacts were expected:

> An accidental oil spill that might occur as a result of the proposed action has the
> potential to impact marine and pelagic birds – birds could become oiled.
> However, it is unlikely that an accidental oil spill would occur from the proposed
> activities. No adverse impacts to marine and pelagic birds are anticipated as a
> result of the proposed activities in Mississippi Canyon Block 252.

Id. at 14-5.

50. With respect to the risk posed to shore and coastal nesting birds by activities conducted

pursuant to its Exploration Plan, BP explained that no adverse impacts were expected:

> An accidental oil spill from the proposed activities could cause impacts to shore
> birds and coastal nesting birds. However, due to the distance to shore (48 miles)
> and the response capabilities that would be implemented, no significant adverse
> impacts are expected. Both the historical spill data and the combined
> trajectory/risk calculations . . . indicate there is little risk of contact or impact to
> the coastline and associated environmental resources.

Id. at 14-6.

51. With respect to the risk posed to coastal wildlife refuges by activities conducted pursuant

to its Exploration Plan, BP explained that no adverse impacts were expected:

> An accidental oil spill from the proposed activities could cause impacts to coastal
> wildlife refuges. However, due to the distance to shore (48 miles) and the
> response capabilities that would be implemented, no significant adverse impacts
> are expected. Both the historical spill data and the combined trajectory/risk

calculations . . . indicate there is little risk of contact or impact to the coastline and associated environmental resources.

Id. at 14-7.

52. With respect to the risk posed to beaches by activities conducted pursuant to its

Exploration Plan, BP explained that no adverse impacts were expected:

An accidental oil spill from the proposed activities could cause impacts to beaches. However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected. Both the historical spill data and the combined trajectory/risk calculations … indicate there is little risk of contact or impact to the coastline and associated environmental resources.

Id. at 14-5.

53. BP explained that no federally-protected species would be harmed or killed during

operations conducted pursuant to the Exploration Plan. Id. at 8-1.

54. BP did not consider any alternatives to the proposed action to reduce environmental

impacts. Id. at 14-12. Likewise, BP explained that "[n]o mitigation measures other than those

required by regulation and BP policy will be employed to avoid, diminish, or eliminate potential

impacts on environmental resources. Id. Finally, "[n]o agencies or persons were consulted

regarding potential impacts associated with the proposed activities." Id.

**2. MMS's Approval of BP's Exploration Plan Without Environmental Review**

55. MMS approved BP's Exploration Plan for the Deepwater Horizon site on April 6, 2009

without preparing an EIS or EA for the activities covered by the Plan. Instead, MMS granted BP

a categorical exclusion from NEPA review pursuant to its Manual. MMS simply warned BP to

"[e]xercise caution while drilling due to indications of shallow gas and possible water flow."

MMS Letter of April 6, 2009 Approving Exploration Plan.

56. MMS did not explain why the Exploration Plan qualified for a categorical exclusion

16

from NEPA review.  As described above, the Manual makes clear that the categorical exclusion

for exploratory drilling in the Gulf of Mexico will not be applied in "relatively untested

deepwater," "areas of high biological sensitivity," or for drilling operations "utilizing new or

unusual technology."  Manual at 15.4(C)(10).  BP's Exploration Plan disclosed that the two

wells would be drilled in 4,992 feet of water, waters that qualify as "deepwater" under MMS's

Notice to Lessees and Operators.  See NTL2008-G04, Manual at 15.4(C)(10)(1).

### 3.  The Explosion at the Deepwater Horizon and Subsequent Spill

57. On April 20, 2010, the Deepwater Horizon exploded and caught fire, causing the deaths

of 11 workers and spilling millions of gallons of oil into the water.

58. The Deepwater Horizon sank shortly thereafter, and the well it was digging continues to

spew oil.  According to current estimates, at least 5000 barrels, or 210,000 gallons, of oil per day

are being spilled, for a total of at least 5.5 million gallons spilled to date.

59. At the time of this Complaint, the oil slick created by this spill is estimated to cover at

least 2500 square miles of surface and has approached, and in some cases reached, the shores of

the Gulf Coast.  Experts now state that sea currents may have picked up parts of the spill and

transported into the Loop Current, which will carry the spill around the Florida panhandle,

through the Florida Keys, and up the Atlantic seaboard.

60. Scientists also report large plumes of oil below the sea's surface.  Researchers from

National Institute for Undersea Science and Technology have discovered oil plumes as big as ten

miles long, three miles wide, and 300 feet thick.  Plumes of this sort may drastically reduce

oxygen levels in the Gulf, which will result in the loss of marine wildlife at all trophic levels.

61. As of the date of this filing, over 400,000 gallons of a dispersant called Corexit, a

chemical that breaks surface oil slicks into microscopic droplets that can sink into the sea, has been used at the spill.  Dispersants have known toxic effects for marine life, and Corexit ranks above dispersants made by competitors in toxicity and below them in effectiveness in handling oil in the Gulf of Mexico.

62. At present, efforts to contain the spread of the spill and to stop the leak have been largely unsuccessful.  Drilling a relief well may turn out to be the only viable solution, an option that would take at least three months to complete.  Based on current estimates of spill volume this would mean that up to 450,000 barrels, or 19 million gallons, of oil would be leaked into the Gulf, an amount that would dwarf the approximately 12 million gallons spilled in the 1989 Exxon Valdez accident.

63. Several hundred species in the Gulf are expected to be at risk of being harmed by the oil from this spill, including several protected species of endangered and threatened sea turtles, whales, seabirds, and fish.  Oil has begun to appear in the coastal wetlands used by seabirds and other species, and much of the marine life in and around the Gulf Coast has been exposed to oil and thus likely will experience its toxic effects on their bodies and ecosystems.

**4.  Categorical Exclusions Since the Deepwater Horizon Spill**

64. Since the explosion at the Deepwater Horizon, MMS has granted over twenty categorical exclusions from NEPA review for other exploratory wells and drilling operations in the Gulf of Mexico and continues to grant such exclusions at present.  See Map of Categorical Exclusions for Drilling Operations, attached as Exhibit 2.

65.  For example, on May 6, 2010, MMS granted a categorical exclusion to another

Exploration Plan submitted by BP.  Under this Exploration Plan, BP proposed to begin drilling

three exploratory wells at a depth of over 4000 feet, with an anticipated start date for drilling of

May 15, 2010.

66. BP's Exploration Plan for these three wells contained a virtually identical statement of

environmental risks as the Exploration Plan for the Deepwater Horizon.  Notably, as with

Deepwater Horizon, BP stated that

> In the unlikely event of an accidental surface or subsurface oil spill, a variety of
> physical, chemical, and biological processes act to disperse the oil slick, such as
> spreading, evaporation of the more volatile constituents, dissolution into the water
> column, emulsification of small droplets, agglomeration sinking, microbial
> modification, photochemical modification, and biological ingestion and excretion.
> The water quality would be temporarily affected by the dissolved components and
> small oil droplets that do not rise to the surface or are mixed down by surface
> turbulence.  Dispersion by currents and microbial degradation would remove the
> oil from the water column or dilute the constituents to background levels.

BP Exploration Plan for Green Canyon Area, Attachment E at 6.

67.  BP's Exploration Plan for these three wells disclosed virtually identical

statements of potential harm to fisheries and fish habitat, turtles, marine mammals, birds,

coastal wildlife refuges, and beaches as the Exploration Plan for the Deepwater Horizon.

See id. at 8-11.

68. As with Deepwater Horizon, BP explained that "[n]o alternatives to the proposed

activities were considered to reduce environmental impacts;" "[n]o mitigation measures

other than those required by regulation will be employed to avoid, diminish, or eliminate

potential impacts on environmental resources," and  "[n]o agencies or persons were

consulted regarding potential impacts associated with the proposes activities." Id. at 11.

69. Since the Deepwater Horizon spill, MMS has also granted a categorical exclusion

to an Exploration Plan submitted by Kerr-McGee Oil & Gas Corporation for four exploratory wells in almost seven thousand feet of water.  As with BP's Exploration Plan for the Deepwater and Green Canyon sites, the Kerr-McGee Exploration Plan for Keathley Canyon explains that "[t]he occurrence of an accidental surface or subsurface spill from the proposed activities is unlikely" and predicts a similar lack of impacts on fisheries, turtles, marine mammals, birds, coastal wildlife refuges, and beaches from any exploratory activities.  Kerr-McGee Exploration Plan at Appendix N.

70. Since the Deepwater Horizon spill, MMS has also granted a categorical exclusion to an Exploration Plan submitted by Anadarko E&P Company for four exploratory wells in over nine thousand feet of water.

71. In each of these examples and in the numerous others approved by MMS since the Deepwater Horizon spill, MMS authorized the plans without requiring a stringent environmental review and without explaining how the proposed operations qualified for a categorical exclusion, especially given that many of the exploratory wells were proposed for drilling operations in waters classified as "deepwater" by MMS regulations and for which categorical exclusions are not supposed to apply.

### CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
#### (MMS Acted Arbitrarily and Capriciously in Granting Categorical Exclusions to Exploration Plans in Gulf of Mexico)

72. The allegations of paragraphs 1-71 are incorporated herein by reference.

73. Pursuant to NEPA regulations, "categorical exclusion[s]" only cover actions which "do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations…."  40 C.F.R. § 1508.4.  Thus, MMS may only grant

20

categorical exclusions from NEPA review when it concludes that there will be no "significant effect on the human environment" from a given action.  Id.

74. Since the explosion at the Deepwater Horizon, MMS has granted over twenty categorical exclusions for exploration wells and drilling operations in the Gulf of Mexico, with over fifteen of these exclusions covering wells and operations in waters defined as "deepwater" by MMS.

75. In violation of NEPA and its implementing regulations, MMS has granted these exclusions from NEPA analysis despite the ongoing environmental harm caused by the Deepwater Horizon, and without any explanation of how the actions authorized will not individually or cumulatively have a significant effect on the environment.

76. In violation of its Manual, MMS has also granted these exemptions despite the fact that the wells and operations may be in "relatively untested deepwater, or remote areas . . . ; or within the boundary of a proposed or established marine sanctuary, and/or within or near the boundary of a proposed or established wildlife refuge or areas of high biological sensitivity; or  . . . utilizing new or unusual technology." Manual at 15.4(C)(10).

77. MMS has also failed to explain how, in light of new information regarding potential environmental impacts as a result of the Deepwater Horizon spill, "extraordinary circumstances" do not preclude the application of categorical exclusions to any of these newly authorized exploration plans.  See Wilderness Watch, 375 F.3d at 1096 (holding that "[a]t a minimum, the agency should have recognized that these exceptions 'may' apply" and considered their application).

78. MMS's failure to apply its own regulations and to explain its apparent decision that extraordinary circumstances do not exist is arbitrary, capricious, and otherwise not in accordance with law.  See 40 C.F.R. § 1508.4; 43 C.F.R. § 46.215; Jones, 792 F.2d at 828 ("An agency

cannot . . . avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment. … [T]he Service, in issuing the permit, provided no reasoned explanation – indeed, no explanation at all – of how these conditions would prevent application of an exception to the categorical exclusions."); Cal. ex rel. Cal. Coastal Comm'n, 150 F. Supp. 2d at 1057 ("The Court finds that the MMS should have provided some explanation for its reliance on the categorical exclusion and its view that the extraordinary circumstances exceptions do not apply before granting the requested suspensions.").

**SECOND CLAIM FOR RELIEF**
**(Violation of APA – MMS Acted Arbitrarily and Capriciously**
**in Adoption of Categorical Exclusions in Its Manual)**

79. The allegations of paragraphs 1-78 are incorporated herein by reference.

80. The Department of the Interior has promulgated detailed regulations that list the actions which qualify for a categorical exclusion from NEPA review.  See 43 C.F.R. § 46.210.  The categorical exclusions listed in these regulations cover routine administrative, financial, legal, and operational actions of the Department which have no significant environmental impacts.

81. The regulations do not allow for any categorical exclusions for activities related to OCS leasing, sale, or development, or any other actions with significant environmental impacts.

82. The regulations do not provide agencies of the Department such as MMS with discretion to adopt additional categorical exclusions for activities that would have more than an insignificant environmental impact.

83.  Yet in the Manual, MMS has adopted additional categorical exclusions covering "[a]pproval of offshore geological and geophysical mineral exploration activites[,]" "[a]pproval of an offshore lease or unit exploration, development/production plan . . . in the central or

22

western Gulf of Mexico" and other categorical exclusions not authorized by Department

regulations.  Manual at 15.4(C)(10).

84. The categorical exclusions contained in the Manual are outside of the scope of

categorical exclusions authorized by 43 C.F.R. § 46.210, and as exemplified by the significant

and ongoing environmental impacts from the Deepwater Horizon spill, authorize exclusions for

actions which can have a significant impact on the human environment.

85. MMS thus acted arbitrarily, capriciously, and otherwise not in accordance with law in

adopting categorical exclusions in its Manual which violate NEPA and its own regulations.  See

5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4; 40 C.F.R. § 1508.4.  The

categorical exclusions contained in the Manual are invalid and must be vacated.

### THIRD CLAIM FOR RELIEF
### (Violation of APA – MMS Acted Arbitrarily and Capriciously
### in Failing to Prepare a Supplemental Environmental Impact Statement)

86. The allegations of paragraphs 1-85 are incorporated herein by reference.

87. Given the incident at the Deepwater Horizon, the conclusions of the Multisale EIS are

no longer valid.  For example, in the Multisale EIS, MMS predicted that over the 40-year life

span of the eleven proposed lease sales, the  total amount of oil spilled in the offshore waters of

the Central Planning area, which includes the Deepwater Horizon site, would be  a maximum of

26,500 barrels, slightly over 1 million gallons and less than one-fifth of the oil presently

estimated to have been spilled in connection with the Deepwater Horizon incident.  See

Multisale EIS at 4-241.  Similarly, MMS estimated that the impacts on fish, marine mammals,

turtles, and other marine life would be "sublethal" and "negligible."  See id. at 2-37-40.

88. Given the "new circumstances or information relevant to environmental concerns"

resulting from the Deepwater Horizon spill, MMS must prepare a supplemental Multisale EIS. See 40 C.F.R. § 1502.9(c)(1)(ii).

89. MMS's failure to do so is arbitrary, capricious, and an abuse of discretion in violation of NEPA and the APA. See La. Wildlife Fed'n, Inc. v. York, 761 F.2d 1044, 1051 (5th Cir. 1985); Southern Utah Wilderness Alliance v. Norton, 457 F.Supp.2d 1253, 1264-65 (D. Utah 2006) (finding that Utah BLM's own files - as well as information provided by the Southern Utah Wilderness Alliance - presented a "textbook example of significant new information about the affected environment [e.g., the wilderness attributes and characteristics] that would be impacted by oil and gas development" and  thus the Utah BLM should have supplemented its NEPA analysis accordingly).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.  Declare that the Defendants are each in violation of NEPA and the APA as described above;

B.  Vacate provisions of the Manual providing categorical exclusions for exploration and development and production plans;

C.  Vacate the twenty-seven categorical exclusions issued by MMS since April 20, 2010;

D.  Enjoin MMS from authorizing further categorical exclusions from NEPA review for oil drilling operations in the Gulf of Mexico;

E.  Order all Defendants to comply with NEPA and the APA in connection with any further actions regarding exploratory drilling in the Gulf;

F.  Vacate and remand the Gulf of Mexico OCS Oil and Gas Lease Sales: 2007-2012 Environmental Impact Statement and enjoin all future lease sales authorized therein until such time as a Supplemental Environmental Impact Statement has been prepared;

G.  Grant, in its discretion, Plaintiffs their costs of suit, including reasonable attorneys' fees and expert witness fees; and

H.  Grant Plaintiffs such further and additional relief as this court deems to be necessary and appropriate.

Respectfully submitted this 17th day of May, 2010.

/s Catherine M. Wannamaker                    /s Sierra B. Weaver

Catherine M. Wannamaker, application for        Sierra B. Weaver, application for
    pro hac vice admission forthcoming            pro hac vice admission forthcoming
    GA Bar No. 811077                             DC Bar. No. 488560

Gilbert B. Rogers, AL Bar No. ASB-2085T66R      Michael P. Senatore, application for
                                                  pro hac vice admission forthcoming
                                                  DC Bar No. 453116

Southern Environmental Law Center               Defenders of Wildlife
127 Peachtree St NE, Suite 605                  1130 17th St NW
Atlanta, GA 30303-1840                          Washington, DC 20036
Phone: (404)521-9900                            Phone: (202)682-9400
Email: cwannamaker@selcga.org                   Email:  sweaver@defenders.org
    grogers@selcga.org                            msenatore@defenders.org