# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| DEFENDERS OF WILDLIFE,<br>　　　　Plaintiff,<br><br>　　　v.<br><br>BUREAU OF OCEAN ENERGY<br>MANAGEMENT, REGULATION, AND<br>ENFORCEMENT; UNITED STATES<br>DEPARTMENT OF THE INTERIOR; and<br>KEN SALAZAR, SECRETARY OF THE<br>INTERIOR,<br>　　　　Defendants,<br><br>AMERICAN PETROLEUM INSTITUTE,<br>INDEPENDENT PETROLEUM<br>ASSOCIATION OF AMERICA, US OIL<br>& GAS ASSOCIATION, AND<br>INTERNATIONAL ASSOCIATION OF<br>DRILLING CONTRACTORS,<br>　　　　Intervenor-Defendants. | C. A. No. 1:10-cv-00254 (WHS-WEC) |

## MEMORANDUM IN SUPPORT OF INTERVENORS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

Steven J. Rosenbaum
Bradley K. Ervin
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Telephone: (202) 662-5568
Facsimile: (202) 778-5568
srosenbaum@cov.com

Brian P. McCarthy   (MCCAB 7434)
McDowell Knight Roedder
& Sledge LLC
11 North Water Street, Suite 13290
P.O. Box 350
Mobile, Alabama 36601
Telephone: (251) 431-8806
Fax: (251) 432-5303
bmccarthy@mcdowellknight.com

Counsel for Defendant-Intervenors
American Petroleum Institute, Independent
Petroleum Association of America, US Oil
& Gas Association, and International
Association of Drilling Contractors

December 6, 2010

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

BACKGROUND ................................................................................................................. 3

I.  VENUE IS NOT PROPER IN THIS DISTRICT. .............................................. 4

II.  THE FIRST AND SECOND CLAIMS FOR RELIEF ARE NOT WITHIN THE
SUBJECT MATTER JURISDICTION OF THE COURT AND FAIL TO STATE A
CLAIM UPON WHICH RELIEF CAN BE GRANTED. .................................. 8

    A.  DOW's Claims Relating to the Government's Compliance With NEPA
Obligations With Respect to Future Lease Sales Are Not Ripe. ........................... 8

    B.  As a Matter of Law, the Government Had No Obligation to Prepare A New
Supplemental EIS With Respect to Lease Sale 213............................................... 11

III.  THE THIRD AND FOURTH CLAIMS FOR RELIEF ARE NOT WITHIN THE
SUBJECT MATTER JURISDICTION OF THE COURT AND/OR FAIL TO STATE A
CLAIM UPON WHICH RELIEF CAN BE GRANTED. ................................. 16

    A.  DOW's ESA Challenge to Future Lease Sales Is Not Ripe................................. 16

    B.  DOW's ESA Challenge to Lease Sale 213 Fails as a Matter of Law. ................. 17

CONCLUSION .................................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. U.S. Army Corps of Eng'rs*,
  382 F. Supp. 2d 1301 (N.D. Ala. 2005) ................................................................ 4

*Center for Biological Diversity v. Salazar*,
  No. 09-cv-8207, 2010 WL 2493988 (D. Ariz. June 17, 2010) ........................... 14, 15

*Center for Biological Diversity v. U.S. Dep't of the Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ................................................................ 18

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005) ................................................................ 6

*Father Flanagan's Boys Home v. District of Columbia*,
  No. 02-7157, 2003 WL 1907987 (D.C. Cir. April 17, 2003) ........................... 11

*Goodman v. Sipos*,
  259 F.3d 1327 (11th Cir. 2001) ................................................................ 8

*Greater Yellowstone Coalition v. Tidwell*,
  572 F.3d 1115 (10th Cir. 2009) ................................................................ 16

*In re LTL Shipping Servs. Antitrust Litig.*,
  No. 08-md-01895, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009) ........................... 11

*Jenkins Brick Co. v. Bremer*,
  321 F.3d 1366 (11th Cir. 2003) ................................................................ 5, 7

*Meier v. Sun Int'l Hotels, Ltd.*,
  288 F.3d 1264 (11th Cir. 2002) ................................................................ 4, 6

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
  417 F.3d 1272 (D.C. Cir. 2005) ................................................................ 11

*Nevada v. Dep't of Energy*,
  457 F.3d 78 (D.C. Cir. 2006) ................................................................ 10

*North Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980) ................................................................ 18, 19

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ................................................................ 14, 15

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ................................................................ 9, 10

*Ouachita Watch League v. Jacobs*,
  463 F.3d 1163 (11th Cir. 2006) ................................................................ 10

*Paley v. United States*,
  349 F.3d 418 (7th Cir. 2003) ................................................................ 11

*Public Citizen v. U.S. Trade Representative*,
  5 F.3d 549 (D.C. Cir. 1993) ................................................................ 8

*Rogers v. Civil Air Patrol*,
   129 F. Supp. 2d 1334 (M.D. Ala. 2001) .................................................. 7

*Sec'y of the Interior v. California*,
   464 U.S. 312 (1984) ................................................................................ 3

*Sierra Club v. Penfold*,
   857 F.2d 1307 (9th Cir. 1988) ................................................................. 8

*Sierra Club v. Slater*,
   120 F.3d 623 (6th Cir. 1997) ................................................................... 8

*Wachovia Bank v. Schmidt*,
   546 U.S. 303 (2006) ................................................................................. 5

*Wendy's Int'l, Inc. v. City of Birmingham*,
   868 F.2d 433 (11th Cir. 1989) ................................................................. 10

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ................................................................................. 9

*Wyoming Outdoor Council v. U.S. Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999) ................................................................... 10

*Wyoming v. U.S. Dep't of the Interior*,
   360 F. Supp. 2d 1214 (D. Wyo. 2005) ..................................................... 15

## Statutes

16 U.S.C. §§ 1531 *et seq.* ............................................................................. 3

16 U.S.C. § 1536 .......................................................................................... 17

28 U.S.C. § 1391(a)(2) ................................................................................. 5

28 U.S.C. § 1391(b)(2) ................................................................................. 5

28 U.S.C. § 1391(e) ................................................................................. 4, 5, 7

42 U.S.C. § 4332 .......................................................................................... 14

42 U.S.C. §§ 4321 *et seq.* ............................................................................. 1

43 U.S.C. § 1337(a)(1) ................................................................................. 4

43 U.S.C. § 1340(c) ...................................................................................... 4

43 U.S.C. § 1344(a) ...................................................................................... 4

43 U.S.C. § 1351 .......................................................................................... 4

43 U.S.C. §§ 1301 *et seq.* ............................................................................. 3

## Other Authorities

64 Fed. Reg. 37560 (July 12, 1999) .............................................................. 13

73 Fed. Reg. 59646 (Oct. 9, 2008) ............................................................... 12

74 Fed. Reg. 58976 (Nov. 16, 2009) ............................................................. 12

75 Fed. Reg. 44276 (July 28, 2010).................................................................. 9

75 Fed. Reg. 6874 (Feb. 12, 2010) ............................................................... 6, 12

75 Fed. Reg. 69122 (Nov. 10, 2010)............................................................. 2, 9

75 Fed. Reg. 70023 (Nov. 16. 2010)............................................................. 2, 9

**Rules**

Fed. R. Civ. P. 12(b)(1).................................................................................. 8

Fed. R. Civ. P. 12(b)(6)................................................................................ 11

Fed. R. Evid. 201(b)..................................................................................... 11

**Regulations**

30 C.F.R. § 250.105 ....................................................................................... 4

30 C.F.R. § 250.201 ....................................................................................... 4

40 C.F.R. § 1502.9(c).................................................................................... 14

40 C.F.R. § 1508.18 ...................................................................................... 14

50 C.F.R. § 402.02 ........................................................................................ 17

The Third Amended Complaint should be dismissed for lack of venue because a substantial part of the events or omissions giving rise to Plaintiff Defenders of Wildlife ("DOW")'s claims did not occur in this judicial district. DOW's claims arise out of various Government administrative decisions, which for venue purposes are deemed to have occurred in the states in which they were made, which do not include Alabama.

Alternatively, the Third Amended Complaint should be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted:

**First and Second Claims for Relief.** The National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), provides that a Supplemental environmental impact statement ("EIS") may be required if there are significant new circumstances or information relevant to environmental concerns and bearing on proposed governmental action or its impacts, but *only* if there remains major Federal action to occur. DOW claims that the April 20, 2010 Deepwater Horizon oil spill created a need to perform a Supplemental EIS in two respects: (1) with respect to the remaining lease sales scheduled to take place in the Gulf of Mexico Outer Continental Shelf ("OCS") under the Interior Department's 2007-12 five-year leasing program, *see* First Claim for Relief ¶¶ 57–61, and Prayer for Relief ¶ D, and (2) with respect to the most recent lease sale, Sale 213, conducted by the Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE")[1] of the United States Department of the Interior, *see* Second Claim for Relief, ¶¶ 62–65, and Prayer for Relief ¶ B.

This Court should dismiss the First and Second Claims for Relief in their entirety:

---

[1]    By a June 22, 2010 executive order, the Secretary of the Interior changed the name of the Minerals Management Service to the Bureau of Ocean Energy, Management, Regulation, and Enforcement. For ease of reference, the Associations will refer to the agency both before and after this name change as BOEMRE.

— With respect to the remaining lease sales scheduled to take place in the Gulf of Mexico under the 2007-12 five-year leasing program, the Secretary of Interior in a decision announced on May 27, 2010 and published in the Federal Register on July 28, 2010, cancelled the only lease sale scheduled to occur in 2010, and stated that he will decide "whether to move forward with other leases sales in the Gulf of Mexico that are currently scheduled for 2011 and 2012" based upon the "findings of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, … *environmental reviews*, science-based analysis, and public input…." (emphasis added).  Then, on November 10, 2010, and November 16, 2010, BOEMRE published notice of its "intent to prepare a supplemental environmental impact statement" for all remaining upcoming lease sales, and solicited public comments regarding alternatives to those sales, including whether to "cancel the sale[s]."  Exh. 15 hereto, 75 Fed. Reg. 69122, 69122–23 (Nov. 10, 2010) (identifying "alternatives that will be considered"); Exh. 16 hereto, 75 Fed. Reg. 70023, 70024 (Nov. 16. 2010).  Thus, it is uncertain whether the Secretary will proceed with the remaining Gulf of Mexico lease sales, and he is already preparing a supplemental EIS, the purported adequacy of which cannot be assessed (or challenged) until completed.  Under these circumstances, DOW's claim is not ripe.

— With respect to Lease Sale 213, there were no "major federal actions remaining to occur" as of April 20, 2010, the date of the Deepwater Horizon oil spill, and a Supplemental EIS therefore was not required as a matter of law.  The federal action with potentially major effects was Lease Sale 213 itself, an event that had occurred more than a month previously, on March 17, 2010 (and which had been preceded by the preparation of not only an EIS, but a Supplemental EIS and an Environmental Assessment).

**Third and Fourth Claims for Relief.**  The Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*. ("ESA"), requires that federal agencies consult with the Fish and Wildlife Service and/or the National Marine Fisheries Service to ensure that action authorized by the agency is not likely to jeopardize the continued existence of endangered or threatened species or their critical habitats, and forbids an agency during that consultation from making any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures that would avoid such impacts, *see* 16 U.S.C. § 1536(a)(2).

DOW claims that Defendants violated these requirements in connection with future Gulf of Mexico lease sales, and in connection with Lease Sale 213, *see* Third and Fourth Claims for Relief, ¶¶ 66–74, and seeks to rescind approval of lease sales and related drilling activities pending completion of reinitiated ESA consultation, *see* Prayer for Relief ¶ C.

DOW's ESA claims suffer from essentially the same deficiencies as its NEPA and APA claims.  DOW's ESA challenge to future lease sales is not ripe.  DOW's ESA challenge to Lease Sale 213 fails as a matter of law, given the ESA consultation that previously took place with respect to that lease sale, and guiding precedents regarding the proper application of the ESA to the four-stage OCS leasing, exploration and development process.

## BACKGROUND

The OCS Lands Act, 43 U.S.C. §§ 1301 *et seq.*, confers on the United States control over the mineral resources in the submerged lands of the OCS.  43 U.S.C. §§ 1301(a), 1331(a).  OCS oil and gas activities take place in four stages: the five-year leasing program; the lease sale; the exploration phase; and the development and production phase.  *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984).

3

The first stage, the five-year leasing program, culminates in the Government's issuance of "a schedule of proposed lease sales" based upon a consideration of, *inter alia*, the relative environmental sensitivity and marine productivity of the different OCS areas, and an equitable sharing of developmental benefits and environmental risks among the various regions. 43 U.S.C. §§ 1344(a), 1344(a)(2). The second stage, the lease sale, is the event at which specified tracts in a given area of the OCS are made available for leasing, and awarded to the highest bidder as determined through sealed bids. 43 U.S.C. § 1337(a)(1).

After lease issuance, an OCS lessee may submit for BOEMRE approval an exploration plan ("EP") (the third stage), and if that exploration is successful, a "development and production plan" for areas outside the Central and Western Gulf of Mexico, or a "development operations coordination document" ("DOCD") for the Central and Western Gulf of Mexico (the fourth stage). 43 U.S.C. §§ 1340(c), 1351; 30 C.F.R. §§ 250.105, 250.201.

## I.    VENUE IS NOT PROPER IN THIS DISTRICT.

Venue in civil actions against federal agencies, their officers and employees is limited to a judicial district in which: (1) a defendant resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, (3) a substantial part of the property that is the subject of the claim is situated, or (4) the plaintiff resides if no real property is involved. 28 U.S.C. § 1391(e). DOW bears the burden of proving that venue is proper. *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268–69 (11th Cir. 2002); *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1327 (N.D. Ala. 2005).

DOW purports to rely on Section 1391(e)(2), *see* Third Amended Complaint ¶ 5, but because a substantial part of the events or omissions giving rise to DOW's claims did not in fact occur in this district, the Third Amended Complaint should be dismissed for improper venue. Such dismissal will not eliminate the opportunity to present the claims asserted by DOW,

4

given that a substantively identical lawsuit was filed in D.C. federal district court by a different environmental group the day after DOW filed its original complaint here, *see* Exh. 14 hereto.

In determining venue under Section 1391(e)(2), "[o]nly the events that *directly* give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003) (emphasis added). The events taking place in the judicial district must have a "close nexus" with the claim. *Id.* at 1372.[2]

DOW alleges that the events giving rise to its claims did occur in the Southern District of Alabama, citing the following: the Deepwater Horizon spill will threaten Alabama's natural resources, and the grant of new leases purportedly threaten those resources. *See* Third Amended Complaint ¶ 5.

But without in any way minimizing its significance, the Deepwater Horizon oil spill is simply not the "event[] that directly give[s] rise to [DOW's] claim," *Jenkins Brick, supra*. DOW is not seeking relief for personal injury, property damage or other loss arising out of the Deepwater Horizon oil spill, or attempting to stop that drilling (which is already completed).

Rather, the events giving rise to DOW's claims are the Government's decisions to conduct (or potentially conduct) *other* lease sales without preparing a Supplemental EIS or engaging in additional Endangered Species Act consultations, *see*, *e.g.*, Third Amended Complaint ¶ 2. *None* of these Government decisions took place in Alabama. Rather, these administrative decisions or omissions all occurred either in Department of the Interior or

---

[2]     The "substantial part of the events or omissions giving rise to the claim" test appears in three different venue provisions, 28 U.S.C. §§ 1391(a)(2), 1391(b)(2) and 1391(e)(2), and the same analysis applies to each. *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006).

BOEMRE offices, none of which are located in the Southern District of Alabama, or in other locations outside the state.

Specifically, lease sales are announced and published in the Federal Register by the Director of BOEMRE, *see, e.g.*, Exh. 8 hereto, 75 Fed. Reg. 6874 (Feb. 12, 2010), who is located in Washington D.C., *see* http://www.boemre.gov/ooc/newweb/leadership.htm.[3] BOEMRE itself is headquartered in the District of Columbia, with its national offshore office in Virginia and regional offices in Louisiana, Alaska, and California. *See* Contact Information, Bureau of Ocean Energy Management, Regulation, and Enforcement, http://www.mms.gov/ooc/ newweb/contactus.htm (last visited July 26, 2010).

For venue purposes, administrative decisions are deemed to have occurred in the state in which they were made. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 434 (2d Cir. 2005). In *Daniel*, a group of physicians sued a Medical Certification Board for conspiring to constrict competition. *Id*. at 414–15. Some of the physicians were based in the Western District of New York, where the suit was brought; the Board was located in Michigan. *Id*. at 434. The physicians alleged that venue was proper, among other reasons, because the defendant's actions had limited certification options in New York and other places and refused to allow the plaintiffs to take the certification exam in New York. *Id*. The circuit court found that venue was not proper in New York because the decisions were made in Michigan: the Board's "decision to close the practice-track was made at its headquarters in Michigan. Similarly, [the Board's] rejections of plaintiffs' applications to take its certification exam were made in Michigan." *Id*.

---

[3]     Materials outside the pleadings are properly considered in resolving venue. *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268–69 (11th Cir. 2002).

Likewise, the court in *Rogers v. Civil Air Patrol*, 129 F. Supp. 2d 1334, 1339 (M.D. Ala. 2001), held that for venue purposes, the events giving rise to the plaintiff's claim of unconstitutional government decision-making took place in Washington, D.C., where the challenged decisions were made.

In this case, none of the relevant administrative decisions made or actions taken occurred in Alabama. Thus, none of the events — much less the requisite "substantial part" of the events — directly giving rise to DOW's claims took place in this district.

DOW posits that if drilling takes place in the future on the leases issued pursuant to the challenged sales, and if there were an oil spill, the effects might be felt in Alabama, *see* Third Amended Complaint ¶ 5. But this speculation cannot support venue, because only events actually occurring prior to the filing of the complaint can be considered. *Jenkins Brick*, 321 F.3d at 1371 (examining "the places where the events *have taken place* …." (emphasis added)); *accord Rogers*, 129 F. Supp. 2d at 1339.

For example, the *Rogers* plaintiff argued that the Secretary of the Air Force acted unconstitutionally in delegating the authority to choose the Board of Governors of the Civil Air Patrol. *Id*. at 1335–36. The plaintiff claimed venue in the Middle District of Alabama, where the Board would be chosen. *Id*. at 1339. The court rejected that contention: "Allegations that [there will necessarily be] performance at a later date in this judicial district cannot support venue under section 1391(e)(2). That section provides for venue where 'a substantial part of the events or omissions giving rise to the claim **occurred.**' 28 U.S.C. § 1391(e)(2)." *Id*. (emphasis in original).

Venue is not proper in this district.

7

II.  **THE FIRST AND SECOND CLAIMS FOR RELIEF ARE NOT WITHIN THE SUBJECT MATTER JURISDICTION OF THE COURT AND FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

The First and Second Claims for Relief assert NEPA violations[4] arising out of the Department's failure to prepare a Supplemental EIS: with respect to the remaining lease sales scheduled to take place in the Gulf of Mexico under the Interior Department's 2007-12 five-year leasing program, *see* First Claim for Relief ¶¶ 57–61, and Prayer for Relief ¶ D, and with respect to the most recent lease sale, Sale 213, *see* Second Claim for Relief, ¶¶ 62–65, and Prayer for Relief ¶ B (seeking vacatur of leases).  The Court lacks subject matter jurisdiction as to the first claim, and the second claim fails to state a claim upon which relief may be granted.

A.  **DOW's Claims Relating to the Government's Compliance With NEPA Obligations With Respect to Future Lease Sales Are Not Ripe.**

As originally published, the 2007-12 five-year leasing program sets forth four remaining Gulf of Mexico lease sales: Sales 215 and 218 in the Western Gulf of Mexico OCS, scheduled for 2010 and 2011, respectively, and Lease Sales 216 and 222 in the Central Gulf of Mexico OCS, scheduled for 2011 and 2012, respectively.  *See* 2007-2012 Five-Year Leasing Program, pp. 3–4, Exh. 1 hereto, entire program available at http://www.boemre.gov/5-year/2007-2012FiveYearProgram.htm.[5]

However, in a decision announced on May 27, 2010, and published in the Federal Register on July 28, 2010, the Secretary of the Interior canceled the only lease sale remaining for

---

[4]    NEPA does not itself authorize a private right of action, and NEPA challenges are accordingly brought pursuant to the APA.  *Public Citizen v. U.S. Trade Representative*, 5 F.3d 549, 551 (D.C. Cir. 1993); *Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir. 1988); *Sierra Club v. Slater*, 120 F.3d 623, 630–31 (6th Cir. 1997).

[5]    The Associations may rely upon materials outside the complaint in support of their Fed. R. Civ. P. 12(b)(1) motion.  *Goodman v. Sipos*, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001).

8

2010, Lease Sale 215, and announced an intention to perform additional environmental reviews before deciding whether to proceed with the three lease sales scheduled for 2011 and 2012. *See* Exh. 2 hereto, 75 Fed. Reg. 44276 (July 28, 2010). Thereafter, on November 10, 2010, and November 16, 2010, BOEMRE published notice of its "intent to prepare a supplemental environmental impact statement" for all remaining Gulf of Mexico lease sales, and solicited public comments regarding alternatives to those sales, including whether to "cancel the sale[s]." 75 Fed. Reg. at 69122–23; 75 Fed. Reg. at 70023–24. *See also* p. 2 *supra*. Based upon these announcements, there currently exist two material uncertainties: (a) whether the Secretary will decide to proceed with the remaining Gulf of Mexico lease sales (although the Associations certainly believe he should); and (b) the exact nature and extent of the environmental reviews the Department will conduct prior to making an affirmative decision to proceed with those lease sales or, subsequently, prior to holding the lease sales. *See* Third Amended Complaint ¶ 60 (alleging BOEMRE "must prepare a supplemental Multistate EIS and [Environmental Assessments] for … future lease sales").

Under these circumstances, DOW's claim is not ripe. "[T]he ripeness requirement is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–33 (1998) (quotation omitted). Article III of the U.S. Constitution requires that a plaintiff suffer either a present injury or an injury that is "imminent" and "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

"A controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop." *Wendy's Int'l, Inc. v. City of Birmingham*, 868 F.2d 433, 436 (11th Cir. 1989) (quotation omitted). Thus, when a "suit necessarily is based upon the possibility of an occurrence which may never come to pass … there is as yet no controversy … ripe for adjudication." *Id*.

These constitutional principles apply with full force to NEPA requirements, *see Ohio Forestry*, *supra*. A NEPA lawsuit such as this, seeking declaratory or injunctive relief that an agency must perform a certain kind of environmental assessment, is not ripe when it is uncertain whether the Government will undertake the action for which the assessment is sought. *See Ohio Forestry*, 523 U.S. at 732–33 ("[T]he ripeness inquiry is designed … to protect the agencies from judicial interference until an administrative decision has been formalized….") (quotation omitted); *Nevada v. Dep't of Energy*, 457 F.3d 78, 84 (D.C. Cir. 2006) (NEPA challenge not ripe with respect to "plan [that] might be implemented at some future time"); *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49–50 (D.C. Cir. 1999) (NEPA action not ripe "until leases … had actually been issued"). BOEMRE has not yet decided whether to proceed with the scheduled lease sales (although the Associations certainly hope and expect it will do so).

Moreover, even when it is clear what Government action is to be taken, a NEPA claim is not ripe until the Government has actually conducted whatever environmental assessment it has determined to perform of its own volition. *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1174 (11th Cir. 2006) ("Because of the rather special nature of the injury (that is, the [alleged] failure to follow NEPA), the issue is ripe at the time the agency fails to comply.");

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1286 (D.C. Cir. 2005) (NEPA challenge ripe at time agency issued permits).  This is perfectly logical, because it is only after the environmental analysis has been conducted that its adequacy can be determined.

 That is precisely the factual situation presented here, given that BOEMRE has announced an intention to conduct a Supplemental EIS regarding the remaining upcoming lease sales, and an intention to include in that review the question whether or not to proceed with the lease sales.  DOW's NEPA challenge is therefore not ripe.

**B. As a Matter of Law, the Government Had No Obligation to Prepare A New Supplemental EIS With Respect to Lease Sale 213.**

 The Government had no obligation to prepare a new Supplemental EIS for Lease Sale 213, and the Second Claim for Relief fails to state a claim upon which relief can be granted.

 The Department of Interior prepared a 1095-page EIS addressing the environmental impacts of the Gulf of Mexico lease sales scheduled to take place during the 2002-12 leasing program, including Lease Sale 213.  *See* Exh. 3 hereto, entire EIS available at https://www.gomr.mms.gov/PDFs/2007/2007-018-Vol1.pdf  and  https://www.gomr.mms.gov/PDFs/2007/2007-018-Vol2.pdf.[6]  The Government then prepared in September 2008 a 485-page Supplemental EIS, addressing the environmental impacts of the lease sales scheduled to take

---

[6] The Court may consider on a Rule 12(b)(6) motion the official Government documents cited by the Associations in this memorandum.  *See*, *e.g.*, *Father Flanagan's Boys Home v. District of Columbia*, No. 02-7157, 2003 WL 1907987 at *1 (D.C. Cir. April 17, 2003) (district court may "examine matters of public record in ruling on a Rule 12(b)(6) motion") (citation omitted); *In re LTL Shipping Servs. Antitrust Litig.*, No. 08-md-01895, 2009 WL 323219, at *7 (N.D. Ga. Jan. 28, 2009) (taking judicial notice of information from a U.S. Department of Energy website "because the information presented is drawn from a United States Government agency source, the accuracy of which cannot reasonably be questioned"); *Paley v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003) (court on Rule 12(b)(6) motion may consider matters in the public record); *see* Fed. R. Evid. 201(b) (court can take judicial notice of a fact that is "not subject to reasonable dispute in that it is … capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

place during 2009-12, again including Lease Sale 213, *see* Exh. 4 hereto, entire Supplemental EIS available at https://www.gomr.mms.gov/PDFs/2008/2008-041.pdf.

The Government subsequently announced on October 9, 2008, an intention to prepare, and solicited comments with respect to, an Environmental Assessment for Lease Sale 213 specifically, which would "reexamine the potential environmental effects of the proposed lease sale and its alternatives … based on any new information regarding potential impacts and issues that were not available at the time the Supplemental EIS was prepared," and be used to "determine whether to prepare a Finding of No New Significant Impact (FONNSI) or a Supplemental EIS." Exh. 5 hereto, 73 Fed. Reg. 59646, 59648 (Oct. 9, 2008).

The Government proceeded with that analysis, and in October 2009 published an 87-page Environmental Assessment, which concluded that there was no new information indicating "that there are likely to be significant new impacts that were not addressed in the [April 2007] Multistate EIS and the [September 2008] Supplemental EIS." Exh. 6 hereto, entire EA available at https://www.mms.gov/PDFs/2009/2009-053.pdf. The Government thereafter announced in the Federal Register on November 16, 2009 that it "had determined that a supplemental EIS is not required.…" Exh. 7 hereto, 74 Fed. Reg. 58976 (Nov. 16, 2009).

BOEMRE on February 12, 2010 proceeded to publish in the Federal Register a "Final Notice of Sale 213," announcing that "[o]n Wednesday, March 17, 2010, the Minerals Management Service (MMS) will open and publicly announce bids received for blocks offered in [Central Planning Area] Oil and Gas Lease Sale 213," and identifying the blocks that would be offered for sale. Exh. 8 hereto, 75 Fed. Reg. 6874 (Feb. 12, 2010). The Notice emphasized that once submitted, bids could not be withdrawn after 10:00 a.m. on March 16, 2010. 75 Fed. Reg. at 6880. The Notice further explained that "[t]o ensure that the Government receives a fair

return for the conveyance of lease rights for this lease sale, high bids will be evaluated in accordance with MMS bid adequacy procedures.  A copy of current procedures, 'Modifications to the Bid Adequacy Procedures' [was published] at 64 FR 37560 on July 12, 1999."  75 Fed. Reg. at 6881.

Lease Sale 213 took place as scheduled on March 17, 2010, with 67 companies submitting 642 bids on 468 tracts.  High bids totaled a little less than $950 million.  *See* Exh. 9 hereto, March 17, 2010 BOEMRE Press Release, available at http://www.gomr.mms.gov/homepg/whatsnew/newsreal/2010/100317.pdf.

BOEMRE then proceeded to conduct its two phase evaluation of the adequacy of the high bids pursuant to the Modified Procedures, *see* Exh. 10 hereto, 64 Fed. Reg. 37560, 37561 (July 12, 1999).  A high bid for a given tract may be determined adequate in Phase I depending upon how many bids were submitted for that tract, their relative amounts, and related information, *see id*.  If bid adequacy for a given tract has not been established based upon Phase I criteria, it is determined in Phase II based upon additional economic criteria, *see id*. at 37561–62.

BOEMRE completed Phase I of its Lease Sale 213 bid evaluations on March 31 13, 2010, and eighty-five bids were deemed acceptable as a result of that evaluation.  BOEMRE proceeded to conduct Phase II, and by June 11, 2010, had deemed acceptable the high bids on 358 additional tracts, rejected the high bids on 20 tracts, and still had 5 high bids left to process.[7]

DOW contends that BOEMRE was required to prepare a new Supplement to the previously prepared EIS, Supplemental EIS and Environmental Analysis before accepting those

---

[7]     *See* Exh. 11 hereto, Final Phase I Acceptances, available at http://www.gomr.mms.gov/ homepg/lsesale/213/213ph1letter.pdf; Exh. 12 hereto, Interim Phase 2 Decision Report, available at http://www.gomr.mms.gov/homepg/lsesale/213/213ph2letter-06-11-10-revised.pdf.

high bids that had not as of the April 20, 2010 (the date of the Deepwater Horizon oil spill) completed the bid sufficiency review process, *e.g.*, Prayer for Relief ¶ B.

This claim should be dismissed as a matter of law. Although a Supplemental EIS may be required if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," 40 C.F.R. § 1502.9(c)(1)(ii), "supplementation is necessary *only* if there remains 'major Federal actio[n]' to occur, as that term is used in [NEPA, 42 U.S.C.] § 4332(2)(C)." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 73 (2004) (emphasis added) (citation omitted). "Major" federal actions are those "actions with effects that may be major.…" 40 C.F.R. § 1508.18.

There clearly was no major federal action "remain[ing] to occur" as of April 20, 2010. The federal action with potentially major effects was Lease Sale 213 itself, an event that had occurred more than a month previously, on March 17, 2010, and which had been preceded by the preparation of not only an EIS, but a Supplemental EIS and an Environmental Analysis, *see* pp. 11–12 *supra*. The only ongoing activity with respect to Lease Sale 213 as of April 20, 2010 was the determination of the adequacy of individual high bids. Dozens of high bids had already been deemed adequate and accepted as of that date, *see* p. 13 *supra*, and all that remained was BOEMRE's assessment — based upon *economic* criteria, not environmental considerations — whether the remaining high bids were acceptable, *see* pp. 12–13 *supra*.

This clearly did not constitute major federal action. The recent decision in *Center for Biological Diversity v. Salazar*, No. 09-cv-8207, 2010 WL 2493988 (D. Ariz. June 17, 2010), confirms this conclusion. The Bureau of Land Management in 1988 had performed an environmental assessment and approved a plan of operations for a uranium mine, but the mine had ceased operations in 1992. Before being allowed to resume operations seven years later, the

new owner was required by the Bureau both to increase the amount of the reclamation bond posted for the mine, and to obtain a new state air permit.  The plaintiff sued, arguing that the Bureau was required to prepare a Supplemental EIS.

The court disagreed, observing that "[i]f there is no 'major federal action,' that is the end of the inquiry; the agency need not prepare Supplemental NEPA analysis."  2010 WL 2493988, at *6 (quotation omitted). Although the actions taken by the Bureau in 1999 were a condition precedent to the resumption of mining operations, they did not constitute major federal actions, as opposed to the Bureau's approval of the original plan of operations.  *Id*. at *7.  "There is no ongoing 'major Federal action' that could require supplementation."  *Id*. (quoting *S. Utah*, *supra*, 542 U.S. at 73).

The case against a Supplemental EIS is even stronger here, given that the ongoing action involved an economic evaluation of high bids, and had no bearing on lease operations.

Many other decisions are to the same effect.  For example, in *Southern Utah*, the Supreme Court held that increased off-road vehicle usage did not require the preparation of a Supplemental EIS with respect to an Interior Department land use plan that permitted some off-road vehicles on certain Utah federal lands.  There was "no ongoing 'major Federal action' that could require supplementation," 542 U.S. at 73, even though the approved plan explicitly called both for continued Government monitoring and Governmental action to close areas to off-road vehicles if warranted,  *id*. at 68.  *See also Wyoming v. U.S. Dep't of the Interior*, 360 F. Supp. 2d 1214 (D. Wyo. 2005) (no major federal action remained that could trigger the preparation of a Supplemental EIS with respect to a wolf reintroduction plan, even though: (a) wolves were being introduced into additional areas, and (b) the Interior Department had taken affirmative action to shift responsibility for the program to the State of Wyoming); *Greater Yellowstone Coalition v.*

15

*Tidwell*, 572 F.3d 1115, 1123, 1128 (10th Cir. 2009) ("That the Forest Service retains discretion to amend the permit does not alone lead to the conclusion there is ongoing major federal action or major federal action to occur," nor does the fact that Bureau of Land Management "reviews the [Memorandum of Understanding] yearly and has the discretion to renegotiate.").

The Second Claim for Relief should be dismissed for failure to state a viable claim.

## III.    THE THIRD AND FOURTH CLAIMS FOR RELIEF ARE NOT WITHIN THE SUBJECT MATTER JURISDICTION OF THE COURT AND/OR FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

The Third and Fourth Claims for Relief assert ESA violations arising out of the Department's failure to engage in additional consultations with the Fish and Wildlife Service and National Marine Fisheries Service subsequent to the Deepwater Horizon oil spill, and its purported irreversible or irretrievable commitment of resources with the effect of foreclosing alternative measures which avoid jeopardizing the continued existence of any endangered or threatened species.  On that basis, DOW challenges: (1) the remaining lease sales scheduled to take place in the Gulf of Mexico under the Interior Department's 2007-12 five-year leasing program, and (2) the most recent lease sale, Sale 213.  *See* Third Amended Complaint ¶¶ 66–74.

For essentially the same reasons that have already been addressed with respect to DOW's NEPA and APA challenges, the Court lacks subject matter jurisdiction as to the first challenge, and the second fails to state a claim upon which relief may be granted.

### A.    DOW's ESA Challenge to Future Lease Sales Is Not Ripe.

DOW's NEPA and APA claims with respect to future Gulf of Mexico lease sales are not ripe because: (a) it is uncertain whether the Secretary will decide to proceed with the remaining Gulf of Mexico lease sales; and (b) it is uncertain exactly what environmental reviews the Department will decide to conduct prior to making an affirmative decision to proceed with

those lease sales or, subsequently, prior to holding the lease sales.  *See* pp. 8–11 *supra*.  The same conclusion applies equally to DOW's ESA claim.

### B.    DOW's ESA Challenge to Lease Sale 213 Fails as a Matter of Law.

The Department of Interior engaged in extensive consultations with the National Marine Fisheries Service regarding the lease sales scheduled to take place in the Gulf of Mexico pursuant to the 2007-12 five year leasing program, including Lease Sale 213.  That consultation culminated in the Services' 129-page June 29, 2007 "Biological Opinion," the "document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  *See* 50 C.F.R. § 402.02.  The Service concluded that "the five-year leasing program and its associated actions are not likely to jeopardize the continued existence of threatened or endangered species under the jurisdiction of [the Service] or destroy or adversely modify designated critical habitat."  Exh. 13 hereto at p. 1, entire Biological Opinion, available at http://sero.nmfs.noaa.gov/sf/deepwater_horizon/02611_MMS_Leases_2007-2012.pdf.

DOW challenges the continued adequacy of this consultation and Biological Opinion with respect to Lease Sale 213 in light of the subsequent Deepwater Horizon oil spill, seeking reinitiation of that consultation and contending that the Department by conducting the lease sale inappropriately committed an irreversible or irretrievable commitment of resources prior to the completion of required consultation, *see* Third Amended Complaint ¶¶ 66–74 (citing 16 U.S.C. § 1536).  This claim fails as a matter of law.

First, the claim ignores that Lease Sale 213 had already occurred more than a month before the oil spill, with the only remaining event the determination of bid adequacy, a purely economic analysis already completed for approximately 100 leases, *see* pp. 12–14 *supra*.

Second, the claim ignores the D.C. Circuit's resolution of essentially the identical issue and claim thirty years ago in *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), a decision whose continued vitality was confirmed by the D.C. Circuit last year in *Center for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 482–83 (D.C. Cir. 2009), in the course of rejecting an ESA challenge to the 2007-12 five year OCS leasing program.

Like DOW here, North Slope challenged the adequacy of an ESA consultation in connection with an OCS lease sale, but the D.C. Circuit allowed the sale to proceed, notwithstanding the "conceded 'incomplete information' on which the biological opinion" was based, 642 F.2d at 611 n.143; *see also id*. at 609 n.127.

The Court began by observing that "the lease sale itself is only a preliminary and relatively self-contained stage within an overall oil and gas development program which requires substantive approval and review prior to implementation of each of the major stages: leasing, exploring, producing." *Id*. at 593. Lessees upon receipt of a lease are only permitted to engage in "preliminary activities," and "[i]t is apparent, then, that the situation in the [leased area] can hardly spiral out of the Secretary's guidance and ongoing control now that 'high' bids have been accepted and the lease stage is fully underway." *Id*. at 594.

The court emphasized the "various federal statutes which require continuing review of all activity growing out of these leases," with the Secretary empowered under the OCS Lands Act "to suspend activities on a lease if 'continued activity … would ... cause harm ... (to marine life or environment).'" *Id*. at 594–95. While "the segmented approach of [the OCS Lands Act] does not attenuate ESA's notion of 'agency action,'… [i]t does, however, qualify somewhat the broadest practical effect the term could have. Mandatory stage-by-stage review prevents the telescoping of any and every projected hazard to endangered life and to the

environment into one overwhelming statutory obstacle," and "satisfaction of the ESA mandate that no endangered life be jeopardized must be measured in view of the full contingent of OCSLA checks and balances and all mitigating measures adopted in pursuance thereof." *Id*. at 609.

Thus, given the approval processes applicable to exploration and production plans, *see id*. at 611 n.140, the conduct of the lease sale itself did not violate the ESA because it "[p]lainly … entail[s] no 'irreversible or irretrievable commitment of resources with respect to the Agency action which has the effect of foreclosing … alternative measures which avoid jeopardizing the continued existence of any endangered or threatened species ….'" *Id*. at 611 (quoting 16 U.S.C. § 1536(d)).

The ESA claim is far weaker here, given that in *North Slope*, the deficiencies in the Biological Opinion were identified more than one month *before* the lease sale,[8] while here, the purported deficiencies stem from events that occurred more than a month *after* the lease sale.

## CONCLUSION

The Third Amended Complaint should be dismissed for lack of venue. Alternatively, the Third Amended Complaint should be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.

Respectfully submitted,

Steven J. Rosenbaum
Bradley K. Ervin
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.

/s/ Brian P. McCarthy  (MCCAB 7434)
BRIAN P. McCARTHY
MCDOWELL KNIGHT ROEDER
& SLEDGE LLC

---

[8]    *See* 642 F.2d at 609 & nn.126, 127 (deficiencies identified in Nov. 6, 1979 National Marine Fisheries Service letter), *id*. at 598 (lease sale took place on December 11, 1979).

Washington, D.C. 20004
Telephone:  (202) 662-5568
Facsimile:  (202) 778-5568
srosenbaum@cov.com

December 6, 2010

11 North Water Street, Suite 13290
P.O. Box 350
Mobile, Alabama 36601
Telephone: (251) 431-8806
Fax: (251) 432-5303
bmccarthy@mcdowellknight.com
Counsel for Defendant-Intervenors

20

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December 2010, a true and accurate copy of the foregoing Motion to Dismiss the Third Amended Complaint and supporting Memorandum were filed via the Court's CM/ECF system and served via the Court's CM/ECF system, upon the following:

Catherine M. Wannamaker
Gilbert Broughton Rogers
127 Peachtree St., Suite 605
Atlanta, GA 30303
(404) 521-9900
cwannamaker@selcga.org
grogers@selcga.org


Michael Senatore
Sierra B. Weaver
1130 17th St., N.W.
Washington, D.C. 20036
(202) 682-9400
msenatore@defenders.org
sweaver@defenders.org

Guillermo A. Montero
James D. Gette
Joanna K. Brinkman
P.O. Box 663
Washington, DC 20044
(202) 305-0443
guillermo.montero@usdoj.gov
james.gette@usdoj.gov
joanna.brinkman@usdoj.gov


Michael D. Thorp
601 D Street, Room 3112
Washington, D.C. 20004
(202) 305-0456
michael.thorp@usdoj.gov


Gary A. Moore
U.S. Attorney's Office
63 South Royal Street, Suite 600
Mobile, AL 36602
251-441-5845
251-441-5051 (fax)
gary.moore2@usdoj.gov


/s/ Brian P. McCarthy  (MCCAB 7434)
BRIAN P. McCARTHY
McDowell Knight Roedder
& Sledge LLC
11 North Water Street, Suite 13290
P.O. Box 350
Mobile, Alabama 36601
Telephone: (251) 431-8806
Fax: (251) 432-5303
bmccarthy@mcdowellknight.com