**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DEFENDERS OF WILDLIFE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 10-0254-WS-C** |
| | ) | |
| **BUREAU OF OCEAN ENERGY** | ) | |
| **MANAGEMENT, REGULATION, AND** | ) | |
| **ENFORCEMENT,** *et al.*, | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| **CHEVRON U.S.A. INC.,** *et al.*, | ) | |
| | ) | |
| **Intervenor-Defendants.** | ) | |

**ORDER**

This matter comes before the Court on the Federal Defendants' Motion to Dismiss (doc. 66), the Association Intervenors' Motion to Dismiss (doc. 63) and Intervenor Chevron U.S.A. Inc.'s Motion to Dismiss (doc. 68). All three overlapping Rule 12(b) Motions have been briefed extensively, and are ripe for disposition.

**I.     Nature of the Action.**

Plaintiff, Defenders of Wildlife ("DOW"), brought this action against a collection of federal defendants, including the Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE");[1] the United States Department of the Interior; and Ken Salazar, Secretary of the Interior (collectively, the "Federal Defendants").[2] The lawsuit proceeds from

---

[1]     That agency was previously known as the Minerals Management Service ("MMS"). The change in agency names is not material to this dispute. Accordingly, to avoid unnecessary confusion, this Order will refer to both current and former iterations of that agency as BOEMRE, without differentiating between when it was called MMS and when it became known as BOEMRE.

[2]     The parties concur that, under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.* ("OCSLA"), the Federal Defendants adhere to a five-step process for federal (Continued)

DOW's position that, in the wake of the Deepwater Horizon drilling rig explosion and oil spill in the Gulf of Mexico on April 20, 2010, the Federal Defendants have failed to modify their policies and practices concerning offshore oil and gas leasing operations in the Gulf as required by the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"); the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* ("ESA"); and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA").

The operative Third Amended Complaint (doc. 61) summarizes the Federal Defendants' alleged violations by asserting that BOEMRE continued accepting bids on more than 200 new deepwater leases in Lease Sale 213 after the April 2010 oil spill, without preparing a Supplemental Environmental Impact Statement, reinitiating consultation under the ESA, or insuring that its actions will not jeopardize the survival of endangered and threatened species. (Doc. 61, at 2.) In a nutshell, DOW contends that, by continuing to accept lease bids, the Federal Defendants have failed adequately to consider the new information gleaned from the Deepwater Horizon oil spill in administering the oil and gas leasing program in the Gulf of Mexico, and that the Federal Defendants' deficiencies in that regard violate NEPA, the ESA, and the APA.

Pursuant to this overarching theory, DOW advances four causes of action against the Federal Defendants. Claim One asserts that BOEMRE violated NEPA and the APA by continuing to rely on the conclusions of an April 2007 environmental impact statement (the "Multi-sale EIS") governing 11 lease sales in the Gulf (including Lease Sale 213), even though

---

offshore oil and gas leasing, exploration, and development on the Outer Continental Shelf. Those steps are as follows: (i) the Secretary develops a five-year leasing program, prepares a lease sale schedule, and completes a programmatic environmental impact statement ("EIS"); (ii) after preparation of a multi-sale EIS for the anticipated lease sales, leases are offered and awarded through competitive auctions, with each lease conveying an exclusive right to the successful bidder to explore, develop and produce oil and gas on a specific tract for a specific period of time; (iii) the lessee submits an Exploration Plan to the BOEMRE for approval setting forth its plans for exploration activities, drilling methods and exploratory wells; (iv) if exploration is successful, the lessee submits for approval a Development Operations Coordination Document delineating the number and location of production wells, type of platform, and the like; and (v) the lessee sells the recovered oil and gas. (Doc. 66-1, at 3-4; doc. 72, at 4.) This action appears primarily focused on the second stage of the OCSLA process, inasmuch as DOW's Third Amended Complaint stripped out various allegations and claims that would have related to the third and fourth stages.

key conclusions of the Multi-sale EIS are demonstrably invalid after the Deepwater Horizon oil spill. In this regard, DOW maintains that BOEMRE "must prepare a supplemental Multisale EIS and [Environmental Assessments] for ongoing and future lease sales" (doc. 61, ¶ 60), and that its failure to do so violates NEPA and the APA. Claim Two focuses on Lease Sale 213, and alleges an APA violation based on BOEMRE's acceptance of bids for more than 200 new oil and gas leases in the Gulf in that lease sale following the Deepwater Horizon spill, "in reliance on the invalid conclusions of the Multisale EIS and Environmental Assessment – Finding of No Significant Impact for Sale 213 and without supplementation of the EIS based on significant new circumstances and information." (*Id.*, ¶ 65.) Claim Three alleges that BOEMRE violated the APA and the ESA by failing to reinitiate consultation with the National Marine Fisheries Service ("NMFS") and U.S. Fish and Wildlife Service ("FWS") based on new information from the Deepwater Horizon spill showing that deepwater drilling in that area may harm endangered or threatened species and critical habitat. And in Claim Four, DOW maintains that BOEMRE violated the APA and the ESA by "proceeding with lease sales in the Gulf after the Deepwater Horizon incident, … in violation of its independent duty to insure that its actions are not likely to jeopardize the continued existence of any listed species." (*Id.*, ¶ 73.)

On the strength of these four claims, DOW seeks a declaration that the Federal Defendants are in violation of the specified statutes in the specified ways, vacatur of BOEMRE's acceptance of bids for new leases in Lease Sale 213 post-Deepwater Horizon spill, vacatur and remand of the Multi-sale EIS and injunction of "all future lease sales authorized therein" until a supplemental EIS is prepared, and an order commanding the Federal Defendants "to reinitiate consultation to account for the new information presented by the Deepwater Horizon incident." (*Id.* at 22.)

This action is not confined to DOW and the Federal Defendants. On August 9, 2010, the undersigned entered an Order (doc. 31) granting leave to intervene to the American Petroleum Institute, the Independent Petroleum Association of America, the U.S. Oil & Gas Association, and the International Association of Drilling Contractors (collectively, the "Association Intervenors"). On December 9, 2010, the undersigned entered a similar Order (doc. 67) granting leave to intervene to Chevron U.S.A., Inc. ("Chevron").

Now pending are three sets of overlapping Rule 12(b) Motions and accompanying memoranda filed by the Federal Defendants, the Association Intervenors and Chevron. In the

interests of efficiency and clarity, the Court will address the Federal Defendants' Motion first, then turn to non-redundant aspects of the intervenors' Motions.

## II. Rule 12(b) Standards.

All three Motions to Dismiss proceed in whole or in part under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[3]

On a Rule 12(b)(6) motion to dismiss for failure to state a claim, "the court construes the complaint in the light most favorable to the plaintiff and accepts all well-pled facts alleged … in the complaint as true." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009); *see also Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) ("In ruling on a 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff.").

To withstand Rule 12(b)(6) scrutiny, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face," so as to "nudge[] their claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citation omitted). Thus, minimum pleading standards "require[] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. As the Eleventh Circuit has explained, *Twombly/Iqbal* principles simply require that a plaintiff plead "enough facts to state a claim to relief that is plausible on its face," whose allegations are "enough to raise a right to relief above the speculative level." *Speaker*, 623 F.3d at 1380 (citations omitted). The factual content of the complaint must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citations omitted).

---

[3] The intervenors also invoke the improper venue provision of Rule 12(b)(3) as a separate ground for seeking dismissal. The appropriate legal standard for the Rule 12(b)(3) issue will be addressed *infra* as appropriate.

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction where the movant mounts a facial attack on the Complaint, the Court must "look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Stalley ex rel. United States v. Orlando Regional Healthcare System, Inc.*, 524 F.3d 1229, 1232-33 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Sinaltrainal*, 578 F.3d at 1260 (in facial attack under Rule 12(b)(1), the Court "examines whether the complaint has sufficiently alleged subject matter jurisdiction" and "construes the complaint in the light most favorable to the plaintiff and accepts all well-pled facts alleged … in the complaint as true").[4]

### III. The Federal Defendants' Motion to Dismiss.

The Federal Defendants seek dismissal of Claims One and Three, and a portion of Claim Four, principally on grounds of mootness and ripeness. The Federal Defendants acknowledge, however, that they "are not currently moving to dismiss the Second Claim for Relief that appears to challenge the acceptance of bids under Lease Sale 213." (Doc. 66-1, at 2 n.2.)[5]

---

[4] The Association Intervenors insist that for challenges to subject matter jurisdiction and venue, courts may look beyond well-pleaded factual allegations of a complaint. That is true in certain instances. *See Bryant v. Rich*, 530 F.3d 1368, 1376 (11th Cir. 2008) (explaining that "a judge may make factual findings about subject matter jurisdiction on a Rule 12(b)(1) motion" and "may make factual findings necessary to resolve motions to dismiss for … improper venue"); *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1237-38 (11th Cir. 2002) (explaining that if Rule 12(b)(1) motion argues that facts as stated do not provide cause for federal jurisdiction, then plaintiff's factual allegations receive presumption of truthfulness, as opposed to where 12(b)(1) motion attacks the very facts providing cause for jurisdiction). The 12(b)(1) motions in this case are largely facial attacks on subject matter jurisdiction, as to which the well-pleaded allegations of the Third Amended Complaint are taken as true. In any event, this discussion is largely academic, inasmuch as movants have not identified any contested facts that would materially alter the jurisdictional or venue determinations in this case. The parties' briefs do not point out any significant disputes of fact that might sway the Rule 12(b)(1) or 12(b)(3) analyses in one direction or the other.

[5] The Federal Defendants elaborate on their intentions as to the Second Claim in their reply, wherein they state that they "will address the Second Claim for Relief in a Motion for Summary Judgment." (Doc. 77, at 2 n.1.) Although the Federal Defendants have not moved for dismissal of Claim Two, the intervenors have done so; therefore, the viability of Claim Two for Rule 12(b) purposes will be explored in § IV, *infra*.

**A.      Claim One: Failure to Prepare Supplemental Multisale EIS for Ongoing and Future Lease Sales.**

As noted, DOW's first claim is that BOEMRE has improperly failed to "prepare a supplemental Multisale EIS and EAs for ongoing and future lease sales" to take into account new information resulting from the Deepwater Horizon spill. This claim challenges not only the continuing validity of the Multi-sale EIS, but also that of "the EAs for Lease Sale 206 and 213, both of which tiered off the Multisale EIS." (Doc. 61, ¶ 59.)[6] The Federal Defendants seek dismissal of Claim One on grounds of mootness (in that BOEMRE is in fact preparing a supplemental Multi-sale EIS and will likewise supplement the EAs for Lease Sales 206 and 213), ripeness (in that plaintiff's challenges to future lease sales in Claim One are not ripe for judicial review), and lack of final agency action.

**1.      The Mootness Doctrine and Claim One.**

The Federal Defendants' mootness argument is straightforward. Their position is that DOW need not sue them in Claim One for failure to supplement the Multi-sale EIS by taking into account new information gleaned from the Deepwater Horizon accident because the Federal Defendants are in fact preparing such a supplement.[7] A notice that BOEMRE published in the Federal Register on November 10, 2010, confirms this development, as follows: "The BOEMRE is announcing its intent to prepare a supplemental environmental impact statement (SEIS)" that will, among other things, "update the environmental and socioeconomic analyses in the Gulf of Mexico OCS Oil and Gas Lease Sales: 2007-2012," as well as those associated with at least 11

---

[6]      As explained by plaintiff, this "tiering" concept works as follows: BOEMRE prepared a single Multi-sale EIS for Outer Continental Shelf oil and gas exploration and development in the Gulf of Mexico for the period spanning from 2007 to 2012 (the "2007-2012 Program"). That Multi-sale EIS analyzed the environmental impacts of some 11 contemplated lease sales for that period. For each specific lease sale, the Federal Defendants also prepared an Environmental Assessment ("EA") that was "tiered to" the Multi-sale EIS, in that each EA relied on the Multi-Sale EIS and found no significant impacts not previously studied in that document. (Doc. 72, at 5.) So if the Multi-sale EIS is invalid, then EAs tiered off that EIS are similarly problematic.

[7]      As the Federal Defendants put it, "BOEMRE has initiated the preparation of an SEIS and will not conduct another lease sale under the Multi-sale EIS until the SEIS is completed." (Doc. 66-1, at 9.)

specific lease sales. 75 Fed. Reg. 69122-01 (Nov. 10, 2010).[8] The November 10 Notice continues that "[a] SEIS is deemed appropriate … in order to consider new circumstances and information arising, among other things, from the Deepwater Horizon blowout and spill." *Id.*

As a general proposition, "[a] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. If events that occur subsequent to the filing of a lawsuit … deprive the court of the ability to give the plaintiff … meaningful relief, then the case is moot and must be dismissed." *National Ass'n of Boards of Pharmacy v. Board of Regents of the University System of Georgia*, 633 F.3d 1297, 1309 (11th Cir. 2011) (citations omitted); *see also Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1351 (11th Cir. 2011). Dismissals on mootness grounds are properly entered under Rule 12(b)(1) as dismissals for lack of subject matter jurisdiction. *See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007).

The Federal Defendants urge the Court to dismiss Claim One as moot insofar as DOW seeks to force BOEMRE to supplement the Multi-sale EIS and associated EAs because BOEMRE is voluntarily doing just that.[9] For its part, DOW contests this mootness argument, even as it acknowledges BOEMRE's formal announcement of its intent to prepare a supplemental EIS governing the remainder of the 2007-2012 Program. Plaintiff reasons that, despite its efforts to supplement the Multi-sale EIS, BOEMRE is nonetheless "violating NEPA by continuing to tier its approval of drilling plans and lease sales to an admittedly inadequate EIS." (Doc. 72, at 7.) Thus, DOW's theory is that Claim One is not moot, even though BOEMRE is working on a supplemental EIS, because it is continuing to approve "drilling plans and lease sales" based on the old EIS.

Insofar as DOW says Claim One is not moot because BOEMRE is approving "drilling plans" under the faulty EIS today, that argument fails because no "drilling plans" claims are

---

[8] Six days later, BOEMRE published a follow-up Notice that corrected certain "clerical errors" contained therein. *See* 75 Fed. Reg. 70023-01 (Nov. 16, 2010).

[9] As the Federal Defendants succinctly put it, "BOEMRE has committed to preparing the SEIS, which is the very relief that DOW seeks in its First Claim." (Doc. 77, at 5.)

presented in the Third Amended Complaint.[10]  Even if Claim One in fact asserted violations based on the Federal Defendants' approval of drilling plans, which it does not, any such claims would be properly dismissed because exclusive jurisdiction over them vests with the courts of appeals.  *See* 43 U.S.C. § 1349(c)(2) ("Any action of the Secretary to approve … any exploration plan or any development and production plan under this subchapter shall be subject to judicial review only in a United States court of appeals ….").[11]  To the extent, then, that DOW would bolster Claim One with argument that the Federal Defendants are approving drilling/exploration/ production/development plans that they should not, that argument fails because (i) Claim One omits any "drilling plan" theories, and (ii) even if the Third Amended Complaint brought claims based on the agency's approval of drilling plans, such claims would be precluded in this District Court by § 1349(c)(2)'s mandate that such claims are reviewable only in the United States Court of Appeals for the circuit encompassing the affected state.

---

[10]    In submitting its Third Amended Complaint, DOW expressly deleted its claims regarding drilling plans, including allegations that the Federal Defendants were violating NEPA by granting categorical exclusions "for exploration and drilling operations in the Gulf of Mexico" (Doc. 33, ¶ 92) following the Deepwater Horizon explosion.  Plaintiff thus voluntarily dismissed that aspect of its claims.  (*See* doc. 60.)  Having done so, DOW cannot now backdoor these dismissed claims and allegations back into this case via arguments that Claim One is not moot because BOEMRE is "violating NEPA by continuing to tier its approval of drilling plans … to an admittedly inadequate EIS."  (Doc. 72, at 7.)  Yet DOW attempts to do just that.  Its briefs on the Rule 12(b) Motions are rife with references to "the granting of applications for permits to drill" (doc. 72, at 2), BOEMRE's approval of "twenty-seven exploration plans or development operations coordination documents" between June 2010 and December 2010 (*id.* at 11), its approval of "over 3000 applications for permission to drill" (*id.* at 11-12), BOEMRE's recent notice to "thirteen companies involved in deepwater drilling that they are able to resume drilling at certain deepwater wells without undergoing additional environmental review" (doc. 74, at 5), "ongoing approval of … drilling projects" (*id.* at 6), and so on.  Such allegations are perplexing, given DOW's excision of all drilling-related claims from its Third Amended Complaint.  They are also inappropriate, given the well-settled principle that federal district courts are not empowered under the OCSLA to review BOEMRE's approval of exploration, development and production plans for lessees whose bids have previously been accepted.

[11]    *See also Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 784 (9th Cir. 2001) ("The Secretary's action to approve, require modification of, or disapprove a [development and production plan] is subject to judicial review only in the United States Court of Appeals"); *Shell Oil Co. v. F.E.R.C.*, 47 F.3d 1186, 1192 (D.C. Cir. 1995) ("judicial review of decisions with respect to leasing [programs], exploration, development or production plans shall take place only in the courts of appeals").

DOW also suggests that Claim One is not moot because BOEMRE is "continuing to tier its approval of … lease sales to an admittedly inadequate EIS" (doc. 72, at 7). Plaintiff's premise is that, even as it moving forward with preparation of a supplemental Multi-sale EIS, BOEMRE is continuing to approve lease sales under the old, invalid EIS. In response, the Federal Defendants make a strong showing (which DOW does not counter or rebut) that, other than Lease Sale 213, BOEMRE has not conducted and will not conduct any post-Deepwater Horizon lease sales under the Multi-sale EIS until the supplemental EIS is completed.[12] But Lease Sale 213 is the rub. The Federal Defendants do <u>not</u> maintain that no bid approvals have occurred on Lease Sale 213 following the Deepwater Horizon disaster, and the Third Amended Complaint contains specific factual allegations to the contrary. *See* doc. 61, ¶ 2 ("In violation of NEPA and its own regulations, BOEM has accepted bids on at least 221 new leases in Lease Sale 213 for deepwater wells … since the BP well blowout."). Rather than suggesting that Claim One should be dismissed insofar as it concerns Lease Sale 213 activity, the Federal Defendants simply state in a footnote that "Plaintiff's claim as to Lease Sale 213 is embodied in its Second Claim for Relief, and this motion does not seek dismissal of that Claim." (Doc. 66-1, at 9 n.5.)

Because Claim One has a Lease Sale 213 component that the Federal Defendants' Motion to Dismiss does not address, the Court finds that movants have not shown that this portion of Claim One is moot or otherwise due to be dismissed.[13] That said, the Court agrees

---

[12]    In particular, the Federal Defendants show that, at the inception of this case, there were four remaining lease sales scheduled under the 2007-2012 Program, those being Lease Sales 215, 216, 218 and 222. Lease Sale 215 has been canceled. *See* 75 Fed. Reg. 44276-03 (July 28, 2010) ("On May 27, 2010, the President announced the Secretary of the Interior's decision to cancel WPA Sale 215 that was scheduled to occur on August 18, 2010."). And the Secretary of the Interior issued a press release on December 1, 2010 stating that the other three lease sales (which were slated for 2011 and 2012) would not go forward until after the supplemental Multi-sale EIS has been prepared. (Doc. 66-1, at 10; doc. 77, at 4.) Plaintiff has neither alleged nor shown that any of Lease Sales 215, 216, 218 or 222 have proceeded in any way under the old, outdated EIS.

[13]    Stated differently, the Third Amended Complaint alleges that BOEMRE has continued accepting bids under Lease 213 after the Deepwater Horizon disaster, tiering such actions on what it knows to be an invalid EIS. That claim (which is fairly presented in both Claim One and Claim Two) is not mooted by BOEMRE's commitment to prepare a supplemental EIS because it alleges that BOEMRE is continuing to accept bids under the old, incorrect EIS in the interim.

with the Federal Defendants that the remainder of Claim One is moot.  DOW contends that BOEMRE must supplement the EIS, but BOEMRE is already doing so.

As for those portions of Claim One mooted by the Federal Defendants' demonstrated commitment to supplementing the Multi-sale EIS, DOW asserts that they should not be dismissed because "there is reason to think that those actions fall under the voluntary cessation exception to mootness."  (Doc. 72, at 8.)  It is well established that "the voluntary cessation of challenged conduct will only moot a claim when there is no reasonable expectation that the accused litigant will resume the conduct after the lawsuit is dismissed."  *National Ass'n of Boards of Pharmacy*, 633 F.3d at 1309 (citations omitted).  An important feature of this voluntary cessation doctrine is that government actors "receive the benefit of a rebuttable presumption that the offending behavior will not recur."  *Sheely*, 505 F.3d at 1183; *see also Bankshot Billiards*, 634 F.3d at 1352 (noting that Eleventh Circuit has consistently deemed moot "a challenge to government policy that has been unambiguously terminated … in the absence of some reasonable basis to believe that the policy will [be] reinstated if the suit is terminated") (citation omitted); *Beta Upsilon Chi Upsilon Chapter at the University of Florida v. Machen*, 586 F.3d 908, 917 (11th Cir. 2009) ("In cases where government policies have been challenged, the Supreme Court has held almost uniformly that voluntary cessation of the challenged behavior moots the claim.") (citations omitted).

According to DOW, the voluntary cessation exception may apply because the cited Federal Register notice "appears to say nothing about when the future lease sales would take place or even whether they would commence only after the SEIS is completed."  (Doc. 72, at 8.)[14]  But in that notice, the Federal Defendants unequivocally committed to preparing the supplemental EIS, which is precisely the relief that Claim One requests.  Moreover, in various

[14]     Plaintiff elaborates that "the decision to create a SEIS for future lease sales does nothing to alleviate the fact that, in the interim, BOEM is still relying on problematic NEPA analyses." (Doc. 72, at 9.)  It is not clear what BOEMRE activity plaintiff is referencing here.  If plaintiff intends to reference approval of drilling plans, then that claim is beyond this Court's jurisdiction for the reasons stated *supra*.  If plaintiff is referencing Lease Sale 213, then that argument need not be considered because, as noted, the Federal Defendants do not seek Rule 12(b) relief as to Lease Sale 213 claims.  If plaintiff is suggesting that other lease sale bids are being accepted based "on problematic NEPA analyses" post-Deepwater Horizon, that assertion fails because the Court has no evidence, no argument, and no allegations in the pleadings that such is the case, and the Federal Defendants have expressly denied same.

Federal Register notices, the Federal Defendants have either canceled (in the case of Lease Sale 215) or specifically stated their intent to analyze (in the case of Lease Sales 216, 218 and 222) under that supplemental EIS all remaining lease sales.[15]  In short, BOEMRE has bound itself, via Federal Register notices, to prepare the supplemental EIS that DOW wants and to analyze the remaining lease sales under the 2007-2012 Program pursuant to that supplemental EIS.  There is no "voluntary cessation" problem here, and nothing in plaintiff's showing or argument overcomes the presumption that the Federal Defendants' purportedly offending behavior will not recur.

> ### 2.    *The Ripeness Issue and Claim One.*

Claim One specifically mentions future lease sales, and DOW's Third Amended Complaint seeks injunction of "future lease sales" pending preparation of a supplemental Multi-sale EIS.  (Doc. 61, ¶¶ 3, 60.)  The Federal Defendants extrapolate from these isolated references to future lease sales that DOW is asking the Court to find that "future lease sales would violate NEPA unless the agency completes a SEIS."  (Doc. 66-1, at 14.)  Because it is unknown and unknowable at this point what the supplemental EIS will say, or if or when BOEMRE will conduct future lease sales relative to completion of that supplemental EIS, the Federal Defendants assert, this aspect of Claim One is rooted in hypotheticals and speculation and is therefore not ripe.  *See, e.g., Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1174 (11th Cir. 2006) ("The ripeness inquiry is designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.") (citation and internal quotation marks omitted); *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006) (ripeness doctrine "protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes") (citation omitted).  In the NEPA context, the Eleventh Circuit has explained that "the issue is ripe at the time the agency fails to comply" with NEPA.  *Ouachita*, 463 F.3d at 1174.  Movants' point is simple:  BOEMRE cannot

---

[15]    Of course, the exception is Lease Sale 213, which is for reasons already stated outside the scope of the Federal Defendants' Motion to Dismiss and therefore not embraced by this discussion.

have failed to comply with NEPA as to future lease sales that it has not yet approved or authorized.

In response, DOW insists that the Federal Defendants misunderstand the nature of the relief sought in Claim One. Plaintiff states that "it is not challenging the adequacy of the SEIS that BOEM plans to create nor the fact that the future lease sales in the Multisale Plan may tier from some new SEIS." (Doc. 72, at 13.)[16] Rather, DOW explains, its Third Amended Complaint "relate[s] to the inadequacy of BOEM's environmental review at present" and it "seeks to remedy existing instances of such faulty reliance" on the now-outdated Multi-sale EIS. (*Id.*)

From review of the briefs on this issue, it is evident that the parties are talking past each other, interpreting the reference to "future lease sales" in Claim One in drastically differing ways. The Federal Defendants assume that Claim One is challenging the validity of future lease sales that have not yet been announced and that will be tiered to a supplemental EIS that has not yet been prepared. But DOW states that Claim One is intended to redress only "existing instances" of BOEMRE action in reliance on the now-invalid Multi-sale EIS. As discussed above, those "existing instances" that are properly being litigated in this case appear confined to Lease Sale 213, and specifically the agency's approval of bids for Lease Sale 213 following the Deepwater Horizon explosion using the old Multi-sale EIS without awaiting supplementation that BOEMRE itself agreed was needed. There is no ripeness problem with that claim. Therefore, based on plaintiff's representation that Claim One proceeds no further than "existing instances" of BOEMRE action in reliance on the old Multi-sale EIS, the Court need not examine further the ripeness and final agency action arguments. DOW has expressly disclaimed any intent to challenge lease sales that have not yet occurred or to seek relief in Claim One for lease sales that have not been approved or initiated at this time, based on speculation about what BOEMRE might do in the future.[17]

---

[16]     In that respect, DOW correctly concedes that the adequacy of any future supplemental EIS or the propriety of tiering future lease sales from that document are "topics that could be reviewed at a later time" and that would not properly be litigated here. (*Id.*)

[17]     A recurring theme in the various Rule 12(b) Motions in this case is that DOW's claims are not ripe insofar as it is contending that future lease sales conducted by BOEMRE may violate NEPA, the APA, or the ESA. The foregoing analysis applies with equal force to all of (Continued)

**B.** **_Claim Three: Failure to Reinitiate Consultation under ESA._**

Claim Three of the Third Amended Complaint alleges that the Federal Defendants' "failure to reinitiate consultation with NMFS and FWS violates" the Endangered Species Act and the Administrative Procedure Act. (Doc. 61, ¶ 70.) This claim centers on the requirement of § 7(a)(2) of the ESA that federal agencies engage in such consultation in carrying out their substantive obligation to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2).[18] ESA consultation is not a one-time-only, "fill-the-square" kind of obligation. Rather, pursuant to the ESA's implementing regulations, "[r]einitiation of formal consultation is required and shall be requested by the Federal agency … [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b).[19] The gravamen of Claim Three is

those arguments. In the interest of efficiency, the Court will not replicate this analysis in this Order each time another variant of the future lease sales / ripeness challenge is invoked by a defendant or intervenor-defendant. In all such instances, the argument fails because the Third Amended Complaint (as construed by this Court and as clarified by plaintiff's own admissions in its briefs on the Rule 12(b) motions) does not seek judicial determination that future lease sales will violate the ESA, NEPA or the APA; rather, plaintiff's claims are focused on the Federal Defendants' current activities and existing instances of alleged non-compliance with statutory obligations.

[18] _See also Florida Key Deer v. Paulson_, 522 F.3d 1133, 1138 (11th Cir. 2008) ("[S]ection 7(a)(2) … requires that agencies consult with the FWS to determine the effects of their actions on endangered or threatened species and their critical habitat."); 50 C.F.R. § 402.14(a) (if federal agency determines that its action "may affect listed species or critical habitat," then "formal consultation is required").

[19] _See also Wyoming Outdoor Council v. Bosworth_, 284 F. Supp.2d 81, 94 (D.D.C. 2003) (under ESA regulations, "both the Forest Service and the FWS are under a duty to reinitiate formal consultation if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered") (citations and internal quotation marks omitted); _Lone Rock Timber Co. v. U.S. Dep't of Interior_, 842 F. Supp. 433, 440-41 (D. Or. 1994) ("the BLM has a continuing duty to reinitiate consultation with the FWS if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered").

that BOEMRE failed to reinitiate consultation concerning lease sales in the Gulf of Mexico based on new information derived from the Deepwater Horizon oil spill.

The Federal Defendants maintain that Claim Three should be dismissed in its entirety because it proceeds from a false premise, namely, that BOEMRE has not reinitiated such consultation. To demonstrate the inaccuracy of DOW's position, the Federal Defendants proffer a pair of letters dated July 30, 2010, from BOEMRE to the NMFS and FWS. The letter to NMFS specifies that BOEMRE "requests that the National Marine Fisheries Service (NMFS) reinitiate consultation (based on the existing consultation and resulting Biological Opinion (BO) dated June 29, 2007) under Section 7 of the [ESA] on the effects of the Five-Year Outer Continental Shelf Oil and Gas Leasing Program (2007-2012) in the Central and Western Planning Areas of the Gulf of Mexico. This request is in response to the Deepwater Horizon (DWH) incident and is meant to comply with 50 C.F.R. § 402.16." (Doc. 66, Exh. D.) The letter to FWS is substantively identical to the NMFS letter in all material respects. (Doc. 66, Exh. E.)[20]

Based on these uncontested facts, the Federal Defendants argue that Claim Three is moot because they have already done exactly what DOW is asking of them (namely, reinitiation of § 7 consultation with the NMFS and FWS). Courts in analogous circumstances have deemed ESA claims moot and have declined to order federal agencies to reinitiate consultation when those agencies have already done so.[21] DOW's Claim Three is properly dismissed as moot for the very same reason.

---

[20] Both letters set forth BOEMRE's position that "the DWH incident and the resulting oil spill necessitate this reinitiation action." (Doc. 66, Exhs. D & E.) The letters also reflect that "spill volumes and scenarios" addressed in the initial biological opinions "need to be readdressed" based on the Deepwater Horizon oil spill, and that "[e]ffects to and the status of some listed species or designated critical habitats may have been altered as a result of the DWH incident and require further consideration." (*Id.*)

[21] *See Defenders of Wildlife v. Martin*, 454 F. Supp.2d 1085, 1103 (E.D. Wash. 2006) ("Clearly Plaintiffs' third claim regarding reinitiation of consultation is now moot. Defendants have reinitiated consultation."); *Greenpeace Foundation v. Mineta*, 122 F. Supp.2d 1123, 1128 (D. Haw. 2000) (finding moot plaintiff's claim "to compel NMFS to reinitiate formal consultation on the Bottomfish FMP in light of new information about the impact of bottomfishing on the monk seal," where "NMFS has already acquiesced: It requested reinitiation of formal Section 7 consultation," such that "[i]t would serve no purpose to order NMFS to do what it has already done"); *Center for Marine Conservation v. Brown*, 917 F. Supp. 1128, 1144 (S.D. Tex. 1996) (where plaintiff sued federal defendants under ESA for failure to reinitiate (Continued)

DOW protests that deeming Claim Three moot "based on this barest of effort put forth by a federal agency would make a mockery of the ESA's command that each federal agency ensure that its activities are not likely to jeopardize the continued existence of threatened and endangered species." (Doc. 72, at 9.) Plaintiff maintains that Claim Three is not moot because this Court could still "grant declaratory relief deeming Federal Defendants to be in violation of the ESA with respect to the Multisale Plan" and because the Federal Defendants "have not evidenced any intent to correct the ongoing ESA violations during reinitiation of consultation." (*Id.* at 10, 12.) But these arguments improperly expand the scope of Claim Three, and conflate it with Claim Four. As pleaded in the Third Amended Complaint, Claim Three does not ask the Court to declare ongoing violations of BOEMRE's duty not to jeopardize the continued existence of threatened or endangered species. It does not allege that BOEMRE's present conduct violates the substantive "no jeopardy" obligation under the ESA, as compared to the procedural "reinitiation of consultation" duty under the ESA. Instead, Count Three goes no further than to allege that BOEMRE's "failure to reinitiate consultation with NMFS and FWS violates § 7(a)(2) of the ESA … and its implementing regulations." (Doc. 61, ¶ 70.) It is undisputed that BOEMRE, in fact, reinitiated such consultation back in July 2010. As such, the entire premise of Claim Three (namely, that BOEMRE has violated the ESA by failing to reinitiate consultation) has been mooted by the agency's subsequent conduct (namely, its reinitiation of consultation). There is no reason for Claim Three to remain in play, inasmuch as any need for the relief sought therein has been obviated by the Federal Defendants' actions. Stated differently, plaintiff has already gotten exactly what it asked for *vis a vis* this cause of action.[22]

---

formal consultation, and federal defendants had in fact reinitiated consultation, claim was dismissed because "it is unnecessary for the Court to order the Federal Defendants to do what they have already done").

[22]    It bears emphasis, too, that the dismissal of Claim Three on mootness grounds in no way deprives DOW of a platform for litigating the Federal Defendants' alleged ongoing ESA violations with respect to the "no jeopardy" requirement. Plaintiff's Fourth Claim specifically asserts such a claim, and it would serve no purpose to construe the procedural Third Claim so broadly as to be redundant of the substantive Fourth Claim. Plaintiff's arguments against dismissal of Claim Three blur the line between these two conceptually distinct causes of action. In short, DOW's claims of ongoing § 7(a)(2) violations live on in Claim Four, so there is no (Continued)

## C.     Claim Four: Failure to Ensure No Jeopardy under ESA.

The Federal Defendants also move for dismissal of Claim Four, in part.  In that claim, DOW alleges that in relying on "faulty opinions in proceeding with lease sales in the Gulf after the Deepwater Horizon incident," BOEMRE has "failed to insure that there will be no jeopardy to endangered or threatened species resulting from actions it implements," in violation of the ESA and APA.  (Doc. 61, ¶¶ 73-74.)  Claim Four flows from the ESA's directive in § 7(a)(2) that federal agencies must insure that their actions are not "likely to jeopardize the continued existence of any endangered or threatened species."  16 U.S.C. § 1536(a)(2).[23]

The Federal Defendants emphasize that their Motion to Dismiss is narrowly circumscribed with respect to Claim Four.  Indeed, they state that they "have only moved to dismiss that part of DOW's Fourth Claim … to the extent that it purports to challenge future lease sales (on the grounds that such challenges are not ripe)."  (Doc. 77, at 12.)  Movants further clarify that they "have not moved to dismiss [the] Fourth Claim for Relief (except to the extent that it also challenges future lease sales)."  (*Id.* at 13.)  As to any "future lease sales" prong of Claim Four, the Federal Defendants' position is that such a claim is not ripe because no such "future lease sales" have been approved, there is no way of knowing what environmental review (including consultation with FWS or NMFS) will be completed before such approval takes place, and it is speculative as to the form and restrictions that may accompany any such future lease sales.  (Doc. 66-1, at 19-20.)

Federal Defendants' Rule 12(b) Motion construes Claim Four as being geared toward future lease sales.  But careful scrutiny of the Third Amended Complaint reveals no allegations in Claim Four that future lease sales approved by BOEMRE may violate the ESA's requirement that agencies insure that their actions are not likely to jeopardize listed species.  Indeed, a fair

---

reason and no benefit to reframing Claim Three's narrow "failure-to-reinitiate" theory to embrace such claims.  The authorities cited by DOW in support of Claim Three are distinguishable for the same reason.

[23]     *See also Sierra Club v. United States Army Corps of Engineers*, 295 F.3d 1209, 1211 (11th Cir. 2002) ("Section 7 of the ESA requires every federal agency to insure that its actions are not likely to jeopardize the continued existence of any species which has been listed as endangered or threatened.").

reading of Claim Four shows no reference to future lease sales at all. On its face, Claim Four is aimed exclusively at past and current agency actions, and specifically BOEMRE's reliance on faulty NMFS/FWS opinions "in proceeding with lease sales in the Gulf after the Deepwater Horizon incident." (Doc. 61, ¶ 73.)[24] Thus, plaintiff has framed the challenged conduct on which Claim Four is grounded as being actions that BOEMRE has taken and is taking now in the wake of the Deepwater Horizon spill, rather than lease sale approvals that may or may not happen at some future time with or without certain conditions or restrictions, after the conclusion of reinitiated consultation with NMFS/FWS.[25]

In sum, the Federal Defendants' objection to Claim Four for purposes of its Motion to Dismiss centers on allegations that future lease sales that BOEMRE may someday approve will violate its § 7(a) duty to insure that its actions are not likely to jeopardize endangered or threatened species. But a plain reading of the Third Amended Complaint demonstrates – and plaintiff confirms – that Claim Four is directed only at past or present actions by BOEMRE, not at future lease sales that have not yet happened. Because this aspect of the Federal Defendants' Motion to Dismiss takes aim at a claim that plaintiff is not pursuing, the Motion is **denied** insofar as it relates to Claim Four.

## IV. Additional Issues Raised by Intervenors' Motions to Dismiss.

After consideration of the Federal Defendants' Motion to Dismiss, the following aspects of Dow's Third Amended Complaint remain active and pending: the portion of Count One

---

[24]     The Federal Defendants do not point to anything in Claim Four that they contend establishes that plaintiff is seeking relief for future lease sales. At most, they rely on a broad statement in the Prayer for Relief requesting that the Court "Order all Defendants to comply with NEPA, the ESA, and the APA in connection with any further actions regarding exploratory drilling and the approval of any future lease sales in the Gulf." (Doc. 61, at 22.) While plaintiff's use of such overly broad wording in its pleading is regrettable and confusing (and has been seized upon by all three Rule 12(b) Motions), it has clarified in its briefs that Claim Four is not asking for a judicial determination that future lease sales approved by BOEMRE will be in violation of the "no jeopardy" requirement.

[25]     Plaintiff confirms the validity of this construction in its response brief, wherein DOW represents that its "claims relate to the inadequacy of BOEM's environmental review *at present*" and "*existing instances* of such faulty reliance" by the Federal Defendants on incomplete or outmoded consultations. (Doc. 72, at 13 (emphasis added).) Plaintiff explains that its concerns "are not with the future lease sales themselves … but with the inadequate environmental review relied on at present." (*Id.* at 14.)

concerning Lease Sale 213, all of Count Two, and all of Count Four.  The Court now examines the two Motions to Dismiss filed by intervenors (the Association Intervenors and Chevron, respectively) to the extent that those Motions seek dismissal of claims which survived scrutiny under the Federal Defendants' Rule 12(b) Motion.[26]

### A. *The Association Intervenors' Motion to Dismiss.*

The Association Intervenors' Rule 12(b) Motion identifies a trio of arguments not explored in the Federal Defendants' corresponding motion, to-wit: (i) movants' contention that venue is improper, (ii) movants' assertion that Counts One and Two should be dismissed because there were no major federal actions remaining to occur with respect to Lease Sale 213 at the time of the Deepwater Horizon explosion; and (iii) movants' position that Count Four should be dismissed because DOW complied with the ESA as to Lease Sale 213, as a matter of law.  Each of these arguments will be addressed in turn.

### 1. *Rule 12(b)(3) Objection.*

The Third Amended Complaint predicates venue in this judicial district on 28 U.S.C. § 1391(e)(2), which provides that a civil action against an agency of the United States may "be brought in any judicial district in which … a substantial part of the events or omissions giving rise to the claim occurred."  *Id.*  The Association Intervenors maintain, however, that "none of the events … directly giving rise to DOW's claims took place in this district."  (Doc. 63-1, at 7.)  Movants view this case as arising from the Federal Defendants' administrative decisions concerning lease sales after the Deepwater Horizon disaster, rather than arising from the oil spill itself.  According to the Association Intervenors, all such administrative decisions took place in Washington D.C. and/or at BOEMRE offices in states other than Alabama.  On that basis, the Association Intervenors move for dismissal of the Third Amended Complaint for improper venue, pursuant to Rule 12(b)(3), Fed.R.Civ.P.

---

[26] In considering the intervenors' Motions, the Court will not revisit aspects of the Third Amended Complaint that have already been dismissed pursuant to the Federal Defendants' Motion to Dismiss.  Moreover, to the extent that the intervenors' Motions duplicate arguments that have already been considered and rejected by the Court in the context of the Federal Defendants' Motion, such arguments will not be considered a second time simply because the intervenors have repeated them.

As a threshold matter, DOW challenges the Association Intervenors' right to raise a venue objection. Plaintiff's reasoning is that, inasmuch as the Federal Defendants have not objected to venue, intervenors are not entitled to assert that privilege on their behalf, and have waived that objection by voluntarily interjecting themselves into this litigation in this forum. There is considerable persuasive support for this proposition. Indeed, decisional authority and commentators alike have recognized that "[v]enue is a privilege personal to a defendant in a civil suit and a person intervening on either side of the controversy may not object to improper venue." *Trans World Airlines, Inc. v. C.A.B.*, 339 F.2d 56, 63-64 (2nd Cir. 1964); *see also Intrepid Potash-New Mexico, LLC v. U.S. Dep't of Interior*, 669 F. Supp.2d 88, 91 (D.D.C. 2009) ("Courts have noted that an intervenor-defendant cannot assert that venue is improper … because such a defendant voluntarily participated in the case and assumed the risk that a court could order relief or enter a judgment against it."); *Beam Laser Systems, Inc. v. Cox Communications, Inc.*, 117 F. Supp.2d 515, 517 (E.D. Va. 2000) (determining that "as an intervenor, SeaChange may not question venue"); *Asbury Glen/Summit Ltd. Partnership v. Southeast Mortg. Co.*, 776 F. Supp. 1093, 1096 (W.D.N.C. 1991) ("As a general matter, it is true that the intervenor cannot question venue.") (citation and internal punctuation omitted); *Commonwealth Edison Co. v. Train*, 71 F.R.D. 391, 394 (N.D. Ill. 1976) ("When a party seeks to enter pending litigation as an intervenor, he enters the litigation subject to venue which already exists. The purpose of venue is to alleviate the hardship on a defendant arising from his being forced to defend a suit in an inconvenient forum. Such a consideration does not apply to an intervenor."); *Recht v. Metro Goldwyn Mayer Studio, Inc.*, 2008 WL 4460379, *2 (W.D. Wis. Sept. 29, 2008) ("Even if she were allowed to intervene, Ms. Recht would have no standing to question the venue in this case."); *Dexia Credit Local v. Rogan*, 2008 WL 4543013, *6 (N.D. Ill. Oct. 9, 2008) (observing that intervenors "likely have waived any objection to venue by intervening in this proceeding"); 7C Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 1918 ("The intervenor cannot question venue. By voluntarily entering the action the intervenor has waived the privilege not to be required to engage in litigation in that forum."); 6 *Moore's Federal Practice*, § 24.22[3] (3d Ed.) ("A person who intervenes as plaintiff or

defendant may not object to the venue chosen for the action.  Since the intervenor specifically invoked the jurisdiction of the court, any potential venue objections are considered waived.").[27]

Notwithstanding these authorities, the Association Intervenors posit that "the better reasoned and more recent holdings" are to the contrary.  (*Id.*)  Neither prong of this argument is persuasive.  As shown by the foregoing citations, the cases finding that intervenors cannot challenge venue are not antiquated, dust-encrusted relics, but instead date all the way through the present.  Moreover, the reasoning of those decisions is not perfunctory, but is intuitive and clear, and has enjoyed broad acceptance by courts and treatises alike.  To be sure, the Association Intervenors have cited a pair of cases showcasing a minority viewpoint, but neither of them squarely addresses the subject via holding and in-depth treatment of venue.  *See S.E.C. v. Ross*, 504 F.3d 1130, 1149-50 (9th Cir. 2007) (in discussion of whether intervenor has waived right to challenge personal jurisdiction, offering opinion that "the *quid pro quo* for his intervention is that he consents to have the district determine all issues in the case, including issues of jurisdiction, venue and service of process"); *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Department of Interior*, 100 F.3d 837 (10th Cir. 1996) (stating in *dicta*, without citation or elaboration, that an intervenor "has the right to file legitimate motions, including venue motions").  Nor do these authorities cited by the Association Intervenors acknowledge or rebut the extensive body of case law and commentators that have rejected the notion that intervenors may litigate whether venue is proper under Rule 12(b)(3).

At least one commentator has described the Ninth Circuit's approach in *Ross*, with respect to its finding that intervenors do not waive personal jurisdiction objections, as a "minority position" of "questionable" validity.  6 *Moore's Federal Practice*, at § 24.22[4].  More importantly, the personal jurisdiction analysis in *Ross* conflicts with the law of this Circuit.  *See In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1248 (11th Cir. 2006) ("Westgate challenges the district court's jurisdiction over its person, but by filing a successful motion to intervene, it acquiesced to such jurisdiction."); *see also Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 2008 WL 902982, *3 n.2 (11th Cir. Apr. 4, 2008) (noting that binding

---

[27]     Given this considerable collection of authorities, the Court cannot agree with the Association Intervenors' characterization that "a few courts may have accepted that view" championed by DOW.  (Doc. 76, at 2.)

Circuit precedent "suggests strongly that a party may not intervene for any purpose without conceding personal jurisdiction"). This Court could not adopt *Ross*, as the Association Intervenors urge it to do, without rejecting *Bayshore Ford*, which is binding precedent. *See Ross*, 504 F.3d at 1148-50 (considering and declining to follow *Bayshore Ford* on this point).[28] For these reasons, the Court finds the Association Intervenors' counterarguments in favor of allowing them to challenge venue to be fundamentally incompatible with the well-reasoned majority view and in conflict with Eleventh Circuit law.

The bottom line is this: By voluntarily intervening in this action, the Association Intervenors (and Chevron, for that matter) invoked and acquiesced to the jurisdiction of this District Court, and thereby waived their privilege not to be required to engage in litigation in this forum. Accordingly, the Association Intervenors' Motion to Dismiss is **denied** insofar as it is predicated on a venue objection under Rule 12(b)(3). The intervenors are not entitled to challenge venue, and the Federal Defendants (who would have been so entitled) have elected not to do so by not objecting to the venue of this District Court. Therefore, Rule 12(b)(3) dismissal is not appropriate here, regardless of whether § 1391(e)(2) is satisfied.

### 2.  *Claims One and Two and Lease Sale 213.*

The Association Intervenors also seek dismissal of Claims One and Two insofar as they relate to Lease Sale 213 (as to which the Federal Defendants did not move for dismissal). The thrust of their argument is that BOEMRE was under no obligation to prepare a supplemental EIS for Lease Sale 213 based on the Deepwater Horizon spill because there was no major Federal action remaining to occur at that time.

To understand movants' point, it is helpful to summarize briefly the timeline as to Lease Sale 213. The Federal Defendants prepared an initial EIS for the 2007-2012 Program in 2007, a supplemental EIS in September 2008, and an Environmental Assessment in October 2009 as to

---

[28]     It is true, of course, that *Bayshore Ford* addresses an intervenor's right to object to personal jurisdiction, not venue. But *Ross*'s reasoning treats personal jurisdiction and venue the same for purposes of an intervenor's waiver of right to challenge. Because *Ross* collides with Eleventh Circuit law as to personal jurisdiction, all indications are that its reasoning as to venue would likewise be turned away in this Circuit. Certainly, neither *Ross* nor the Association Intervenors proffer any basis in fact or law for treating personal jurisdiction and venue questions differently with respect to intervenors. The Court declines to follow the *Coalition of Arizona* case cited by the Association Intervenors for the same reason.

Lease Sale 213.  (*See* doc. 63, at Exhs. 3-7.)  On February 12, 2010, the Federal Defendants published a Final Notice of Sale as to Lease Sale 213, wherein they announced that public bid reading would occur on March 17, 2010 in New Orleans, Louisiana.  *See* 75 Fed. Reg. 6874 (Feb. 12, 2010).  That Notice further specified procedures by which bids would be evaluated and considered.  *Id.* at 6881.  A press release issued by the Federal Defendants on March 16, 2010 confirmed that Lease Sale 213 was moving forward as scheduled, with "67 companies submitting 642 bids on 468 tracts" in that lease sale.  (Doc. 63, at Exh. 9.)  The press release also stated that bids had been received for "[a] total of 295 tracts in water depths greater than 1,300 feet," that the sealed bids would be publicly read the following morning, and that "[t]he high bidder for each tract will have its bid analyzed for fair market value before the lease is awarded." (Doc. 63, at Exh. 9.)[29]

With respect to Lease Sale 213, BOEMRE accepted bids on 85 tracts pursuant to Phase 1 of its bid adequacy procedures on March 31, 2010, some three weeks before the Deepwater Horizon explosion.  (Doc. 63, at Exh. 11.)  Phase 2 continued for several months thereafter, and by June 11, 2010, BOEMRE had accepted bids on an additional 385 tracts, with bids on 20 tracts rejected, and 5 tracts remaining.  (*Id.* at Exh. 12.)

Based on these facts, the Association Intervenors theorize that DOW's claims alleging violations of law by the Federal Defendants for not requiring a Supplemental EIS before moving forward with Lease Sale 213 post-April 20, 2010 are not cognizable.  In support of this notion, the Association Intervenors rely on the black-letter rule that supplementation of an EIS is required only if there remains "major Federal action" to occur.  *See, e.g., Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 73, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) ("supplementation is necessary only if there remains 'major Federal action' to occur"); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a

---

[29]     BOEMRE's economic evaluation of high bids involved a two-phase bid adequacy procedure for ensuring receipt of fair market value.  Those procedures were delineated via notice published in the Federal Register.  *See* 64 Fed. Reg. 37560 (July 12, 1999).

significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.") (citation omitted).[30]

Defining the term "major Federal action" is not a straightforward proposition.  Relevant regulations provide that "Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18. "Federal action" may include activities such as "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area.  Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities."  *Id.* § 1508.18(b)(4); *see also Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1213 (11th Cir. 2002) (under NEPA regulations, "major actions include approving permits for construction").  Although the case law is not uniform, a reasonable, helpful formulation of the "major Federal action" test provides that if "the actions remaining to the [agencies] … are purely ministerial, or if the agencies have no discretion that might usefully be informed by further environmental review, then there is no major federal action and no SEIS must be prepared."  *Hammond v. Norton*, 370 F. Supp.2d 226, 255 (D.D.C. 2005) (citing *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001)); *see also Southern Utah Wilderness Alliance v. Office of Surface Min. Reclamation and Enforcement*, 2008 WL 4912058, *12 (D. Utah Nov. 14, 2008) (no "major federal action" requiring supplemental EIS where agency "retained no discretion to decide whether the projects should go forward or to determine the terms and conditions of the projects' approval").

---

[30]    *See also  Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981) ("We therefore hold that NEPA does require the supplementation of an EIS when subsequent project changes can … be classified as major Federal actions significantly affecting the quality of the human environment") (citation and internal quotation marks omitted); *Greater Yellowstone Coalition v. Tidwell*, 572 F.3d 1115, 1123 (10th Cir. 2009) (agency's decision not to supplement was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, where "there is no ongoing major federal action or major federal action to occur"); *Audubon Naturalist Society of the Central Atlantic States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp.2d 642, 709 (D. Md. 2007) (similar); *Sierra Club v. Bosworth*, 465 F. Supp.2d 931, 937 (N.D. Cal. 2006) ("a supplemental EIS should be prepared if … there remains major Federal action to occur") (citation and internal punctuation omitted); *Senville v. Peters*, 327 F. Supp.2d 335, 355-56 (D. Vt. 2004) ("Major federal action … dictates the preparation of a SEIS.").

The Association Intervenors say that the "major Federal action" prerequisite for a supplemental EIS cannot be satisfied here because, at the time of the Deepwater Horizon spill, Lease Sale 213 "had occurred more than a month previously" and "[t]he only ongoing activity with respect to Lease Sale 213 … was the determination of the adequacy of individual high bids." (Doc. 63-1, at 14.) According to Association Intervenors, "all that remained was BOEMRE's assessment – based upon *economic* criteria, not environmental considerations – whether the remaining high bids were acceptable." (*Id.*) So, in movants' view, the "major Federal action" associated with Lease Sale 213 terminated with the public reading of the bids on March 17, 2010, well before the Deepwater Horizon spill.

The facts do not support movants' proposition that there was no major Federal action left to occur with regard to Lease Sale 213 as of April 20, 2010. By the Association Intervenors' own admission, BOEMRE was still evaluating – and had not accepted – bids for hundreds of tracts involved in Lease Sale 213 at that time. There is no indication, and no reason to believe, that BOEMRE's review of those outstanding bids was a purely ministerial function as to which it lacked any meaningful discretion.[31] Nor does it appear that any high bidder would have been entitled to move forward with exploration and production activities at a given tract as of April 20, 2010, if BOEMRE had not yet formally accepted the bid. By regulation, BOEMRE "reserve[d] the right to reject any and all bids received for any tract, regardless of the amount offered." 30 C.F.R. § 256.47(b); *see also* 75 Fed. Reg. 6874, 6881 (Feb. 12, 2010) ("The United States reserves the right to reject any and all bids," as well as "to withdraw any block from this lease sale prior to issuance of a written acceptance of a bid for the block").[32] In short, on this record and under the citations provided by the parties, the Court cannot agree with the Association Intervenors that the "major Federal action" involving Lease Sale 213 concluded with the public reading of the bids. Rather, there was an ongoing major Federal action as to Lease Sale 213 during the relevant period as BOEMRE reviewed, evaluated, and accepted or rejected

---

[31]     *See generally North Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C. Cir. 1980) (under the OCSLA, "it becomes clear that the Secretary of Interior retains strict control of an outer continental shelf project for its duration, from lease sale to depleted, run-dry well").

[32]     These provisions undermine the Association Intervenors' contention that BOEMRE's review of bids was confined to purely economic considerations and that it could not take other factors into account in deciding whether to accept such bids.

particular bids.[33]  Acceptance of bids is a major Federal activity because BOEMRE retained discretion to reject them and to consider noneconomic factors in deciding whether or not to approve them, and because the mere submission of a high bid (without more) did not confer upon the bidders any right to lease a particular tract without agency approval.[34]

The Association Intervenors' Motion to Dismiss is **denied** insofar as it rests on a theory of no major Federal action as to Lease Sale 213 that might trigger any duty on the part of BOEMRE to prepare a supplemental EIS in the wake of the Deepwater Horizon oil spill.

### 3. *Claim Four and Lease Sale 213.*

Recall that in Claim Four, DOW alleges that the Federal Defendants violated their obligation under the ESA to insure no jeopardy to protected species when they proceeded with Lease Sale 213 bid approval following the Deepwater Horizon spill.  The Association Intervenors maintain that Claim Four should be dismissed because (i) "the claim ignores that Lease Sale 213 had already occurred more than a month before the oil spill," and (ii) the claim fails pursuant to *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) because carrying

---

[33]    The cases cited by the Association Intervenors on this point are readily distinguishable.  In *Center for Biological Diversity v. Salazar*, 2010 WL 2493988 (D. Ariz. June 17, 2010), the court found no major Federal action where the agency had <u>already</u> approved the mine's plan of operations, and there was no requirement that the agency approve a new plan before the mine resumed operations; rather, the agency was merely monitoring the mine operator's activities.  *Id.* at *4-6.  Likewise, in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), the Supreme Court found no major Federal action requiring supplementation where the agency had already approved the land use plan in question.  *Id.* at 73; *see also Cold Mountain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004) (finding "no ongoing 'major Federal action' requiring supplementation … [b]ecause the Permit has been approved and issued").  By contrast, BOEMRE had not accepted bids or entered into leases as to hundreds of tracts within the scope of Lease Sale 213; therefore, there was ongoing major Federal action at that time.  BOEMRE's role as to Lease Sale 213 on April 20, 2010 extended well beyond mere supervision and oversight of previously approved activities.

[34]    The Association Intervenors' position is further eroded by the fact that BOEMRE itself acknowledged the need to prepare a supplemental EIS for Lease Sale 213 to account for the new information obtained as a result of the Deepwater Horizon incident.  *See* 75 Fed. Reg. 69122-01 (Nov. 10, 2010).  By all appearances, BOEMRE itself believed that there was ongoing major Federal action triggering its obligation to prepare a supplemental EIS with respect to Lease Sale 213.

out a lease sale involves only "preliminary activities" that do not harm endangered species. (Doc. 63-1, at 17-18.)[35]

The Association Intervenors' position that DOW's ESA claim should be dismissed because Lease Sale 213 had already happened is a variant of its argument that no supplemental EIS is needed as to Lease Sale 213 because there was no remaining major Federal action to occur. This theory fails in the ESA context just as it did in the NEPA context. As discussed *supra*, after the Deepwater Horizon spill, BOEMRE continued to analyze and accept numerous bids concerning Lease Sale 213. If, in performing those discretionary, non-ministerial actions after April 20, 2010, BOEMRE shirked its obligation under § 7(a) of the ESA to ensure that the authorized conduct is not likely to jeopardize the continued existence of listed species, then DOW's Claim Four would be cognizable. The Court therefore rejects movants' contention that Lease Sale 213 predated the Deepwater Horizon incident and that DOW is barred from raising a § 7(a) ESA claim concerning Lease Sale 213 on that basis.

The Association Intervenors' alternative argument that Claim Four is foreclosed by *North Slope Borough* fares no better. Movants rely on *dicta* from *North Slope Borough* to imply that § 7(a) of the ESA does not apply to early stages of OCSLA lease sales because environmental review at subsequent stages of the process (oil/gas exploration, production and sale) is sufficient to protect endangered and threatened species from harm. But the D.C. Circuit stopped well short in that case from declaring that BOEMRE can ignore the "no jeopardy" strictures of ESA in accepting bids for lease sales.[36] Indeed, the holding in *North Slope Borough* was the rather modest proposition that "section 7(a)(2) was not violated as the Secretary incorporated in the

---

[35] The tension between these two arguments is striking. In essence, the Association Intervenors' first assertion is that DOW's challenge comes too late because Lease Sale 213 was already a *fait accompli* when the Deepwater Horizon spill happened, whereas their second assertion is that DOW's challenge is premature because the lease sale itself is too early in the multistage OCSLA process to warrant meaningful § 7(a) scrutiny.

[36] The D.C. Circuit expressly disclaimed any notion that the OCSLA's multistage structure might "attenuate ESA's notion of 'agency action'" to which § 7(a) of the ESA applies. *North Slope Borough*, 642 F.2d at 609 (recognizing that "'agency action' in this case may signify the lease sale and all subsequent activities"); *see also Conservation Law Foundation of New England, Inc. v. Andrus*, 623 F.2d 712, 715 (1st Cir. 1979) (observing that "[t]he ESA by its terms applies to all action by the Secretary").

'final notice of sale' the suggested alternatives that NMFS indicated could ensure the freedom from jeopardy for the endangered whales." 642 F.2d at 610 (footnote omitted). Far from announcing that the Secretary of the Interior can skip § 7(a) of the ESA in carrying out lease sales, then, the *North Slope Borough* court found that the Secretary had complied with it by incorporating the specific recommendations of the NMFS's biological opinion into the notice of sale and the accompanying lease stipulations and mitigating measures communicated to lessees. *See id.* at 609-10. Viewed through the prism of its § 7(a)(2) holding, rather than its broader generalizations about the relationship between the ESA and OCSLA, *North Slope Borough* does not mandate, or even support, dismissal of DOW's ESA claims pertaining to Lease Sale 213.[37] This is because DOW is alleging that BOEMRE did not do in Lease Sale 213 post-Deepwater Horizon spill that which the Secretary did in *North Slope Borough*, namely, "perform[ ] a comprehensive analysis of all the ramifications of the lease sale" and honor "the substantive prescription of section 7(a)(2) to preserve endangered life" after obtaining new, material information from the oil spill. *Id.* at 609.

For all of the foregoing reasons, the Association Intervenors' Motion to Dismiss is **denied** as to Claim Four.

### B. *Chevron's Motion to Dismiss.*

Finally, the Court considers those aspects of intervenor Chevron's Motion to Dismiss that have not been adequately addressed in analyzing the other Rule 12(b) motions.[38] In particular,

---

[37]    The same is true of the more recent D.C. Circuit opinion, *Center for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466 (D.C. Cir. 2009), cited by the Association Intervenors. In that case, the D.C. Circuit concluded that an ESA challenge to the "initial stage of the Leasing Program" was not ripe because it was "not certain … that any of the endangered species in the areas at issue may be affected by the Program, as the proposed leases in these areas might never come to pass." *Id.* at 483. At the relevant time, Lease Sale 213 was one full step beyond the "initial stage of the Leasing Program," so *Center for Biological Diversity* is inapposite. Besides, the D.C. Circuit noted in that case that for "later stages of the program, each … requires ESA consultation and additional environmental review by Interior." *Id.* Lease Sale 213 constitutes just such a "later stage" of the leasing program, as to which *Center for Biological Diversity* opines that ESA consultation and additional environmental review are mandatory.

[38]    In granting Chevron's request to intervene, the Court cautioned that it "would be counterproductive and detrimental to the interests of efficiency and justice for Chevron and the Associations to deluge this Court and adverse parties with a flood of duplicative or substantially overlapping materials as this case proceeds." (Doc. 67, at 6.) That Order specifically directed (Continued)

Chevron interposes new arguments that Claim Four is not adequately pleaded and that DOW failed to furnish adequate statutory notice to the Federal Defendants of certain aspects of that claim.[39]

### 1.   *Adequacy of Pleading Claim Four.*

Chevron's contention that Claim Four is inadequately pleaded flows from the baseline legal requirement that only final agency action is subject to judicial review. *See, e.g., National Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003) ("federal jurisdiction is similarly lacking when the administrative action in question is not 'final'").[40]  The "final agency action" requirement has been applied to the ESA context, and no party suggests that it is inapplicable here.  *See Bennett v. Spear*, 520 U.S. 154, 174, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (declining to administer the ESA in a manner that "would effect a wholesale abrogation of the APA's 'final agency action' requirement"); *Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009) ("Biological opinions are final agency actions subject to judicial review"); *National Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005) ("There exists no statutory review provision in the ESA that authorizes judicial review of agency action beyond that provided for in the APA. … Thus, an agency action must be final in order to be judicially reviewable.") (citations omitted).  Chevron maintains that Claim

---

Chevron to coordinate its efforts with the Association Intervenors in motion practice and discovery alike "to avoid unnecessary duplication."  (*Id.*)  Notwithstanding these admonitions, much of Chevron's Motion to Dismiss reads as a "me too" motion that reiterates (without materially elaborating on or extending) arguments previously developed in the other Rule 12(b) motions.  Chevron must redouble its efforts to avoid unnecessary multiplication of filings and duplication of arguments as this case moves forward.

[39]      Chevron also makes these arguments with regard to Claim Three; however, the Court need not address those aspects of the Motion because Claim Three has been dismissed pursuant to the Federal Defendants' Rule 12(b) Motion.  *See* § III.B., *supra*.

[40]      *See also Fanin v. United States Dep't of Veterans Affairs*, 572 F.3d 868, 877 (11th Cir. 2009) ("If the claim attacks an agency's action … and if the statute allegedly violated does not provide a private right of action, then the agency action must also be a final agency action.") (citations and internal quotation marks omitted); *Georgia Power Co. v. Teleport Communications Atlanta, Inc.*, 346 F.3d 1047, 1050 (11th Cir. 2003) ("Only final agency actions can be subject to judicial review.").

Four does not satisfy the "final agency action" requirement because it "raises only general ESA challenges" and seeks an order "broadly requiring ESA compliance" by BOEMRE. (Doc. 68, at 12.) In Chevron's view, the Third Amended Complaint "does not identify a single specific 'final agency action' within the Secretary's broad leasing program that is alleged to violate the ESA." (*Id.* at 13.)

A fair reading of the Third Amended Complaint defeats this objection. Far from lobbing broadside programmatic attacks at BOEMRE or the 2007-2012 Program, the Fourth Claim is focused specifically on allegations that the agency "relied on these faulty opinions [by NMFS and FWS] in proceeding with lease sales in the Gulf after the Deepwater Horizon incident," and that the agency's actions in this regard "are in violation of its independent duty to insure that its actions are not likely to jeopardize the continued existence of any listed species." (Doc. 61, ¶ 73.) Moreover, the Third Amended Complaint elaborates on the factual underpinnings of this claim by specifically alleging with regard to Lease Sale 213 that, following March 16, 2010, "BOEM has been continuously analyzing and approving the bids incrementally, with many of these approvals taking place since the Deepwater Horizon spill." (*Id.*, ¶ 47.) Under any reasonable construction of the Third Amended Complaint as a whole, DOW has identified specific final agency actions post-Deepwater Horizon (namely, BOEMRE's continued acceptance of lease bids in connection with Lease Sale 213) that it contends run afoul of the agency's duties under § 7(a) of the ESA. Accordingly, Claim Four is not an impermissible programmatic challenge to the 2007-2012 Program divorced from any final agency actions, and Chevron is not entitled to dismissal of that claim on that basis.[41]

---

[41] This is particularly true, given that the sufficiency of DOW's Third Amended Complaint is gauged under the liberal "notice pleading" standards of Rule 8, Fed.R.Civ.P. *See generally Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d 1371, 1380 (11th Cir. 2010) (observing that federal pleading standards do "not require heightened fact pleading of specifics" or "detailed factual allegations," so long as the allegations are "enough to raise a right to relief above the speculative level") (citations omitted). For better or worse, DOW was not obliged to articulate its claims in the pleadings as expansively as it could. *See In re Southeast Banking Corp.*, 69 F.3d 1539, 1551 (11th Cir. 1995) ("[F]or better or for worse, the Federal Rules of Civil Procedure do not permit district courts to impose upon plaintiffs the burden to plead with the greatest specificity they can.").

## 2. *Adequacy of Statutory Notice as to Claim Four.*

Chevron's other new argument concerns the sufficiency of DOW's written pre-suit notice to BOEMRE. The ESA mandates that no plaintiff may commence an action under the statute's citizen-suit provision "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A)(i); *see also Friends of Animals v. Salazar*, 670 F. Supp.2d 7, 13 (D.D.C. 2009) ("When bringing an action pursuant to the citizen suit provisions of the ESA, no plaintiff may commence an action without giving the Secretary sixty-days prior written notice of its intent to sue."). "The sixty-day notice requirement is jurisdictional and failure to comply strictly with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Pulaski v. Chrisman*, 352 F. Supp.2d 1105, 1115-16 (C.D. Cal. 2005); *see also Conservation Force v. Salazar*, 715 F. Supp.2d 99, 102 (D.D.C. 2010) (declaring that 60-day notice requirement under ESA is "mandatory and jurisdictional") (citations omitted). So, if DOW did not give BOEMRE the requisite sixty days notice of its ESA § 7(a) claim asserted in Claim Four, then the Court lacks jurisdiction to hear it and that cause of action must be dismissed.

In support of this theory of dismissal, Chevron submits a copy of DOW's notice letter to the Federal Defendants dated May 17, 2010. (*See* doc. 68, at Exh. 1.) That letter alleges in its opening paragraph that, *inter alia*, BOEMRE is in violation of § 7 of the ESA through its failure to insure that its actions "are not likely to jeopardize the continued existence of any threatened or endangered species." (Doc. 68, Exh. 1, at 1.) Elsewhere, the May 17 letter reiterates BOEMRE's ongoing duty under § 7(a) of the ESA to insure against jeopardy, and specifically states that the agency's "decision to proceed with the lease sales in the Gulf" is an agency action under the ESA and that its failure, in the wake of the Deepwater Horizon spill, "to address this new information and meaningfully analyze the potential risks to marine and coastal species constitutes a violation of section 7." (*Id.* at 7.) Under any reasonable reading of the May 17 letter, the Federal Defendants were put on notice of DOW's contention that the agency's decision to proceed with lease sales after Deepwater Horizon without analyzing the new information amounted to a violation of its ongoing duty under the ESA to insure against jeopardy. This is the very claim brought in Claim Four of the Third Amended Complaint. As such, the May 17 notice letter was sufficient to place the Federal Defendants on notice of Claim Four and adequately fulfilled DOW's pre-suit notice obligations under § 1540(g)(2)(A)(i). *See*

*Loggerhead Turtle v. County Council of Volusia County, Fla.*, 148 F.3d 1231 (11th Cir. 1998) (notice letter was sufficient for ESA purposes even though leatherback sea turtle was mentioned only in one part of letter, while violations section of letter cited only loggerhead and green sea turtles, where "the letter as a whole provided notice sufficient to afford the opportunity to rectify the asserted ESA violations") (citation omitted).[42]

Accordingly, Chevron's Motion to Dismiss is **denied** insofar as it is predicated on theories that the Third Amended Complaint has not adequately pleaded ESA violations or that DOW's letter to the Federal Defendants was insufficient to comport with jurisdictional pre-suit notice requirements under the ESA.

## V. Conclusion.

For all of the foregoing reasons, it is hereby **ordered** that the Motions to Dismiss (docs. 63, 66, 68) are **granted in part**, and **denied in part**, as follows:

1. Claim One of the Third Amended Complaint is **dismissed**, except for the portion of Claim One concerning BOEMRE's acceptance of bids for Lease Sale 213 after the Deepwater Horizon oil spill without waiting for the supplemental EIS and EA to be completed;

2. Claim Three of the Third Amended Complaint is **dismissed**;

3. The Court construes the Third Amended Complaint as bringing no claims based on BOEMRE's approval of drilling/exploration/production plans. Any such claims were deleted in plaintiff's latest amendment of its pleadings and, even if they were not, are improper because the OCSLA confers exclusive jurisdiction over them to the relevant court of appeals;

4. The Court construes the Third Amended Complaint as bringing only challenges for agency actions that have already happened or are ongoing, not for agency

---

[42] To the extent that Chevron maintains that the notice letter was also deficient for failing to place the Federal Defendants on notice of future ESA violations that had not happened yet, that argument is likewise rejected. As discussed *supra*, the Court does not construe the Third Amended Complaint as seeking relief under NEPA, the APA, or the ESA for "future violations," or as challenging the validity of lease sale approvals that BOEMRE has not yet made. Rather, the Court construes the Third Amended Complaint as focusing exclusively on violations that have already happened and/or are ongoing, rather than speculative violations that may or may not occur at some future date.

actions that may or may not occur at some point in the future (*e.g.*, claims concerning future lease sales that have not yet been approved based on environmental analysis that has not yet been performed/completed); and

5.      In all other respects, the Motions to Dismiss are **denied**.

All Defendants are **ordered** to file answers to the Third Amended Complaint on or before **June 6, 2011**. Also, the parties are reminded of their responsibility to file their Rule 26(f) report within one week after today's ruling. (*See* doc. 80.)

DONE and ORDERED this 23rd day of May, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE