**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **DEFENDERS OF WILDLIFE,** ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 10-0254-WS-C** |
| ) | |
| **BUREAU OF OCEAN ENERGY** ) | |
| **MANAGEMENT, REGULATION, AND** ) | |
| **ENFORCEMENT,** *et al.,* ) | |
| ) | |
|     **Defendants,** ) | |
| ) | |
| **AMERICAN PETROLEUM INSTITUTE,** ) | |
| *et al.,* ) | |
| ) | |
|     **Defendant-Intervenors.** ) | |

**ORDER**

    This matter comes before the Court on Plaintiff's Motion for Summary Judgment (doc. 113), the Federal Defendants' Cross-Motion for Summary Judgment (doc. 118) and the Joint Motion for Summary Judgment of the American Petroleum Institute, Independent Petroleum Association of America, US Oil and Gas Association, International Association of Drilling Contractors and Chevron USA, Inc. (doc. 117).  These Motions have been the subject of extensive briefing, and are now ripe for disposition.[1]

**I.    Relevant Background.**

    In all pertinent respects, the underlying facts of this matter are undisputed.  Before examining those facts, however, it may be beneficial to summarize key statutory provisions governing the offshore oil leasing program at issue herein.

---

[1]    The summary judgment briefing is accompanied by an administrative record spanning more than 10,000 pages.  That administrative record was not electronically filed, but was instead conventionally filed in the form of a DVD, which also included an index in an Excel spreadsheet containing hyperlinks to specific documents and segments of the record.  (*See* doc. 97.)  Record citations herein will be made via the notation "AR," followed by the page number(s) corresponding to the particular document.

### A.       Basic Provisions of the Outer Continental Shelf Lands Act.

The purpose of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.*
("OCSLA") is "to establish federal ownership and control over the mineral wealth of the OCS
and to provide for the development of those natural resources. … The OCSLA thus …
establishes a regulatory scheme governing leasing and operations there." *EP Operating Ltd.
Partnership v. Placid Oil Co.*, 26 F.3d 563, 566 (5th Cir. 1994); *see also Center for Biological
Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009) ("OCSLA establishes a
procedural framework under which [the Secretary of the] Interior may lease areas of the OCS for
purposes of exploring and developing the oil and gas deposits of the OCS's submerged lands.").
When Congress amended OCSLA in 1978, it declared the policy of the United States to be that
"the outer Continental Shelf is a vital national resource reserve held by the Federal Government
for the public, which should be made available for expeditious and orderly development, subject
to environmental safeguards, in a manner which is consistent with the maintenance of
competition and other national needs."  43 U.S.C. § 1332(3).

Under OCSLA, as amended, Congress prescribed a sequence of "four distinct statutory
stages to developing an offshore oil well: (1) formulation of a five year leasing plan by the
Department of the Interior; (2) lease sales; (3) exploration by the lessees; (4) development and
production."  *Secretary of the Interior v. California*, 464 U.S. 312, 337, 104 S.Ct. 656, 78
L.Ed.2d 496 (1984); *see also Center for Biological Diversity*, 563 F.3d at 473 ("OCSLA
provides that Interior undertake a four-stage process in order to develop an offshore oil well.").
"The stated reason for this four part division was to forestall premature litigation regarding
adverse environmental effects that all agree will flow, if at all, only from the latter stages of OCS
exploration and production."  *Sec'y of Interior*, 464 U.S. at 341.  Congress's decision to
compartmentalize the stages of OCS exploration and drilling in this manner bears profound
implications for the issues joined in this litigation.

### B.       Lease Sale 213.

In April 2007, the Secretary of the Interior issued a proposed five-year program for oil
and gas leasing on the Outer Continental Shelf from 2007 – 2012 (the "Five-Year Plan").  (AR,

50-194.)[2]  The Five-Year Plan was supported by extensive environmental review at its inception, including without limitation a Final Environmental Impact Statement for Gulf of Mexico OCS Oil and Gas Lease Sales: 2007-2012 (the "Multisale EIS") (AR, 1807-2883); a Final Supplemental Environmental Impact Statement for Gulf of Mexico OCS Oil and Gas Lease Sales: 2009-2012 (the "SEIS") (AR, 2884-3368); a National Marine Fisheries Service ("NMFS") Biological Opinion examining the Five-Year Plan (the "NMFS Opinion") (AR, 1493-1638); and a Biological Assessment by the U.S. Fish and Wildlife Service ("FWS") for the Five-Year Plan (the "FWS Assessment") (AR, 1639-1718).

In administering the Five-Year Plan, on March 12, 2009, the Department of the Interior's Bureau of Ocean Energy Management ("BOEM") issued a press release announcing that Lease Sale 213 would be conducted in New Orleans, Louisiana, on March 17, 2010, at which time BOEM would sell oil and gas leases encompassing 6,958 blocks located in federal waters at distances from three to more than 230 miles offshore, in water depths ranging from 10 to 11,200 feet.  (AR, 200.)  BOEM estimated that Lease Sale 213 would culminate in production of as many as 1.3 billion barrels of oil and 5.4 trillion cubic feet of natural gas from the Central Gulf of Mexico.  (*Id.*)  On February 12, 2010, BOEM published a "Final Notice of Sale 213" in the *Federal Register*, confirming that Lease Sale 213 would take place in New Orleans on March 17, 2010.  (AR, 217-18, 247-55.)

Lease Sale 213 proceeded as scheduled.  Indeed, on March 17, 2010, BOEM unsealed and publically announced some 642 bids on 468 tracts located in the central Gulf of Mexico offshore of Louisiana, Mississippi and Alabama, in varying depths of water and at various

---

[2]    More precisely, the proposal was made by a federal agency then known as the Minerals Management Service ("MMS"), which operated under the aegis of the Department of the Interior.  The MMS, which is a named defendant herein, has undergone a series of name changes and reorganizations in the interim.  Most recently, in October 2011, that agency was split into the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE").  In the interests of simplicity and consistency, and because the exact name or incarnation of the federal agency administering the OCSLA oil and gas leasing program at any particular moment is not material to the issues joined herein, this Order will refer to that agency generically as "BOEM" for all purposes, with the understanding that it was actually known by different names at different times of relevance to this action.

distances from the coast.  (AR, 258, 575-78.)[3]  Bids were cast on some 151 blocks at water depths of less than 200 meters, as well as 141 blocks at depths in excess of 2,000 meters.  (*Id.* at 576.)  In the aggregate, the high bids received by BOEM in connection with Lease Sale 213 exceeded $949 million.  (*Id.*)

That said, high bids are not automatically accepted for OCSLA leases; rather, they are subject to BOEM review and approval for adequacy, irregular bidding patterns, and so on.  The agency carried out the regulatory process of review / approval / acceptance of bids on a rolling basis during the weeks and months following the March 17 sale in New Orleans.  Thus, on March 31, 2010, BOEM accepted 85 bids as satisfactory in Phase 1 of the evaluation process for Lease Sale 213.  (AR, 579-81.)[4]  Phase 2 proceeded thereafter, with additional bids being approved by BOEM on an incremental basis in the ensuing ten weeks.  BOEM deemed an additional 358 bids acceptable between April 1, 2010 and June 11, 2010.  (AR, 616-28.)  All but 27 of those 358 Phase 2 bids were accepted by BOEM after April 20, 2010, including (for example) some 21 bids accepted on April 22.  (*Id.*)  The timing of BOEM's acceptance of Phase 2 bids – and its decision to proceed with such acceptances despite the occurrence of a significant external shock in the Gulf of Mexico in the meanwhile – lies at the heart of this litigation.

### C.  The Deepwater Horizon *Spill.*

While BOEM performed the day-to-day task of administering Phase 2 of the bid approval process for Lease Sale 213 in April 2010, environmental disaster struck in the central Gulf of

---

[3]     The record shows that parties joined herein as Intervenor Defendants submitted high bids for various tracts in Lease Sale 213 totaling tens of millions of dollars.  For example, intervenor Anadarko E&P Company LP submitted 48 high bids whose aggregate sum was in excess of $127 million.  (AR, 578.)  Similarly, intervenor Chevron U.S.A. Inc. submitted 46 high bids whose total value was approximately $89 million.  (*Id.*)  Thus, the intervenors have considerable "skin in the game" as to DOW's efforts to invalidate these leases.

[4]     BOEM conducted Lease Sale 213 in accordance with procedures outlined in a July 1999 notice published in the *Federal Register*, stating in part as follows:  "During the bid review process, we conduct evaluations in a two-phased procedure for bid adequacy determination.  We also review bids to ensure that they are for at least the minimum amount specified in the notice of sale and that unusual bidding patterns are not present."  64 Fed.Reg. 37560-01, 37561 (July 12, 1999).  That notice reflected that Phase 1 "procedures are generally completed within 3 weeks of the bid opening," and that "Phase 2 bid adequacy determinations are normally completed sequentially over a period ranging between 21 and 90 days after the sale.  Leases are awarded as the analysis of bids is completed over this time period."  *Id.*

Mexico.  On April 20, 2010, the Mobile Offshore Drilling Unit *Deepwater Horizon* exploded and sank in the Gulf, where it had been drilling a well some 52 miles from shore in nearly 5,000 feet of water.  (AR, 9179.)  Eleven workers at the site died.  (*Id.*)  Compounding the tragedy, crews were unable to secure the wellhead and staunch the flow of crude oil from that location for some time, as safety equipment designed to prevent major oil spills did not function as anticipated.  (*Id.*)  As a result, staggering quantities of crude oil (reaching into the millions of barrels, or the hundreds of millions of gallons) gushed into the Gulf from the *Deepwater Horizon* site for nearly three months before the wellhead was finally capped on July 15, 2010.[5]  Long before the oil flow from the seafloor was contained, it became evident to regulators and to the entire nation that this was an extraordinary event whose economic and ecological effects could be both widespread and severe.  For example, in a report dated May 27, 2010 (just 37 days after the rig explosion, and fully seven weeks before the wellhead was capped), the Department of the Interior wrote that the *Deepwater Horizon* oil spill "has been declared a 'spill of national significance' and could become one of the oil industry's gravest disasters.  Crude oil continues to flow from a broken pipe on the seafloor, has spread across thousands of square miles, and is damaging local economies, sensitive coastlines and wildlife throughout the Gulf region."  (AR, 9181.)  It was obvious, even then, that this incident had the potential to visit catastrophic harm on fragile Gulf Coast aquatic and coastal ecosystems.

### D.   The Secretary of Interior's Post-Spill Conduct.

In the wake of the *Deepwater Horizon* incident, BOEM commenced a joint investigation with the U.S. Coast Guard and issued new safety recommendations to operators and drilling contractors.  (AR, 9179.)  In May 2010, the Department of the Interior issued a comprehensive set of recommendations, including "a series of steps immediately to improve the safety of offshore oil and gas drilling operations in Federal waters and a moratorium on certain permitting

---

[5]     The source that plaintiff cites for these facts is not found in the administrative record, and indeed is not even included as an exhibit in summary judgment filings.  Nonetheless, the temporal span and relative magnitude of the *Deepwater Horizon* spill have been widely reported and defendants do not object to DOW's characterization of these parameters.  Besides, a more detailed recitation of the particulars of the spill is not material to the specific legal issues joined herein.  Rather, the salient points – that the *Deepwater Horizon* spill caused vast quantities of oil to be released from the wellhead into the central Gulf of Mexico for nearly three months beginning on April 20, 2010 – are uncontroverted.

and drilling activities until the safety measures can be implemented and further analyses completed." (AR, 9181.)  On May 28, 2010, the Secretary of the Interior made a specific finding "that offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment," and also "determined that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment." (AR, 9224.)  In reliance on these findings, the Secretary directed a six-month suspension of all offshore drilling operations for new deepwater wells in the Gulf of Mexico and instructed BOEM not to "process any new applications for permits to drill consistent with this directive." (*Id.*)  BOEM implemented these decisions on May 30, 2010 by issuing written notice of the moratorium to all lessees and operators of federal oil and gas leases in the OCS regions of the Gulf of Mexico.  (AR, 9225-28.)  In particular, BOEM notified lessees that they were "to cease drilling all new deepwater wells" (with "deepwater" defined as depths greater than 500 feet) and indicated that BOEM would not consider drilling permit applications for deepwater wells for the next six months.  (*Id.*)[6]  This drilling moratorium was subsequently lifted by a federal district judge on June 22, 2010.

On July 12, 2010, the Secretary directed BOEM to impose new temporary suspensions of OCS deepwater drilling, based on "evidence that grows every day of the industry's inability in the deepwater to contain a catastrophic blowout, respond to an oil spill, and to operate safely." (AR, 9254.)  These suspensions were imposed for the stated purposes of allowing time for implementation of safety reforms and for collection and analysis of "key evidence regarding the potential causes of the April 20, 2010 explosion and sinking of the *Deepwater Horizon*." (*Id.*)  These suspensions were to remain in place until November 30, 2010, although they were subject to being lifted in the interim should the Secretary determine that deepwater drilling operations

---

[6]     The moratorium was issued under the auspices of regulations empowering the Regional Supervisor to direct a suspension of operations or production "[w]hen activities pose a threat of serious, irreparable, or immediate harm or damage," which includes "a threat to life (including fish and other aquatic life), property, any mineral deposit, or the marine, coastal, or human environment." 30 C.F.R. § 250.172(b).  The Regional Supervisor may also grant or direct such a suspension "[w]hen necessary for the installation of safety or environmental protection equipment," *id.*, § 250.172(c), or "[w]hen necessary to carry out the requirements of NEPA or to conduct an environmental analysis," *id.*, § 250.172(d).

could resume safely.  (AR, 9255.)  In contrast to the vacated May 2010 moratorium, the July 2010 suspensions were based on new evidence and factual determinations by the Secretary, and were designed to suspend drilling activities based on drilling configurations and technologies, rather than water depths.  (*Id.*)

Of critical importance to this lawsuit is the fate of Lease Sale 213 activities after the *Deepwater Horizon* spill.  Even as the public's hue and cry over the oil spill reached a fevered pitch in the early summer of 2010, the issuance of leases in Lease Sale 213 was not terminated, suspended, canceled, or impaired in any way.  Instead, federal regulators moved forward with Phase 2 of the Lease Sale 213 bid approval process as if nothing had happened, remaining on the same path they had commenced before April 20, 2010.  It was business as usual.  In particular, BOEM approved 21 bids on April 22, 2010; 32 bids on April 29, 2010; 41 bids on May 6, 2010; 53 bids on May 13, 2010; 38 bids on May 21, 2010; 39 bids on May 27, 2010; 43 bids on June 2, 2010; 12 bids on June 3, 2010; 34 bids on June 8, 2010; and 18 bids on June 10, 2010.  (AR, 616-27.)  All told, then, BOEM accepted bids on at least 331 blocks in Lease Sale 213 between the onset of the *Deepwater Horizon* spill on April 20, 2010 and the conclusion of Phase 2 on June 10, 2010.  Again, the *Deepwater Horizon* spill continued until the wellhead was capped on July 15, 2010, some 35 days <u>after</u> Phase 2 of Lease Sale 213 concluded.  Another way of looking at it is that BOEM completed Phase 2 of the bid approval process fully 50 days before reinitiating consultation with the FWS and NMFS to analyze the effects of the Five-Year Plan on threatened and endangered species in light of the oil spill, and roughly five months before announcing its intent to prepare a Supplemental EIS to consider new information gleaned from the *Deepwater Horizon* experience.

The administrative record offers few insights into BOEM's decision to proceed with approving bids on Lease Sale 213 post-*Deepwater Horizon*.  Most notably, e-mail traffic shows that in May 2010, BOEM fielded inquiries from current and prospective lessees as to whether it would continue with Phase 2 of the Lease Sale 213 bid approval process in light of the *Deepwater Horizon* incident and the accompanying restrictions on new drilling permits.  BOEM responded to those inquiries with assurances that the leasing process for Lease Sale 213 was proceeding as scheduled and that bids would continue to be approved in the ordinary course.  On May 11, 2010, a BOEM official indicated via e-mail that "we are continuing to issue leases awarded by RE until notified otherwise."  (AR, 9155.)  That same day, a BOEM official wrote

that "[t]he Adjudication Unit is still issuing leases for CPA Sale 213." (AR, 9164.) Another BOEM e-mail from May 11 likewise confirms that "Sale 213 leases will continue to be issued as usual." (AR, 9169, 9172.) Yet another message dated May 11, 2010 and authored by a BOEM official states, "We are issuing leases. No one has informed us otherwise." (AR, 9166.) So the agency's course of action after April 20, 2010 was unwavering, at least with respect to the review and approval of Lease Sale 213 bids.

## II.    Procedural History.

At its core, this litigation hinges on the contention of plaintiff, Defenders of Wildlife, ("DOW"), that once the *Deepwater Horizon* disaster began, BOEM was obligated under both the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA") to suspend the bid approval process for Lease Sale 213 until such time as it consulted with expert agencies and performed a supplemental analysis of the environmental effects of the Five-Year Plan (or at least the drilling operations contemplated by Lease Sale 213). DOW filed this action seeking judicial declarations that all bid approvals postdating April 20, 2010 are in violation of ESA and NEPA; that all such leases must be vacated; that BOEM is enjoined from accepting or approving further leases until the necessary environmental compliance steps are completed; and that BOEM must reinitiate consultation with NMFS and FWS.

Initially, DOW sued only a collection of federal defendants, including BOEM, the U.S. Department of the Interior, and Ken Salazar, Secretary of the Interior (collectively, the "Federal Defendants"). However, a host of interested entities in the oil and gas industries – including successful bidders in Lease Sale 213 paying large sums of money for leases that DOW now seeks to nullify – requested and received leave to intervene in this action as parties defendant (collectively, the "Intervenor Defendants").[7]

Following adjudication of various Rule 12(b) Motions advanced by the Federal Defendants and certain Intervenor Defendants, the following claims brought by DOW in the Third Amended Complaint remain active and pending: (i) a cause of action alleging that BOEM violated NEPA and the Administrative Procedure Act ("APA") by accepting bids for Lease Sale

---

[7]       Those Intervenor Defendants consist of the American Petroleum Institute, the Independent Petroleum Association of America, the U.S. Oil & Gas Association, the International Association of Drilling Contractors, Chevron U.S.A., Inc., Anadarko E&P Company LP, and Apache Deepwater, LLC.

213 after the *Deepwater Horizon* oil spill began without waiting for a supplemental EIS to be completed (Claim One); (ii) a cause of action alleging that BOEM violated the APA by continuing to accept bids on Lease Sale 213 after the spill in reliance on invalid conclusions in the Multisale EIS and Environmental Assessment, without first supplementing same (Claim Two); and (iii) a cause of action alleging that BOEM violated the APA and the ESA by proceeding with Lease Sale 213 after April 20, 2010, in contravention of its statutory duty to ensure that its actions are not likely to jeopardize the continued existence of any listed species or their critical habitat (Claim Four).  (*See* doc. 81.)[8]

The parties have submitted the administrative record and, in reliance on that record, have filed Cross-Motions for Summary Judgment.  Those Cross-Motions have been extensively briefed and are properly considered at this time.  Upon review, the Court finds no genuine issues of material fact.  The parties' motions present purely legal questions concerning whether BOEM's acknowledged and admitted conduct post-*Deepwater Horizon* was consistent and in compliance with the strictures of NEPA and ESA.  Therefore, this action is well suited for disposition at the Rule 56 stage on the strength of the parties' competing motions and briefs.  No triable issues of fact are present that might render disposition of this action on summary judgment inappropriate or unwarranted.

---

[8]    The Order ruling on the motions to dismiss indicated that "[t]he Court construes the Third Amended Complaint as bringing no claims based on BOEM[]'s approval of drilling/exploration/production plans," and "as bringing only challenges for agency actions that have already happened or are ongoing, not for agency actions that may or may not occur at some point in the future (*e.g.*, claims concerning future lease sales that have not yet been approved based on environmental analysis that has not yet been performed/completed)."  (Doc. 81, at 31-32.)  The parties have not disputed the legitimacy of those boundaries.  At any rate, no claims seeking judicial review of BOEM's approval of exploration, drilling or production plans are cognizable in federal district court, so none could be brought here even if plaintiff had intended to do so.  *See* 43 U.S.C. § 1349(c)(2) ("Any action of the Secretary to approve … any exploration plan or any development and production plan under this subchapter shall be subject to judicial review only in a United States court of appeals ….").  Thus, in its present configuration, this action is confined to Lease Sale 213, and whether BOEM's continued approval of lease bids after the *Deepwater Horizon* spill began was in derogation of its duties under NEPA and ESA, as reviewed under the deferential standards of the APA.

### III.    Standard of Review.

The parties agree that DOW's challenges brought under ESA and NEPA are subject to review under standards promulgated by the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (*See* doc. 113-1, at 17; doc. 119, at 13.)  The APA provides that reviewing courts shall hold unlawful and set aside agency action, findings and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Miccosukee Tribe of Indians of Florida v. United States,* 566 F.3d 1257, 1271 (11th Cir. 2009) (evaluating ESA claims under "arbitrary and capricious" standard of APA); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1169 (11th Cir. 2006) ("We review an agency's decisions pursuant to NEPA under the arbitrary and capricious standard of the Administrative Procedure Act (APA)."); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 542 (11th Cir. 1996) (under APA, courts "can set aside the federal agencies' actions here only if we find that the agencies abused their discretion, or acted arbitrarily, capriciously, or contrary to law"); *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1191, 1193 (9th Cir. 1988) (review of NEPA environmental impact statement or ESA compliance is governed by APA).  "The arbitrary and capricious standard is exceedingly deferential," and courts may not substitute their "judgment for the agency's as long as its conclusions are rational."  *Miccosukee*, 566 F.3d at 1264 (citations and internal quotation marks omitted); *see also Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("even in the context of summary judgment, an agency action is entitled to great deference").  "The court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision."  *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (citation and internal quotation marks omitted); *see also Fund for Animals*, 85 F.3d at 542 ("The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action.") (citations omitted).

Filtered through the APA lens, then, DOW's claims in this action are that BOEM acted arbitrarily and capriciously in implementing the Lease Sale 213 bid approval process after the *Deepwater Horizon* spill, without first reinitiating consultation under ESA or preparing a new SEIS under NEPA.  In considering these claims, this Court's inquiry is not whether it agrees with BOEM's actions, or whether it would have proceeded differently had it been standing in BOEM's shoes on April 20, 2010.  Instead, the proper analysis is whether the record on

summary judgment establishes that DOW has met its burden of showing that BOEM's decision to move forward with Lease Sale 213 under those circumstances was arbitrary and capricious.

## IV.   The Endangered Species Act.

### A.   Section 7(a)(2) and the Initial Consultation.

As noted, Claim Four alleges that in relying on "faulty opinions in proceeding with lease sales in the Gulf after the Deepwater Horizon incident," BOEM has "failed to ensure that there will be no jeopardy to endangered or threatened species resulting from actions it implements," in violation of ESA and APA.  (Doc. 61, ¶¶ 73-74.)  This claim stems from § 7(a)(2) of ESA, which obliges federal agencies to insure that their actions are not "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  16 U.S.C. § 1536(a)(2).  Section 7(a)(2)'s requirements unquestionably apply to conduct such as BOEM's approval of leases for oil and gas drilling on the OCS.  *See* 50 C.F.R. § 402.02 (stating that "actions" covered by the ESA include "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid," as well as "actions directly or indirectly causing modifications to the land, water, or air").  Importantly, "section 7(a)(2) imposes two obligations upon federal agencies.  The first is procedural and requires that agencies consult with the FWS [and/or NMFS] to determine the effects of their actions on endangered or threatened species and their critical habitat."  *Florida Key Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008).  Consultation is "designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species."  *Defenders of Wildlife v. Jackson*, 791 F. Supp.2d 96, 100 (D.D.C. 2011) (citation omitted).  "The second is substantive and requires that agencies insure that their actions not jeopardize endangered or threatened species or their critical habitat."  *Florida Key Deer*, 522 F.3d at 1138.

To comply with § 7(a)(2), BOEM is required to consult with the NMFS and/or FWS if the contemplated action "may affect" an endangered or threatened species.  *See, e.g., Karuk Tribe of California v. U.S. Forest Service*, 640 F.3d 979, 983 (9th Cir. 2011) ("the standard for ESA consultation is only whether the conduct 'may affect' a listed species"); *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1105 (10th Cir. 2010) (if agency determines that its "proposed discretionary action may affect a listed species or a critical habitat … the agency must consult with the FWS" or NMFS); *Florida Key Deer*, 522 F.3d at 1138 (similar).  It

is undisputed that BOEM properly consulted with both the NMFS and the FWS at the outset of the Five-Year Plan of which Lease Sale 213 is a part.  The NMFS's conclusion in its Biological Opinion was that "the five-year leasing program and its associated actions are not likely to jeopardize the continued existence of threatened or endangered species under the jurisdiction of NMFS or destroy or adversely modify designated critical habitat."  (AR, 1493.)  Similarly, the FWS determined in its Biological Assessment that the brown pelican, bald eagle, piping plover, whooping crane, loggerhead sea turtle, Kemp's ridley, Alabama beach mouse, and Perdido Key beach mouse were not likely to be adversely affected by the Five-Year Plan.  (AR, 1695.)  Simply put, nothing in either the NMFS Opinion or the FWS Assessment at the outset of the Five-Year Plan suggested that BOEM's administration of that Plan was likely to jeopardize endangered or threatened species or their critical habitat.  So § 7(a)(2) did not require anything further of BOEM at the outset of the program.

### B.     Reinitiation of Consultation.

Of course, initial consultation may not insulate an agency from the duty to perform further consultation if circumstances change at a later date.  *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 525 (9th Cir. 2010) (recognizing agency's continuing duty to reinitiate consultation if new information reveals effects of the action that may affect listed species in a manner to an extent not previously considered); 50 C.F.R. § 402.16(b) ("Reinitiation of formal consultation is required … where discretionary Federal involvement or control over the action has been retained or is authorized by law and … [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered").  Where a plaintiff alleges that an agency violated the reinitiation requirement, that plaintiff bears the exacting burden of establishing that the agency acted arbitrarily and capriciously in failing to reinitiate consultation.  *See Miccosukee Tribe of Indians of FL v. United States*, 420 F. Supp.2d 1324, 1337 (S.D. Fla. 2006); *Hawksbill Sea Turtle v. Federal Emergency Management Agency*, 11 F. Supp.2d 529, 550 (D.V.I. 1998) ("the standard for demonstrating that an agency was arbitrary and capricious in failing to reinitiate consultation is an exacting one").

During the initial ESA consultation in 2007, both the NMFS and the FWS made certain assumptions and judgments about the risk of an oil spill in evaluating the likely effects of the Five-Year Plan on listed species and their critical habitat.  For example, the NMFS Opinion indicated that "the coastal waters inhabited by the Gulf sturgeon are not expected to be at any

significant risk from oil spills. … No coastal spills are projected to occur in Mississippi, Alabama, or Florida coastal waters as a result of a proposed action in the [Central Planning Area, where Lease Sale 213 was to occur]. …  It is estimated that there is a 1 percent risk for Louisiana waters east of the Mississippi River to be affected by an oil slick within 10 days.  Probabilities decrease below 1 percent to areas further to the east. … [T]he likelihood of spill occurrence and subsequent contact with Gulf sturgeon designated critical habitat is extremely low."  (AR, 1527.)[9]  The NMFS Opinion also looked at potential effects of oil spills on sea turtles, Gulf sturgeon, and sperm whales using BOEM's oil spill risk analysis and performing computerized modeling to simulate oil spill trajectories.  In gauging those effects, the NMFS utilized a baseline assumption that "[a] total of 14,616 – 161,868 gal of spilled oil is estimated for coastal waters of the [Central Planning Area]."  (AR, 1568.)  The NMFS further assumed that "[i]n the rare event that a spill exceeding 420,000 gal should occur, it is estimated that approximately 630,000 gal of oil will be spilled over the 40-year lifetime of the proposed leases in the CPA."  (AR, 1568.)  According to the NMFS Opinion, if a large spill occurred, "[s]pilled oil would rapidly spread out, evaporate, and weather, quickly becoming dispersed into the water column."  (AR, 1569.)  The NMFS's "no jeopardy" opinion was based, at least in part, on these assumptions concerning the risk and likely effects of accidental oil spills caused by activities pursuant to the Five-Year Plan.[10]

---

[9]      The NMFS Opinion demonstrates that the agency viewed the risk of a significant oil spill damaging Gulf sturgeon critical habitat as being negligible.  Factors that the NMFS cited in reaching that determination included the following: (i) inshore areas of designated habitat are insulated from oil spills by their geographic location; (ii) the floating nature of oil, the lack of large tidal ranges, and the Mississippi River outflow's ability to disperse slicks diminish the risk of significant impact; (iii) there is a "very low probability" of a large offshore oil spill contacting critical habitat; and (iv) there is an "extremely low probability" of a coastal spill having impacts east of the Mississippi River and north of Plaquemines Parish.  (AR, 1526.)

[10]     The NMFS bottom-line conclusion was that a major oil spill during the 40-year lifespan of the contemplated leases in the Five-Year Plan would result in lethal takes of 42 individual loggerhead turtles, non-lethal takes of 111 loggerheads, non-lethal takes of 11 sperm whales, and lethal takes of two Gulf sturgeon.  (AR, 1573-74.)  On that basis, the NMFS Opinion stated that "NMFS believes that a small number of listed species will experience adverse effects as the result of exposure to a major oil spill or ingestion of accidentally spilled oil over the lifetime of this action," and that those numbers were not likely to reduce appreciably the likelihood of survival of any of those species in the wild by diminishing their reproduction, numbers or distribution.  (AR, 1594.)

Also during the 2007 consultation process, the FWS issued a Biological Assessment for the Five-Year Plan.  The FWS Assessment of environmental risks to coastal birds and sea turtles was predicated on estimates that between 5,500 and 26,500 barrels ("bbl") of oil would be spilled in offshore waters, with approximately two 3,000 bbl spills in coastal waters, over a 40-year period as a result of Five-Year Plan activities in the CPA.  (AR, 1660.)  The FWS also cited computer modeling estimates showing only a 2-4% risk of impact on sea turtle nesting habitat in Louisiana, and less than 0.5-1% risk of impact on such habitat east of Louisiana, as a result of offshore spills caused by the proposed actions in the CPA.  (AR, 1668-69.)  Estimates for large offshore oil spills from the Five-Year Plan affecting whooping crane habitat were calculated at less than 0.5-1%.  (AR, 1659.)  With respect to Alabama and Perdido Key beach mice, the FWS Assessment stated that "[t]here is a < 0.5 percent chance that an offshore spill ≥ 1,000 bbl would occur and contact the shoreline inhabited by the Alabama or Perdido Key beach mouse during the life of a proposed action."  (AR, 1672.)  That same document indicated that "[l]arge oil spills associated with OCS activities are low-probability events."  (AR, 1676.)  In the FWS's view, most counties and parishes had a risk of less than 0.5% of an offshore oil spill exceeding 1,000 bbl occurring and contacting their shorelines as a result of Five-Year Plan activities, with the likelihood of exposure reaching as high as 10-15% for Plaquemines Parish in Louisiana.  (AR, 1677.)  That report concluded that oil spills arising from Five-Year Plan activities posed only "a minimal threat to nesting adults or hatchling loggerhead, green, leatherback, and Kemp's ridley sea turtles," and that regulatory safeguards "and the weathering of oil in the environment are expected to significantly minimize potential impacts on sea turtles and their nesting habitat." (AR, 1692.)  The FWS reached similar findings as to impacts on the Alabama and Perdido Key beach mice, and the piping plover, bald eagle, brown pelican and whooping crane.  (AR, 1692-95.)  For these and other reasons, the FWS Assessment found that these species were "Not Likely to Be Adversely Affected" by the proposed actions under the Five-Year Plan.  (AR, 1695.)

The point of the foregoing is to emphasize that, back in 2007, both the NMFS and the FWS rested their "no jeopardy" determinations on specific, detailed assumptions and modeling about oil spill risks, magnitudes and effects arising from the Five-Year Plan.  The *Deepwater Horizon* experience from April – July 2010 reasonably called into question certain of those assumptions and models, and constituted "new information" warranting reinitiation of

consultation with those expert agencies. That is precisely what happened. On July 30, 2010, BOEM reinitiated consultation under Section 7 of the Endangered Species Act with both the NMFS and the FWS. (AR, 9290-93.) This reinitiation was intended to examine the effects of the Five-Year Plan, and was specifically made in response to the *Deepwater Horizon* incident. In that regard, BOEM explained its belief that "the DWH incident and the resulting oil spill necessitate reconsideration of this ESA consultation," and that "the spill volumes and scenarios used in the analysis for the existing [agency consultations] need to be readdressed given the 'rare event' of a spill exceeding 420,000 gallons … and the status of some listed species or designated critical habitats may have been altered as a result of the DWH incident." (AR, 9290, 9292.) BOEM further indicated its intention to continue using existing NMFS and FWS consultations until such time as the reinitiated consultations were completed. (AR, 9291, 9293.) The NMFS and FWS commenced such consultations in the ensuing months. (AR, 9298-9303.)

C. *Lease Sale 213 and the Reinitiation of Consultation under Section 7(a).*

No party herein quarrels with BOEM's decision to reinitiate consultation in July 2010.[11] Nor does this case involve a challenge to the results or conclusions of that reinitiated consultation. Rather, DOW's claim is that BOEM violated § 7(a)(2) of the Endangered Species Act by approving more than 300 bids (including those for dozens of deepwater blocks) in Phase 2 of Lease Sale 213 after the *Deepwater Horizon* incident, without first reinitiating formal consultation with the NMFS and FWS to evaluate this "new information" before more leases

---

[11]    To the contrary, everyone appears to agree that consultation was properly reinitiated in these circumstances. After all, BOEM informed the NMFS and FWS that spill volumes and scenarios from the initial consultations needed to be revisited given the *Deepwater Horizon* spill and its possible effects on listed species and habitats. (AR, 9290, 9292.) On September 24, 2010, the NMFS wrote that it "concurs that the MC 252 incident triggers the conditions of 50 CFR 402.16 (b) and (c); and thus, reinitiation of consultation is warranted." (AR, 9298.) The NMFS further opined that, based on information gleaned from the *Deepwater Horizon* experience, the agency's previous assessments were grounded in "assumptions [that] did not sufficiently address the potential risks of a spill of this magnitude occurring and the risks posed to listed species and their habitats." (AR, 9299.) Similarly, the FWS indicated on September 27, 2010, that "[t]he incident and resulting oil spill represent new information regarding potential adverse effects to endangered and threatened species that has not previously been assessed. Furthermore, the status of some listed species or designated critical habitats may have been altered as a result of the Deepwater Horizon incident and therefore require further consideration." (AR, 9302.)

-15-

were issued.  Stated differently, DOW's position is that § 7(a)(2) forbade BOEM from relying on stale NMFS / FWS consultations and proceeding with bid approvals on Lease Sale 213 after the *Deepwater Horizon* incident until such time as consultation had been reinitiated and the expert agencies had determined that, even after considering the new information, those activities were not likely to jeopardize listed species or their critical habitat.  In plaintiff's words, "BOEM cannot possibly insure the ongoing viability of species in the Gulf when it has not completed consultation to determine how the oil spill has impacted the environmental baseline of the Gulf." (Doc. 113-1, at 21.)  Plaintiff further objects that BOEM was obliged to wait for the results of that reinitiated consultation (a process which could last several years), rather than simply making the request and then continuing with business as usual in administering the approval of bids.  (*Id.* at 24.)[12]

Defendants successfully rebut plaintiff's ESA challenge.  As to DOW's contention that BOEM is categorically barred from taking any action with respect to Lease Sale 213 until after the reinitiated consultation concludes, the Federal Defendants identify express language of the ESA to the contrary.  In particular, § 7(d) of that statute provides that "[a]fter initiation of consultation …, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures …."  16 U.S.C. § 1536(d); *see also Pacific Rivers Council v. Thomas*, 936 F. Supp. 738, 746 (D. Idaho 1996) ("the court cannot agree with Plaintiffs' suggestion that no agency can ever proceed with proposed action until consultation is complete").  So, under § 7(d), an agency is not forbidden from taking <u>all</u> action while consultation is underway, but is simply barred from irreversibly or irretrievably committing resources during that interval.  The purpose of § 7(d) is to ensure that the status quo is maintained during consultation, so as to avoid a circumstance in which a large-scale commitment of resources is made during the consultation

---

[12]     Plaintiff cites general statements from cases in other jurisdictions that purport to support this proposition.  *See, e.g., Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th Cir. 2001) ("Reinitiation of consultation requires either the FWS or the NMFS to issue a new Biological Opinion before the agency action may continue.").

process, which resources cannot be diverted or redirected to other productive uses if the outcome of consultation is that the project would violate the "no jeopardy" requirement of § 7(a).[13]

Nothing in BOEM's mere approval of bids for Lease Sale 213 (which is the only activity at issue in this action) could reasonably be viewed as constituting an "irreversible or irretrievable commitment of resources" under § 7(d).  *See North Slope Borough v. Andrus*, 642 F.2d 589, 611 (D.C. Cir. 1980) ("Plainly, the preliminary activities permitted by this lease sale entail no irreversible or irretrievable commitment of resources ….") (footnote, citation and internal quotation marks omitted); *Village of False Pass v. Clark*, 733 F.2d 605, 610 (9th Cir. 1984) (similar).  After all, "the lease sale itself is only a preliminary and relatively self-contained stage within an overall oil and gas development program which requires substantive approval and review prior to implementation of each of the major stages: leasing, exploring, producing." *North Slope*, 642 F.2d at 593; *see also Sec'y of Interior*, 464 U.S. at 342 ("Since 1978 the sale of a lease grants the lessee the right to conduct only very limited, 'preliminary activities' on the OCS.").  Thus, the Court agrees with the Federal Defendants that this is not a case in which the § 7(d) prohibition on irreversible or irretrievable commitments of resources foreclosed BOEM from taking action with respect to Lease Sale 213 pending the conclusion of the reinitiated consultation with the expert agencies.[14]

---

[13]    *See Washington Toxics Coalition v. Environmental Protection Agency*, 413 F.3d 1024, 1034-35 (9th Cir. 2005) (this section was "enacted to ensure that the status quo would be maintained during the consultation process, to prevent agencies from sinking resources into a project in order to ensure its completion regardless of its impacts on endangered species"); *North Slope Borough v. Andrus*, 486 F. Supp. 332, 356 (D.D.C. 1980) (purpose of this section was "to preclude the investments of large sums of money in any endeavor if (1) at the time of the investment there was a reasonable likelihood that the project, at any stage of development, would violate § 7(a)(2), and (2) that investment was not salvageable") (footnotes omitted).  Courts and commentators alike have noted that § 7(d) was a legislative response to the infamous "snail darter case" of *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), in which the Supreme Court held that the ESA prohibited completion of a dam that would jeopardize the survival of a tiny fish known as the snail darter, even though considerable sums of public money had already been committed to the project (and, indeed, the dam was nearly completed) before the likelihood of adverse effects on the snail darter became known.

[14]    Two other points lend support to this conclusion.  First, even though DOW objects that agencies cannot do anything until consultation is complete and a new biological assessment / opinion has been issued, plaintiff makes no showing as to how the mere approval of bids for Lease Sale 213 would satisfy the "irreversible or irretrievable commitment of resources" (Continued)

As the Federal Defendants properly recognize, avoiding "irreversible or irretrievable commitment of resources" under § 7(d) does not necessarily discharge their obligations as to the "no jeopardy" requirement of § 7(a).  And DOW has brought a § 7(a) cause of action, not a § 7(d) cause of action.  The point is that BOEM's actions with respect to Lease Sale 213 could still violate § 7(a), notwithstanding their compliance with § 7(d).  *See, e.g., Conner v. Burford*, 848 F.2d 1441, 1455 n.34 (9th Cir. 1988) ("Section 7(d) does not amend section 7(a) …. Rather, section 7(d) clarifies the requirements of section 7(a), ensuring that the status quo will be maintained during the consultation process."); *Florida Key Deer v. Brown*, 386 F. Supp.2d 1281, 1293-94 (S.D. Fla. 2005) ("Section 7(d) does not excuse federal agencies from meeting the requirements of Section 7(a)(2).").  For that reason, a § 7(a) analysis remains necessary.

Recall that the ESA imposes a duty on BOEM to "insure" that its lease sale decision "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat."  § 1536(a)(2).  Plaintiff's point is that, until the reinitiated consultation is finished and the NMFS and FWS have analyzed the Five-Year Plan in light of the "new information" relating to the *Deepwater Horizon* spill, BOEM cannot be insuring that its actions of approving bids and issuing leases for Lease Sale 213 are not likely to jeopardize listed species or their critical habitats.

The Federal Defendants offer a host of counterarguments, with varying degrees of persuasiveness and plausibility.  However, their critical insight – and the one that ultimately is

---

test under § 7(d).  Second, BOEM itself made a finding in October 2010 that approval of leases during the reinitiated consultation period did not run afoul of § 7(d) "because the Secretary retains the discretion under OCSLA to deny, suspend, or rescind these plans and permits at any time, as necessary to avoid jeopardy."  (AR, 9308.)  To be sure, the parties spar over the degree of deference to which BOEM's determination under § 7(d) is entitled.  But that exhibit convincingly explains why the objected-to approval of leases during the consultation period is consistent with § 7(d) and cannot be viewed as an irreversible or irretrievable commitment of resources.  Plaintiff has not demonstrated that BOEM's approval of leases in Lease Sale 213 irretrievably committed that agency to approve exploration plans and issue drilling permits for all blocks, or irreversibly authorized lessees to spend lavish sums on drilling at those locations.  The law is otherwise.  *See, e.g.,* 43 U.S.C. § 1334(a)(1)(B) (directing Secretary to promulgate regulations providing "for the suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit … if there is a threat of serious, irreparable or immediate harm or damage to life (including fish and other aquatic life) … or to the marine, coastal, or human environment"); 30 C.F.R. § 250.172(b) (implementing that provision).

fatal to DOW's ESA claim – concerns the strict, staged structure of the OCSLA and its interplay with § 7(a).  As discussed *supra*, under the OCSLA framework, there are "four distinct statutory stages to developing an offshore oil well: (1) formulation of a five year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; (4) development and production."  *Secretary of the Interior v. California*, 464 U.S. 312, 337, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984).  "Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS. And each stage includes specific requirements for consultation … between federal agencies."  *Id.* "The stated reason for this four part division was to forestall premature litigation regarding adverse environmental effects that all agree will flow, if at all, only from the latter stages of OCS exploration and production."  *Id.* at 341; *see also Center for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 473 (D.C. Cir. 2009) (similar).

Undoubtedly, the ESA (and particularly § 7(a)) applies to each stage of the OCSLA process, including the lease sale stage at issue in this litigation.  *See Sec'y of Interior*, 464 U.S. at 338 (for OCS stage involving solicitation of bids and issuance of offshore leases, "[r]equirements of the … Endangered Species Act must be met first"); *Center for Biological Diversity*, 563 F.3d at 483 ("The welfare of animals is, by design, only implicated at later stages of the program, each of which requires ESA consultation and additional environmental review by Interior."); *Village of False Pass*, 733 F.2d at 609 ("ESA appears to apply equally to each stage [of OCSLA stages for offshore oil and gas activities] of its own force and effect.").  As such, BOEM plainly must comply with Section 7(a)(2) with regard to the bid approval process in Lease Sale 213.[15]

---

[15]     The Court has previously made just such a determination in this case at the Rule 12(b) stage.  *See Defenders of Wildlife v. Bureau of Ocean Energy Management, Regulation, and Enforcement*, 791 F. Supp.2d 1158, 1178-79 (S.D. Ala. 2011) (rejecting intervenor defendants' suggestion "that § 7(a) of the ESA does not apply to early stages of OCSLA lease sales because environmental review at subsequent stages of the process (oil/gas exploration, production and sale) is sufficient to protect endangered and threatened species from harm").  The argument unsuccessfully posited by Intervenor Defendants at the Rule 12(b) stage – that § 7(a) is inapplicable to lease sales – is distinct from that presented by the Federal Defendants at the Rule 56 stage, to-wit: That BOEM satisfied its § 7(a) obligations with respect to those lease sales.  As such, this Court's ruling on the motions to dismiss in no way forecloses the summary judgment issue presented, or mandates that it be resolved favorably to DOW.

On summary judgment, defendants' position is that BOEM has indeed satisfied the "no jeopardy" requirement as to Lease Sale 213, in that the approval of the leases is not likely to jeopardize the continued existence of any listed species or to adversely modify critical habitat. The key insight emerging from the case law is that a § 7(a)(2) analysis must be performed separately with respect to each stage of the OSCLA framework.  As the Supreme Court has observed, "Congress has … taken pains to separate the various federal decisions involved in formulating a leasing program, conducting lease sales, authorizing exploration, and allowing development and production."  *Sec'y of Interior*, 464 U.S. at 340.  And one appeals court has opined that, under OCSLA, "we must consider any environmental effects of a leasing program on a stage-by-stage basis, and correspondingly evaluate ESA's obligations with respect to each particular stage of the program."  *Center for Biological Diversity*, 563 F.3d at 483 ("courts must consider the ESA's requirements in light of each particular leasing program stage at issue because those stages are there by design"); *see also North Slope*, 642 F.2d at 593 ("At this point the court must look at the contentions among the parties as pertaining only to the lease sale.  The leasing of tracts is the limited subject-matter to which our decision is relevant.").  Given the compartmentalization of the OCSLA stages for environmental review, the question presented here is whether DOW has shown that BOEM's approval of bids in Lease Sale 213 (taken in isolation, without regard to any ensuing exploration, development or drilling activities) following the April 2010 oil spill might jeopardize listed species or habitat to an extent not previously considered, so as to violate § 7(a)(2).[16]

---

[16]    This formulation of the issue is dictated not only by the case law cited *supra* and the "compartmentalization" of the stage-by-stage OCLSA framework, but also by the reality that this lawsuit is confined to the lease sale stage.  DOW is not suing the Federal Defendants in this action over approval or permitting decisions relating to exploration, drilling or production at any lease site; indeed, the Third Amended Complaint is limited on its face to issuance of leases.  Nor could any such drilling claim be brought here because this Court would lack jurisdiction to hear it.  *See Defenders of Wildlife*, 791 F. Supp.2d at 1166 (any argument "that the Federal Defendants are approving drilling/exploration/production/ development plans that they should not … fails because … such claims would be precluded in this District Court by [43 U.S.C.] § 1349(c)(2)'s mandate that such claims are reviewable only in the United States Court of Appeals for the circuit encompassing the affected state."); *Shell Oil Co. v. F.E.R.C.*, 47 F.3d 1186, 1192 (D.C. Cir. 1995) ("judicial review of decisions with respect to leasing [programs], exploration, development or production plans shall take place only in the courts of appeals").

The inescapable fact of the matter is that BOEM's approval of a bid, and the issuance of a lease to an oil drilling/development/exploration company, is a narrowly circumscribed event, in terms of its repercussions for listed species and their habitat.  Indeed, "the sale of a lease grants the lessee the right to conduct only very limited, 'preliminary activities' on the OCS.  It does not authorize full scale exploration, development, or production.  Those activities may not begin until separate federal approval has been obtained, and approval may be denied on several grounds."  *Sec'y of Interior*, 464 U.S. at 342.  "[T]he purchase of an OCS lease, standing alone, entails no right to explore, develop, or produce oil and gas resources on the OCS."  *Id.* at 340; *see also Mobil Oil Exploration and Producing Southeast, Inc. v. United States*, 530 U.S. 604, 620, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (opining that while lease contracts give "companies rights to explore for, and to develop, oil, … the need to obtain Government approvals so qualified the likely future enjoyment of the exploration and development rights that the contract, in practice, amounted primarily to an *opportunity* to try to obtain exploration and development rights … under the standards specified in the cross-referenced statutes and regulations"); *Abbott v. BP Exploration and Production Inc.*, 781 F. Supp.2d 453, 463 n.14 (S.D. Tex. 2011) ("BP's rights under its leases to drill for and develop oil were expressly conditioned on it obtaining critical permits designed to ensure the safety and efficacy of any drilling and production activities.  The government's authority to require these permits is granted by statute and incorporated into the leases.").

Courts have recognized that OCSLA lease sale decisions, in and of themselves, generally do not cause jeopardy to listed species or critical habitat.  *See Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1194 (9th Cir. 1988) ("We once again note that the risks to endangered species during the lease sale stage are virtually nonexistent.  Only limited preliminary activities are permitted during this stage …."); *Village of False Pass*, 733 F.2d at 611 ("The lease sale decision itself could not directly place gray or right whales in jeopardy").  In light of that fact, DOW's assertion that BOEM violated § 7(a)(2) by the mere act of approving bids, without more, is highly suspect and demands proof, which plaintiff does not have and does not offer.

Recall that it is plaintiff's burden to show not only that BOEM's actions in approving leases post-*Deepwater Horizon* were violative of the ESA, but that they were "arbitrary, capricious, and an abuse of discretion" within the meaning of the APA.  Despite offering several counterarguments to the Federal Defendants' Rule 56 stance, plaintiff has not met this burden.

As an initial matter, DOW insists that the Federal Defendants' position would "nullify any role that consultation plays at the lease sale stage." (Doc. 127, at 2.) The Court disagrees. It is certainly foreseeable that even the "preliminary activities" authorized by a lease sale might, in certain circumstances, jeopardize a listed species or its critical habitat.[17] Thus, contrary to DOW's argument, § 7(a)(2) review is not reduced to an empty, hollow exercise, even at the lease sale stage.[18]

Next, DOW offers outspoken criticism of the stage-by-stage analysis championed by BOEM, reasoning that "ESA consultation occurs only at the lease sale stage, not later" and that

---

[17] Those preliminary activities "fall under the broad rubric of testing. Geological, geophysical, and other surveys necessary to develop a comprehensive exploration plan are allowed. Some construction of test structures will also be necessary in due time …. The lease stage provides the lessees and the Secretary with a chance to amass data which will inform future proposals and decisions. For example, seismic and sonar testing as well as bottom and core sampling might be absolutely essential for the lessees' decision regarding the appropriate commitment of their resources in light of the area's development potential." *North Slope*, 642 F.2d at 594 (footnote and internal marks omitted); *see also Sec'y of Interior*, 464 U.S. at 338-39 ("Lease sale purchasers acquire the right to conduct only limited 'preliminary' activities on the OCS – geophysical and other surveys that do not involve seabed penetrations greater than 300 feet and that do not result in any significant environmental impacts.").

[18] In the same breath, plaintiff objects that accepting the Federal Defendants' reasoning would "contradict this court's well-reasoned conclusions in its Order of May 23, 2011 that (1) BOEM cannot 'skip 7(a) of the ESA in carrying out lease sales,' and (2) ESA consultation is 'mandatory' at this stage." (Doc. 127, at 2.) This variant of plaintiff's argument is likewise unpersuasive. To say that ESA review at the lease sale stage of the OCSLA process is confined to that particular stage (as defendants have maintained) is not to say that ESA review is nonexistent and may be skipped at that stage. In point of fact, ESA consultation has already occurred as to those "preliminary activities" authorized by the lease sale stage. To be sure, DOW remarks that those preliminary activities may harm protected species (*e.g.*, seismic studies may affect the hearing of sperm whales). (Doc. 127, at 9 n.5.) But the existing NMFS report addresses those effects and finds no jeopardy. (AR, 1564-65, 1587-88 ("Harassment of sperm whales resulting from seismic surveys is not expected to result in a reduction of numbers, reproduction, or distribution of sperm whales in the wild.").) Plaintiff has come forward with no reason to believe that the *Deepwater Horizon* spill constitutes "new information" as to the NMFS's and FWS's assessments of the risks to listed species posed by any such "preliminary activities." In more concrete terms, the *Deepwater Horizon* spill does not call into question the validity of the previous NMFS assessments that sperm whales will not be jeopardized by seismic studies attendant to the lease sale. And of course, in the absence of "new jeopardy," there can be no § 7(a) violation. *See, e.g., Wild Fish*, 628 F.3d at 523 (agency action only jeopardizes a species for ESA purposes if that action "causes some new jeopardy") (citation omitted).

"[i]f BOEM is not required to insure against jeopardy at this stage, the agency will never be required to satisfy this duty." (Doc. 127, at 3-4.) Plaintiff's fears in this regard are unfounded. After all, it is well-settled that "the Secretary must comply with ESA at every step of the oil development process." *Tribal Village of Akutan*, 869 F.2d at 1195; *see also Center for Biological Diversity*, 563 F.3d at 483 ("The welfare of animals is, by design, only implicated at later stages of the program, each of which requires ESA consultation and additional environmental review by Interior."). In light of these authorities, plaintiff's insistence that BOEM will get a free ride from ESA review during the exploration, development and production stages unless those stages are scrutinized now appears both inaccurate and incompatible with the stage-by-stage environmental review process that courts have pegged as being Congress's purpose in establishing the OCSLA framework. *See North Slope*, 642 F.2d at 595 ("The congressional intent to facilitate these lease sales, and to save until concrete a significant portion of substantive environmental determinations, compels this court to sanction the lease sale with confidence that environmental safeguards persist."). Moreover, insofar as DOW is arguing that BOEM has not engaged in ESA consultation with respect to approval of exploration / development / drilling plans, that contention is beyond the scope of the pleadings and encompasses issues over which this Court has no jurisdiction. It is of no consequence for purposes of this lawsuit whether BOEM is or not complying with § 7(a)(2) of the ESA as to subsequent OCSLA stages. This case is confined to the narrow question of ESA compliance at the lease sale stage, and this Court will not overstep jurisdictional and pleading boundaries to evaluate the agency's compliance (or lack thereof) at subsequent stages.[19]

---

[19]     By plaintiff's admission, DOW has sued BOEM in the Eleventh Circuit Court of Appeals challenging "BOEM's approval of an exploration plan (the next OCLSA stage) without ESA consultation." (Doc. 127, at 4.) Whether BOEM has violated § 7(a)(2) in connection with the exploration stage is a question for the Eleventh Circuit, not for this Court. And plaintiff will not be allowed in this case to ignore the clear segmentation and compartmentalization of OCSLA stages by insisting that ESA review at the lease sale stage was insufficient because it failed to account sufficiently for environmental effects of future stages. The law is crystal clear that "we must consider the environmental effects of a leasing program on a stage-by-stage basis, and correspondingly evaluate ESA's obligations with respect to each particular stage of the program." *Center for Biological Diversity*, 563 F.3d at 483. While plaintiff protests that this kind of staged analysis is unwise or may lead to skewed decision-making, it is not the place of this Court to ignore the will of Congress in establishing the compartmentalized OCSLA framework. *See Sec'y of Interior*, 464 U.S. at 342 ("The choice between these two policy (Continued)

For all of these reasons, the Court is of the opinion that BOEM's decision to continue approving bids associated with Lease Sale 213 after the *Deepwater Horizon* spill without awaiting the results of reinitiated consultation with expert agencies did not violate § 7(a)(2) of ESA.  More precisely, plaintiff has not met its burden of showing that BOEM's determination, without the benefit of reinitiated consultation, that approving bids for Lease Sale 213 was not likely to jeopardize the existence of any listed species or their critical habitat, was arbitrary, capricious, or an abuse of its discretion.  As to the narrow lease-sale stage at issue herein, the likely effects on listed species and critical habitat appear no different after *Deepwater Horizon* than before.  Certainly, BOEM did not abuse its discretion by so concluding.  Accordingly, and in light of the deferential standard of review governing this action under the APA, the Court finds that the Federal Defendants and Intervenor Defendants are entitled to entry of summary judgment in their favor as to Claim Four of the Third Amended Complaint.

**V.     The National Environmental Policy Act.**

Plaintiff's remaining claims allege violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), arising from BOEM's acceptance of bids for Lease Sale 213 without preparing a Supplemental Environmental Impact Statement ("SEIS"), and instead relying on stale, demonstrably invalid conclusions in the existing Environmental Impact Statement ("EIS") and Environmental Assessment ("EA").

**A.     *BOEM's NEPA Analysis Preceding the April 2010 Oil Spill.***

NEPA "is not a substantive environmental statute which dictates a particular outcome if certain consequences exist."  *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1214 (11th Cir. 2002).  Rather, "[t]he object of NEPA is to require federal agencies to consider environmental values when making decisions and the initial responsibility of the federal agency is to determine the extent of the environmental impact."  *Hill v. Boy*, 144 F.3d 1446, 1449 (11th Cir. 1998) (citations and internal quotation marks omitted).  In assessing an agency's compliance

---

arguments is not ours to make; it has already been made by Congress.").  Whether subsequent stages will or will not satisfy § 7(a)(2) review is of no moment to the issue joined in this action, to-wit: whether BOEM violated § 7(a)(2) by approving bids for Lease Sale 213 after the *Deepwater Horizon* spill without awaiting the results of reinitiated consultation with NMFS and FWS.

with NEPA, a reviewing court's "only role … is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 547 (11th Cir. 1996) (citation omitted). And, as previously noted, "[a] court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion in violation of the APA." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008).

NEPA requires federal agencies to prepare an EIS for any "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C); *see also U.S. Army*, 295 F.3d at 1215 (if the agency concludes "that the action will have a significant effect, then the project is 'major,' and the agency must prepare an environmental impact statement") (citations and internal quotation marks omitted).  "The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government."  40 C.F.R. § 1502.1; *see also U.S. Army*, 295 F.3d at 1215 (EIS must "provide full and fair discussion of significant environmental impacts") (citation omitted).

In April 2007, BOEM completed the Multisale EIS, which numbered more than 1,000 pages and addressed the entirety of the Five-Year Plan.  (AR, 1807-2883.)  Among other conclusions, that Multisale EIS indicated that expected impacts to coastal and marine water quality were minimal, that any offshore oil spills were not expected to cause significant damage to wetlands on the Gulf Coast, that no permanent loss of seagrass was projected to result from oil contact, and that oil spills from the Five-Year Plan had the potential to impact marine mammals, sea turtles, and other animals, even as probability of a major spill was deemed low.  (AR, 2702-06.)  BOEM also prepared a SEIS in September 2008 for the stated purpose of analyzing "the potential environmental effects of oil and natural gas leasing, exploration, development, and production in the 181 South Area for the proposed [Central Planning Area] sales."  (AR, 2888.)[20]

---

[20]     The SEIS explained that it was necessary to analyze potential environmental effects of development of the 181 South Area (a 5.8 million acre area in the Central Planning Area) because the Gulf of Mexico Energy Security Act of 2006 had repealed a previous Congressional moratorium on that area, prompting BOEM to make that area available for leasing in the Five-Year Plan beginning with Lease Sale 208, which was to occur in 2009.  The original EIS did not consider environmental impacts of drilling in the 181 South Area at all, hence the need for supplementation.  (*Id.*)

The SEIS was also intended to address "any and all new information available for the CPA and WPA since the publication of the Multisale EIS" in April 2007.  (*Id.*)  As to that new information, however, BOEM wrote that "[n]o signicant new information was found that would alter the impact conclusions as presented in the Multisale EIS.  In some cases, new information that supported these conclusions was found."  (AR, 2891-92.)

> ### B.     Lease Sale 213 and the SEIS Requirement.

Preparation of an EIS is not necessarily a failsafe, guaranteed means of compliance with NEPA.  In certain cases, after an EIS is published, the agency may receive additional information that reveals "significant effects on the quality of the human environment not previously considered," necessitating the preparation of an SEIS.  *Van Antwerp*, 526 F.3d at 1360.  "The standard for determining when an SEIS is required is essentially the same as the standard for determining when an EIS is required."  *U.S. Army*, 295 F.3d at 1215-16 (citation and internal quotation marks omitted).  Specifically, "[a] supplemental EIS is required only when the post-[original EIS] changes in the [project] will have a 'significant' impact on the environment that has not previously been covered by the [original] EIS."  *Id.* at 1221 (citation and internal quotation marks omitted); *see also* 40 C.F.R. § 1502.9(c)(1)(ii) (agencies must prepare a SEIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

NEPA and its SEIS requirement undoubtedly apply to the bid approval stage of an OCSLA drilling project.  *See Sec'y of Interior*, 464 U.S. at 338 (for OCS stage involving solicitation of bids and issuance of offshore leases, "[r]equirements of the National Environmental Protection Act … must be met first").  Plaintiff maintains that BOEM violated NEPA by continuing to approve bids for Lease Sale 213 in the days and weeks following the *Deepwater Horizon* accident without preparing a SEIS to consider the spill's impacts on Gulf resources or the overall risks of deepwater drilling in the Gulf.  To be clear, everyone agrees that BOEM did indeed prepare a SEIS after the *Deepwater Horizon* spill.  *See Defenders of Wildlife v. Bureau of Ocean Energy Management, Regulation, and Enforcement*, 791 F. Supp.2d 1158, 1166 (S.D. Ala. 2011) ("the Federal Defendants make a strong showing (which DOW does not counter or rebut) that, other than Lease 213, BOEM[] has not conducted and will not conduct any post-Deepwater Horizon lease sales under the Multi-sale EIS until the supplemental EIS is completed"); 75 Fed. Reg. 69122-01 (Nov. 10, 2010) ("BOEM[] is announcing its intent to

-26-

prepare a [SEIS] …. The SEIS will update the environmental and socioeconomic analyses in [the Multisale EIS]" and the September 2008 SEIS); doc. 113-1, at 16-17.[21]  It is likewise undisputed that this SEIS has now been completed and released, and that any BOEM authorization to conduct drilling operations under Lease Sale 213 will be informed by that SEIS.  At least in this case, DOW does not contest the adequacy of the SEIS, for purposes of informing future BOEM actions.  Rather, DOW's NEPA claims are narrowly focused on whether BOEM violated the statute by approving leases in Lease Sale 213 after the *Deepwater Horizon* explosion, rather than immediately suspending the Phase 2 approval process until the SEIS was prepared.  In plaintiff's words, its NEPA theory of liability is that "[s]imilar to BOEM's ESA violations, the agency opted to move ahead approving leases under Lease Sale 213 without supplementing its NEPA analyses to consider the spill's impacts on resources in the Gulf or the risks of deepwater drilling in the Gulf."  (Doc. 113-1, at 25.)

The Federal Defendants maintain that DOW's NEPA argument flows from a fundamental misunderstanding of the circumstances under which a SEIS is required.  In particular, the Federal Defendants point to Supreme Court authority explaining that the duty to prepare a SEIS is triggered when both of the following conditions are satisfied: (i) there remains major federal action to occur, and (ii) the new information is sufficient to show that the "remaining action" will affect the human environment in a significant manner or to a significant extent not already considered.  *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).  This Court has already concluded that "[a]cceptance of bids is a major federal activity because BOEM[] retained discretion to reject them and to consider noneconomic factors in deciding whether or not to approve them, and because the mere submission of a high bid (without more) did not confer upon the bidders any right to lease a particular tract without

---

[21]    Without question, the *Deepwater Horizon* spill was the motivating force for preparation of an SEIS.  Indeed, BOEM's November 2010 notice of intent to prepare the SEIS explained that such action was "deemed appropriate to supplement the NEPA documents … for these lease sales in order to consider new circumstances and information arising, among other things, from the Deepwater Horizon blowout and spill.  The SEIS analysis will focus on updating the baseline conditions and potential environmental effects of oil and natural gas leasing, exploration, development, and production in the WPA and CPA."  75 Fed.Reg. at 69122.

agency approval." *Defenders of Wildlife*, 791 F. Supp.2d at 1177-78.[22]  The question, then, is whether new information concerning the *Deepwater Horizon* disaster was sufficient to show that the "remaining action" would affect the human environment in a significant manner or to a significant extent not already considered.  If so, then BOEM was at least arguably[23] duty-bound to prepare a SEIS after the *Deepwater Horizon* spill before continuing to approve Lease Sale 213 bids.  If not, then it had no such obligation.[24]

        This inquiry, in turn, depends on how broadly the "remaining action" concept is construed.  The Federal Defendants persuasively argue that the remaining action for purposes of DOW's NEPA claim in this case is simply the approval of bids for Lease Sale 213.  As in the ESA context, federal courts applying NEPA requirements to the OCSLA framework have adopted a compartmentalized, stage-specific analysis.  *See Center for Biological Diversity*, 563 F.3d at 474 ("When faced with a multi-stage, pyramidic program such as the Leasing Program at issue here, NEPA's regulations allow an agency to conduct a tiered approach to preparing an EIS."); *Tribal Village of Akutan*, 869 F.2d at 1192 ("the amount and specificity of information necessary to meet NEPA requirements varies at each of OCSLA's stages"); *Village of False*

---

[22]        On summary judgment, the Intervenor Defendants urge the Court to revisit this determination based on their expanded legal and factual showing.  As it is unnecessary to do so in order to resolve the pending Rule 56 motions in their entirety, the Court declines this invitation.

[23]        The "arguably" qualifier is appropriate in recognition of the Federal Defendants' contention (which the Court need not reach) that the "new information" about the *Deepwater Horizon* spill was not known until well after April 20, 2010, because of the ongoing, evolving nature of the disaster, such that pinpointing a precise moment at which the requisite information became available to BOEM is difficult to do.  The Federal Defendants likewise insist that nothing in NEPA compelled them to cease work until such time as the dust settled, the situation in the Gulf stabilized, and the environmental effects of the April 2010 oil spill became known.  Again, the Court does not reach that argument.

[24]        *See National Committee for the New River v. F.E.R.C.*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (SEIS is necessary "if the new information shows that the remaining action will affect the quality of the environment in a significant manner or to a significant extent not already considered") (citation and internal quotation marks omitted); *Florida Keys Citizens Coalition, Inc. v. U.S. Army Corps of Engineers*, 374 F. Supp.2d 1116, 1146 (S.D. Fla. 2005) (to require a SEIS, "the new information must both (1) relate to the environment, and (2) have direct relevance to the proposed action or its impacts"); 40 C.F.R. § 1502.9(c)(1)(ii) (SEIS is required if new information bears "on the proposed action or its impacts").

*Pass*, 733 F.2d at 609 ("Under OCSLA's general environmental provision, NEPA … applies to each stage of its own force and effect.  OCSLA's specific references to NEPA at the leasing and development and production stages … provide additional impetus for its application."); *North Slope*, 642 F.2d at 606 (because "[t]he 1978 amendments to the OCSLA sanction the administrative practice of dividing OCS projects into leasing, exploration, and production stages," at the lease-sale stage, NEPA review is "chiefly (though not exclusively) concerned about those hazards associated with the limited preliminary activities permitted to the lessees during the lease sale phase") (footnotes omitted);[25] *Native Village of Point Hope v. Salazar*, 2010 WL 2943120, *2 (D. Alaska July 21, 2010) (OCSLA "and implementing regulations assign each phase its own environmental review requirements").[26]

As indicated *supra*, Congress has clearly expressed its intent to require stage-specific environmental review for OCLSA projects.  Moreover, both the pleadings and the jurisdictional constraints of OCSLA leave no doubt that DOW's NEPA claims are confined to BOEM's post-April 20, 2010 approval of bids on Lease Sale 213.  There are no claims or causes of action in this litigation (as distinguished from other actions that DOW has filed in other fora) alleging NEPA non-compliance in connection with the exploration, development or production phases of

---

[25]     The "not exclusively" language in *North Slope* does not undermine the analysis. The *North Slope* court indicated summarily via citation in a footnote that some limited discussion of future activities in a multistage project may be needed for an EIS to satisfy a rule of reason. Here, plaintiff has not shown that the rule of reason required BOEM to go further than it did to consider environmental consequences of lease approvals in April – June 2010.  At any rate, courts permit agencies "to defer certain issues in an EIS for a multistage project when … the unavailable information is not essential to determination at the earlier stage."  *Environmental Law and Policy Center v. U.S. Nuclear Regulatory Com'n*, 470 F.3d 676, 684 (7th Cir. 2006). Such is the case here.  BOEM did not need additional information about environmental effects of drilling to make a determination as to the environmental consequences of issuing leases, subject to the myriad limitations and retention of agency discretion under OCSLA, as of spring 2010.

[26]     One commentator summarized the process in the following terms:  "[T]iered review allows specific evaluation of environmental impacts at different stages of the offshore drilling process. … Instead of one overarching EIS for the process of leasing, exploring, drilling and decommissioning, the government is able to do a separate EIS for each individual stage." Rachael E. Salcido, *Enduring Optimism: Examining the Rig-to-Reef Bargain*, 32 ECOLOGY L.Q. 863, 915 n. 298 (2005).  That the Multisale EIS reached all stages does not imply that the lease-sale stage could not proceed post-*Deepwater Horizon* unless a SEIS reexamined those subsequent stages in light of new information.

the OCSLA process.[27]  For all of these reasons, the Court finds that the "remaining action" at issue in this case is simply the approval of bids for Lease Sale 213.  But the approval of bids, in and of itself, was not affected by "new information" gleaned from *Deepwater Horizon*.  Stated differently, nothing about the April 2010 oil spill suggests that the issuance of leases for Lease Sale 213 (or the "preliminary activities" authorized to the lessees by virtue of the approval of their bids) will affect the human environment in a significant manner or to a significant extent not already considered, as would be necessary to mandate preparation of a SEIS before the leases may issue.[28]

As one federal appeals court explained, "[w]e are the least troubled by what may seem to be incomplete or speculative data at the lease sale stage. … [A]ny technical deficiencies at the lease sale stage are unlikely to result in environmental damage, as a lease sale does not directly mandate further activity that would raise an oil spill problem."  *Tribal Village of Akutan*, 869 F.2d at 1192 (citations and internal quotation marks omitted).  Likewise, another appellate court opined that shortcomings in an EIS prepared at the lease sale stage of an OCSLA project were not violative of NEPA where "[t]he numerous and continuing constraints on the oil companies ensure that any future development in the Beaufort Sea will be highly studied and conscientious," "[t]he Secretary retains full power under the OCSLA to modify or disapprove any of the lessees' plans" that might harm the marine or coastal environment, and the "lease sale

---

[27]   In any event, the Federal Defendants state that BOEM now has prepared a SEIS which will be used in evaluating any future approval of drilling activities in connection with Lease Sale 213 or any other pending lease sale.  *See* doc. 119, at 43 ("BOEM has issued an SEIS for upcoming Lease Sales 216 and 222 (which, like Lease Sale 213 will be within the Central Gulf Planning area). … Any environmental analysis that may be necessary to support future actions taken on leases issued pursuant to Lease Sale 213, such as EPs, DOCDs, or APDs, will tier to this SEIS.").  Plaintiff does not dispute these representations that such an SEIS has been prepared and will govern future permitting activities and authorizations under Lease Sale 213.

[28]   To be sure, DOW notes that "leasing permits lessees to conduct preliminary activities, which also have environmental impacts."  (Doc. 127, at 15 n.12.)  But plaintiff does not argue that the *Deepwater Horizon* spill gives rise to any "new information" concerning the probable, likely, or possible effects to the human environment of those "preliminary activities," and the record reveals none.  The existing EIS already examines the effects of those "preliminary activities," as to which the April 2010 oil spill changes nothing.  (AR, 2100 *et seq.*)  As such, plaintiff's reference to those preliminary activities as a basis for requiring a SEIS before approval of bids and issuance of leases is a red herring.

is part of an OCS project which will necessarily occasion reevaluations before the anticipated –
but by no means assured – production of oil on a commercial scale." *North Slope*, 642 F.2d at
606.  These authorities weigh heavily against mandating an SEIS at the lease sale stage here
based on DOW's concerns about environmental effects of subsequent stages.

DOW's initial response to this line of reasoning is that "[l]easing and drilling are
intertwined for NEPA purposes and cannot be viewed in isolation." (Doc. 127, at 13.)  Plaintiff
cites no authority for this proposition, which is difficult to reconcile with the well-reasoned
appellate decisions discussed *supra*.  Next, DOW characterizes the Federal Defendants'
argument as being that "no meaningful Federal action remained."  (*Id.* at 15.)  That is incorrect.
This Court previously found in resolving the Rule 12(b) motions that approval of bids is a major
federal action.  The Federal Defendants have not attempted to relitigate that issue, but have
instead focused on the other *Marsh* requirement for issuance of a SEIS, to-wit:  That the new
information must show that the "remaining action" would affect the human environment in a
manner or to an extent not previously anticipated.  Again, nothing about the *Deepwater Horizon*
spill suggests that BOEM's approval of bids and issuance of leases for Lease Sale 213, without
more, would affect the human environment in a manner or to an extent not fully addressed within
the original EIS.

Nor does the Court find persuasive DOW's contentions that "BOEM is committed to a
program of exploration and development after the sale of leases" and that BOEM is engaging in
misdirection and sleight-of-hand by asserting "that Plaintiffs get NEPA review at whatever stage
of the process is not at issue."  (Doc. 127, at 17-18.)  As to the former, it is simply not accurate
that upon issuing leases, BOEM is bound to allow lessees to conduct unfettered full-scale drilling
operations at those locations.  *See, e.g., Sec'y of Interior*, 464 U.S. at 340-42 ("Congress has thus
taken pains to separate the various federal decisions involved in formulating a leasing program,
conducting lease sales, authorizing exploration, and allowing development and production.
Since 1978, the purchase of an OCS lease, standing alone, entails no right to explore, develop, or
produce oil and gas resources on the OCS. … Those activities may not begin until separate
federal approval has been obtained, and approval may be denied on several grounds."); 30 C.F.R.
§ 250.172(b), (d) (Regional Supervisor may suspend oil/gas operations in the OCS "[w]hen
activities pose a threat of serious, irreparable, or immediate harm or damage" to the environment,
or "[w]hen necessary to carry out the requirements of NEPA or to conduct an environmental

analysis"); *Village of False Pass*, 733 F.2d at 615 (observing that "the Secretary has full discretion to order modification of the plan for consistency with environmental, safety, and health requirements, *e.g.*, his discretion under NEPA. … The Secretary may cancel a lease for failure to comply with these plans over which he retains so large a discretion.") (citations and internal quotation marks omitted). The staged environmental review process that Congress carefully implemented via OCSLA (as federal appeals courts have recognized and enforced) would mean nothing if, as plaintiff suggests, BOEM is irrevocably committed to allow oil/gas exploration to proceed once it issues a lease. Applicable case law, statutes and regulations all undermine plaintiff's position that exploration, development and production are a *fait accompli* once a lessee receives an OCLSA lease.[29]

Plaintiff's latter objection – that BOEM's promises of careful NEPA review are an empty charade that effectively kicks the can down the street until a nonexistent day of reckoning – meets a similar fate. In essence, this argument boils down to DOW's belief that BOEM will never perform a meaningful NEPA analysis once it issues leases. (*See* doc. 127, at 18 ("the reality is that NEPA review is greatly abbreviated after the lease sale").) Again, Congress has

---

[29]     The Court is aware of DOW's reliance on *Commonwealth of Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983). That opinion lends superficial support to plaintiff's position. The *Watt* court opined that a SEIS was required at the lease sale stage, even though the lease did not confer drilling rights, because "[o]nce large bureaucracies are committed to a course of action, it is difficult to change that course – even if new, or more thorough, NEPA statements are prepared and the agency is told to 'redecide.'" *Id.* at 952-53. But the *Watt* rationale that "leasing sets in motion a chain of events that culminates in oil and gas development" was rejected by the Supreme Court in *Secretary of the Interior v. California.* 464 U.S. at 319. In that case, Justice O'Connor and the majority were unperturbed by the practical reality that "a lease sale is a crucial step," in which "[l]arge sums of money change hands, and the sale may therefore generate momentum that makes eventual exploration, development, and production inevitable." *Id.* at 342. Rather, the *Secretary of the Interior* Court emphasized that Congress had established the staged approach of an OCSLA leasing program, with separate environmental review at each step, for the purpose of "forestall[ing] premature litigation regarding adverse environmental effects that all agree will flow, if at all, only from the latter stages of OCS exploration and production." *Id.* at 341. DOW's challenge in this case is exactly the sort that the *Secretary of Interior* majority opinion indicates Congress intended to prevent. As such, the *Watt* language is not persuasive to DOW's cause, inasmuch as DOW would use it to erase clear statutory dividing lines and cram distinct, separate stages of OCSLA environmental review into a single undifferentiated stage, allowing environmental organizations to bring the type of premature drilling challenge that *Secretary of Interior* says Congress disallowed via the OCSLA framework.

enacted an express directive that courts conduct environmental review on a stage-by-stage basis for OCSLA purposes. The particular stage that is relevant to this proceeding is the lease sale stage. Not the exploration stage. Not the production stage. Not any other drilling stage. "If the distinction between a sale of a lease and the issuance of a permit to explore for, produce, or develop oil or gas seems excessively fine, it is a distinction that Congress has codified with great care." *Sec'y of Interior*, 464 U.S. at 335-36. The only issue before the undersigned is whether it was arbitrary, capricious or an abuse of discretion for BOEM to continue issuing leases after the *Deepwater Horizon* spill without stopping to prepare a SEIS. The Court finds that it was not, inasmuch as (i) BOEM already had the benefit of a comprehensive EIS which, as DOW concedes, covered all aspects of the leasing and development process; and (ii) nothing about the *Deepwater Horizon* event constituted "new information" that the approval of leases by BOEM would affect the human environment in a manner or to an extent different than that forecast by the original EIS. To be sure, the Court understands that DOW harbors concerns about whether adequate NEPA review will take place at the exploration drilling, development and production stages for Lease Sale 213. But those concerns are not part of any claim or cause of action validly joined in this action, and are not properly submitted to the undersigned for resolution, in any event, given the jurisdictional constraints imposed by OCSLA.[30]

      As previously stated, it is DOW's burden in this case to establish that BOEM violated its obligations under NEPA by issuing leases for Lease Sale 213 after April 20, 2010, without first preparing a SEIS. *See, e.g., Sierra Club v. U.S. Army Corps of Engineers*, 935 F. Supp. 1556, 1565 & n.12 (S.D. Ala. 1996) (explaining that under both NEPA and APA, the party challenging agency decision bears the burden of proving by a preponderance of the evidence that the agency did not act in conformity with statutory requirements). Moreover, under NEPA and the APA, a court cannot substitute its own judgment for that of the agency, but merely verifies that the agency abided by the applicable procedural requirements and reached a rational conclusion. *See*

---

[30]      Even if those contentions were properly submitted in the context of this action, the Federal Defendants have shown that they have indeed prepared a SEIS taking into account the *Deepwater Horizon* "new information," and that this SEIS will govern every subsequent drilling approval in connection with Lease Sale 213. (Doc. 130, at 16-17.) This sounds a lot like the kind of NEPA analysis that DOW protested would and could never happen as a practical matter once the leases were issued.

*Arkansas Wildlife Federation v. U.S. Army Corps of Engineers*, 431 F.3d 1096, 1104 (8th Cir. 2005) ("Our role is limited to verifying that the agency considered the relevant factors and did not make a clear error in judgment.").  Upon careful review of the administrative record and the arguments presented in the parties' briefs, the Court finds that DOW has failed to meet its burden of showing that BOEM acted arbitrarily, capriciously, or in abuse of discretion by continuing to approve bids for Lease Sale 213 in the immediate aftermath of the *Deepwater Horizon* spill. Where, as here, "a multistage project can be modified or changed in the future to minimize or eliminate environmental hazards disclosed as the result of information that will not become available until the future, and the Government reserves the power to make such a modification or change after the information is available and incorporated in a further EIS, it cannot be said that deferment violates the rule of reason." *Suffolk County v. Secretary of Interior*, 562 F.2d 1368, 1378 (2nd Cir. 1977).  On that basis, the Court finds that the Federal Defendants and Intervenor Defendants are entitled to judgment as a matter of law on the NEPA claims joined herein.

**VI.    Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.    Plaintiff's Motion for Summary Judgment (doc. 113) is **denied**;

2.    The Federal Defendants' Cross-Motion for Summary Judgment (doc. 118) is **granted**;

3.    The Joint Motion for Summary Judgment (doc. 117) filed by certain Intervenor Defendants is **granted**;

4.    This action is **dismissed with prejudice** in its entirety; and

5.    A separate judgment will enter.

DONE and ORDERED this 8th day of May, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE